# EXHIBIT A

**Sloan Securities Corp.**
**444 Madison Avenue, 23rd Floor**
**New York, NY 10022**

December 27, 2004

Drinks Americas Holdings, Ltd.
And Drinks Americas, Inc.
372 Danbury Road
Wilton, CT 06897
Attn: Bruce Klein, Chairman

Re: Investment Banking Agreement

Dear Bruce:

This letter confirms the agreement ("Agreement") of Drinks Americas, Inc. and its affiliated companies, (referred to herein as the "Company") to retain Sloan Securities Corp. ("SSC"), to provide during the Term (as hereinafter defined), the services described below.

1.       Services          SSC agrees to perform such of the following financial advisory and investment banking services ("Services") as the Company reasonably and specifically requests:

1.1       Advisory Services. SSC will (i) familiarize itself to the extent it deems appropriate and feasible with the business, operations, properties, financial condition and prospects of the Company; (ii) advise the Company's management in corporate finance, structuring the nature, extent and other parameters of any transaction; and (iii) evaluate financial matters and assist in financial arrangements and investment banking transactions, including assistance and advice with regard to maximization of shareholder value. In consideration of such financial advisory services and as a material inducement for SSC to enter into this Agreement, the Company shall pay to SSC upon the closing of the Bridge Financing (as hereinafter defined) the sum of Thirty Five Thousand Dollars ($35,000). The foregoing compensation shall be in addition to any other compensation and reimbursement of expenses described herein.

1.2       Financing. The Company is also engaging SSC, except as contemplated in Section 7.9 of this Agreement, on a exclusive basis to use its reasonable efforts to introduce the Company to corporations, partnerships, mutual funds, hedge funds, accredited investors, investment partnerships, securities firms, lending and other institutions and entities (collectively, if introduced by SSC "Entity or Entities") which may engage in or provide financing in the range of Six Million ($6,000,000.00) Dollars to Ten Million ($10,000,000.00) Dollars to the Company in the form of equity or equity-linked securities of the Company. The specific terms and conditions of the Financing shall ultimately be agreed to by the Company and the Entities after good faith negotiations, subject to market conditions. As used herein, the term

PK016

_____, President
December 20, 2004
Page 2

"Entities" also means and includes any party, which is directly or indirectly connected with or related to one of the Entities described above including, without limitation, all affiliates as well as any referral from any of the Entities. The Financing will be made in accordance with the exemption from the registration requirements of the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder (collectively, the "Act") provided by Regulation D under the Act ("Regulation D") and the qualification and registration requirements of applicable state and foreign securities or blue sky laws and regulations. If requested by SSC, the Company will, at the closing of the Financing, furnish SSC with the same favorable opinion of its outside counsel as is furnished to the investors, addressed to SSC or together with a letter from such counsel that SSC may rely on its opinion as if directed to SSC. Such opinion will include customary items contained in legal opinions rendered in connection with Financing transactions, including, among other things, opinions on matters relating to organization and good standing, capitalization, corporate power and authority, and exemption of Financing. In addition, at the closing of the Financing, the Company will provide SSC with the same certificates of the officers of the Company as are furnished to the investors and such other certification, opinions and documents as SSC or its counsel may deem appropriate, in form and substance satisfactory to SSC and its counsel, including any updates of the Company's representations and warranties set forth herein. Prior to the consummation of the Financing, it is also contemplated that SSC shall use reasonable efforts to introduce the Company to Entities for the purpose of providing bridge financing (the "Bridge Financing") to the Company of up to $550,000 on terms substantially set forth in the Bridge Term Sheet, attached hereto as Schedule B.

1.3    **Reasonable Efforts.** SSC agrees to devote such time and effort to the affairs of the Company as is reasonable and adequate to render the Services contemplated by this agreement. The Company understands and agrees that SSC shall not be responsible for the performance of any services which may be rendered hereunder without the Company providing the necessary information in writing prior thereto, nor shall SSC include any services that constitute the rendering of any legal opinions or performance of work that is in the ordinary purview of the Certified Public Accountant. SSC does not guarantee results on behalf of the Company, but shall pursue all reasonable avenues available through its network of contacts. At such time as an interest is expressed by a third party in the Company's needs, SSC shall notify the Company and advise it as to the source of such interest and any terms and conditions of such interest.

1.4    SSC's sole compensation in connection with the Financing and Bridge Financing shall be a "Financing Fee" (as set forth in Section 4 below) upon consummation of the applicable financing in any form with any Entity introduced by SSC to the Company.

1.5    The Company acknowledges that SSC's responsibilities shall be limited to the foregoing, and that SSC shall have no responsibility for fulfilling any reporting or filing requirements of the Company pursuant to applicable federal and state securities laws. In addition, the Company expressly acknowledges and agrees that SSC's obligations hereunder are on a reasonable best effort basis only and that the execution of this Agreement does not constitute a commitment by SSC to purchase the securities or any other securities of the

PK017

_____, President

December 20, 2004
Page 3

Company and does not ensure the successful placement of the securities or any portion thereof.

    2.    Term

    This Agreement shall take effect immediately upon execution and shall continue for an initial term of one hundred eighty (180) days ("Term"). Thereafter, the Agreement will terminate unless renewed by the parties in writing. Notwithstanding the expiration or termination of this Agreement, the indemnification, contribution, reimbursement and "tail" obligations of the Company shall survive and all previously paid fees (including, without limitation, any securities previously issued to SSC) shall be retained by SSC on a non-accountable basis.

    3.    Information

    In connection with SSC's engagement hereunder, the Company will furnish SSC and any prospective Entity with any information concerning the Company that SSC reasonably deems appropriate and will provide SSC and prospective Entities with reasonable access to the Company's officers, directors, accountants, counsel and other advisors, subject to the Company's non-disclosure agreement. In addition, SSC shall be kept fully informed of any events that are reasonably likely to have a material effect on the financial condition of the Company. The Company represents and warrants to SSC that all such information concerning the Company and all private placement materials, whether in the form of a letter, circular, memorandum, notice or otherwise to be used in selling the securities ("Materials") will be true and accurate in all material respects and will not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements therein not misleading in light of the circumstances under which such statements are made. The Company acknowledges and agrees that SSC will not undertake any "due diligence" investigation and will be using and relying upon the information supplied by the Company and its officers, agents and others, the Materials, and any other publicly available information concerning the Company.

    4.    Fees

    In consideration of SSC's services, SSC shall be entitled to receive, and the Company hereby agrees to pay to SSC, the following:

    4.1    Financing Fees.    (a)    Unless otherwise provided herein, either (i) upon closing of a Financing Entities introduced by SSC to the Company or (ii) upon rejection by the Company of a Financing by an Entity introduced by SSC that is ready, willing and able to consummate the Financing on terms the Company had previously agreed (a "Late Rejection"), SSC shall receive a Financing Fee payable by wire transfer or by other immediate available funds equal to 5% of the Financing Amount (as defined below), and shall be paid as proceeds are received by the Company from each Financing, or promptly following a Late Rejection. Any portion of SSC's Financing Fee that is attributable to proceeds to be received by the Company upon the occurrence of a future event, or the satisfaction of a contingency shall be paid when the

PK018

_____, President

December 20, 2004
Page 4

event occurs or the contingency is satisfied and the funds are received by the Company.. In addition to the foregoing, upon consummation of a Financing or promptly following a Late Rejection, the Company will issue to SSC and/or its designee(s) warrants (the "Warrants") to purchase such number of securities as shall be equal to 5% of the number of securities (including stock and warrants) issued to (or which would have been issued in the case of a Late Rejection) investors in the Financing at the same per share price or exercise price applicable to securities sold in the Financing. The Warrants shall be exercisable for a period of five years from the date of closing with an exercise price equal to the effective per price share paid by the Entities participating in the Financing. The terms of the Warrants shall be set forth in one or more agreements (the "Warrant Agreements") in form and substance reasonably satisfactory to SSC and the Company. The Warrant Agreements shall contain customary terms, including without limitation, provisions for change of control, corporate and full ratchet price protection anti dilution(except for compensatory stock options) and registration rights consistent with the registration rights granted to the Entities. In addition, the Company shall also be responsible for SSC's reasonable legal fees and expenses incurred in connection with any Financing or a Late Rejection not to exceed $30,000 in the aggregate to be paid at the initial closing of the Financing or promptly following the Late Rejection.

   (b)    Unless otherwise provided herein, either (i) upon closing of a Bridge Financing with Entities introduced by SSC to the Company or (ii) a Late Rejection by the Company relating to a Bridge Financing by an Entity introduced to the Company by SSC, SSC shall receive a Financing Fee payable by wire transfer or by other immediate available funds equal to 10% of the Financing Amount (as defined below), and shall be paid as proceeds are received by the Company from each closing of the Bridge Financing, or promptly following a Late Rejection. Any portion of SSC's Financing Fee that is attributable to proceeds to be received by the Company upon the occurrence of a future event, or the satisfaction of a contingency shall be paid when the event occurs or the contingency is satisfied and the proceeds are received by the Company. In addition, the Company shall also be responsible for SSC's reasonable legal fees and expenses incurred in connection with the Bridge Financing or a Late Rejection not to exceed $10,000 in the aggregate to be paid at the initial closing of the Financing or promptly following the Late Rejection.

   (c)    It is understood and agreed that to the extent the Company consummates any financing transaction within one year following the expiration or termination of this Agreement with an Entity or Entities introduced by SSC to the Company during the Term, the Company shall pay SSC upon the consummation of such financing a "tail" fee equal to the financing fees which would have otherwise been payable to SSC had such financing been consummated during the Term as described above. In furtherance of the foregoing, within fifteen business days following the expiration or termination of this Agreement SSC shall provide the Company with a written list of Entities introduced to the Company during the Term.

   4.2    SSC's Financing Fee shall have been earned and shall be payable to SSC upon consummation of any Financing (or pursuant to a Late Rejection) which occurs during the term of this Agreement with Entities introduced by SSC to the Company. It is intended that

PK019

, President

December 20, 2004
Page 5

"Introduced" shall have its commonly understood meaning in Financings such as those contemplated in this Agreement. Moreover, an Entity shall be deemed to have been introduced by SSC to the Company if (i) SSC has taken any steps to develop or communicate a specific Financing with the Company to that Entity, even if that Entity has previously been known to the Company or (ii) SSC merely brings such Entity to the attention of the Company, provided that the Company had no prior contacts with that Entity. In addition, no fee payable by the Company to any agent, lender or investor shall reduce or otherwise affect any fee payable by the Company to SSC hereunder.

4.3     As used herein, the term "Financing Amount" shall mean the gross amount of all consideration, including without limitation to, all cash, cash equivalents, stock, warrants, and/or assets that is exchanged or provided to the Company or its shareholders, affiliates, or subsidiaries in a Financing, or which would have been provided to such individuals or entities but for a Late Rejection.

5.     Non-Circumvent.

In order to prevent the Company from circumventing SSC's position with an Entity, the Company agrees that whether or not any Financing concerning the Company is completed, for a twelve month period commencing from the date of this Agreement, without the prior express written consent of SSC, that the Company will not (a) contact an Entity introduced to the Company by SSC during the term of this Agreement in order to (i) deprive SSC of the fees it is entitled pursuant to this Agreement or (ii) arrange any other type of transaction with such an Entity introduced to the Company with SSC; or (b) otherwise circumvent SSC's right to earn a fee pursuant to this Agreement or otherwise with respect to Entities introduced to the Company with SSC in any manner whatsoever.

6.     Indemnification

The Company shall indemnify SSC under the indemnification provisions attached hereto as Schedule A and made a part hereof.

7.     General Provisions.

7.1     Any and all claims, disputes, or controversies arising out of this Agreement will be resolved by arbitration before the American Arbitration Association ("AAA") and that with respect to this Agreement, a party may seek injunctive relief and ancillary damages before the AAA. Each party irrevocably consents to subject matter jurisdiction before the AAA. The parties shall restrict themselves to claims for compensatory damages and no claims shall be made by any party for punitive or similar damages. The parties agree that any award or decision by the AAA shall be final and binding upon the parties and a judgment may be entered in a court of competent jurisdiction upon such award or decision. The parties agree that the situs of any arbitration or legal proceedings hereunder shall be the City of New York.

PK020

_____, President
December 20, 2004
Page 6

   7.2    This Agreement may not be amended or modified except in writing signed by both parties to the Agreement.

   7.3    All notices and other communications hereunder shall be deemed given upon (a) the sender's confirmation of receipt of a facsimile transmission to the recipient's facsimile number set forth below, (b) confirmed delivery by a standard overnight carrier to the recipient's address set forth below, or (c) delivery by hand to the recipient's address set forth below (or, in each case, to or at such other facsimile number or address for a party as such party may specify by notice given in accordance with this Section 7.3):

      (a)    If to the Company, to:

             Drinks Americas Holdings, Ltd.
             Drinks Americas, Inc.
             372 Danbury Road
             Wilton, CT 06897
             Attn: Bruce Klein
             Fax:  (203) 762-8992

      (b)    If to SSC, to:

             James C. Ackerman
             Sloan Securities Corp.
             Two Executive Drive
             Fort Lee, NJ 07024
             Fax: (201) 592-0695

   7.5    SSC shall perform its services hereunder as an independent contractor and not as an employee of the Company or an affiliate thereof. It is expressly understood and agreed to by the parties hereto that SSC shall have no authority to act for, represent or bind the Company or any affiliate thereof in any manner, except as may be agreed to expressly by the Company in writing from time to time.

   7.6    The Company hereby represents that it is a sophisticated business enterprise that has retained SSC for the limited purposes set forth in this letter, and the parties acknowledge and agree that their respective rights and obligations are contractual in nature. Each party disclaims an intention to impose fiduciary obligations on the other by virtue of the engagement contemplated by this letter.

   7.7    Neither the execution and delivery of this Agreement by the Company nor the consummation of the transactions contemplated hereby will, directly or indirectly, with or without the giving of notice or lapse of time, or both: (i) violate any provisions of the Certificate of Incorporation or By-laws of the Company; or (ii) violate, or be in conflict with, or constitute default under, any agreement, lease, mortgage, debt or obligation of the Company or require the

                                                                        PK021

_____, President
December 20, 2004
Page 7

payment, any pre-payment or other penalty with respect thereto. The Company has all requisite power and authority to enter into and perform its obligations under this Agreement. This Agreement has been duly executed and delivered and constitutes valid and binding obligations of the Company, enforceable against the Company in accordance with their respective terms.

7.8    In the event that other services are required and/or transactions which are the result of SSC's efforts that are not as contemplated herein, the parties hereto shall negotiate in good faith to determine a mutually acceptable level of compensation in such an eventuality.

7.9    SSC is aware that the Company will attempt to secure additional financing through debt or equity offerings, or otherwise. Such financing, if raised, will be used to repay the Bridge Financing and for working capital. In the event the Company is successful with these efforts, SS will not be entitled to compensation under this Agreement unless it had introduced the Entity that provided such financing to the Company. Notwithstanding the foregoing, the Company agrees that it will cease all efforts with respect to the foregoing on receipt of written notice by SSC that it expects to begin marketing efforts with respect to the Financing within the succeeding 14 days.

7.10   SSC acknowledges that the Company's shareholders have entered into a Exchange Agreement whereby, among other things, the Company will become a subsidiary of a public company named Gourmet Group, Inc, the Company's shareholders will acquire a majority interest in the public company (the "Reverse Acquisition") and Gourmet Group, Inc. will change its name to Drinks Americas Holdings, Ltd.("Holdings"). Promptly after the closing of the Reverse Acquisition, the Company will cause Holdings to assume and reissue the Bridge Note described on Schedule B attached hereto and to execute this letter agreement on its own behalf. On execution of this letter by Holdings the defined term "Company" referred to in this Agreement will automatically become Drinks Americas Holdings, Ltd. and its affiliated companies.

[BALANCE OF PAGE INTENTIONALLY LEFT BLANK]

PK022

_____, President
December 20, 2004
Page 8


If the foregoing is acceptable to you, please sign and return the enclosed copy of this letter to my attention.

Very truly yours,

SLOAN SECURITIES CORP.

By: _____
James C. Ackerman
Chief Executive Officer and President



AGREED AND ACCEPTED THIS
_____ DAY OF DECEMBER, 2004:

DRINKS AMERICAS HOLDINGS, LTD.
DRINKS AMERICAS, Inc. .

By: _____
Bruce Klein, Chairman

PK023

# EXHIBIT B

_____, President

December 20, 2004
Page 12

## Schedule B

## BRIDGE FINANCING TERM SHEET

| | |
|---|---|
| Company: | Initially Drinks Americas' Inc. (Drinks") to be assumed by Drinks Americas Holdings, Ltd. (the "Company") on the closing of the Reverse Acquisition. |
| Placement Agent: | Sloan Securities Corp. ("SSC" or "Agent") |
| Amount: | $550,000 |
| Investment: | Senior Convertible Promissory Notes ("Notes") and warrants (the "Warrants"). |
| Terms of the Notes: | |
| Maturity Date: | The Notes shall mature upon the earlier of (i) one year after the date of issuance or (ii) consummation of any financing transaction by Drinks or the Company with a minimum gross proceeds of $6 million. Notwithstanding the foregoing, at the holders' option, the Notes shall be satisfied, in whole or in part, from the proceeds of any debt or equity financing consummated by the Company. |
| Payment Terms: | Principal and accrued interest on the Notes shall become due and payable in one installment on the one year anniversary of the date of issuance. |
| Interest Rate: | 10% per annum, calculated on actual calendar days elapsed and a 360-day year basis. Interest shall be paid in cash. |
| Security: | The Notes shall be unsecured obligations of Drinks, but drinks will not issue secured obligations to any third party without the Note holder's consent while the Notes are outstanding.. |
| Conversion: | The Notes shall, at any time and at the holders of the Notes option, convert into the equity or other securities sold in the Financing that is contemplated in connection with the investment banking agreement in which this term sheet forms a part (hereinafter the "IB Financing") at the lower of $.75 per share or the price per share of the IB Financing. |
| Terms of the Warrant: | The purchasers of Notes shall receive 100% Warrant coverage so that assuming all $500,000 of principal amount of Notes are sold, such purchasers would receive five-year warrants to purchase 500,000 shares of common stock at an exercise price equal to the price per share of securities sold in the IB Financing.. Alternatively, in the event the IB Financing is not consummated on or before June 1, 2005, the exercise price and other conversion features of the Warrants from such point forward shall be $1 per share. The Warrants shall contain customary corporate antidilution adjustments in the event of stock splits, stock dividends, and recapitalizations and "full ratchet" price protection (except for compensatory stock options). The Warrant shall contain a "cashless exercise" feature. |

-PK 084-

_____, President
December 20, 2004
Page 13

| | |
|---|---|
| Securities Purchase Agreement: | The parties will use commercially reasonable efforts to execute a definitive securities purchase agreement (the "Securities Purchase Agreement") and other appropriate documents on or prior to December 31, 2004. The Securities Purchase Agreement will contain its representations, warranties, conditions and covenants customary for transactions of this type. The Securities Purchase Agreement shall be governed by and construed in accordance with the law of the State of New York. |
| Conditions to Closing: | Closing subject to negotiation of definitive legal documents. |
| Use of Proceeds: | Proceeds from the investment shall be used for working capital purposes only. |
| Fees and Expenses: | Upon consummation of the Bridge Financing, the Company shall pay to SSC a cash fee equal to 10% of the principal amount of Notes issued in the Bridge Financing. Each party will bear its own expenses relating to the transactions contemplated hereby, except that the Company shall pay the reasonable fees and expenses of Littman Krooks LLP, counsel to the Agent, not to exceed $10,000. |
| Other Terms: | The parties recognize that matters material to the transactions contemplated hereby that are not addressed in this Term Sheet may be raised by one another for inclusion in the Securities Purchase Agreement. |
| Non-Binding Term Sheet; Exceptions: | The parties acknowledge that this is a non-binding term sheet and no party shall be under any obligation to the other unless and until a Securities Purchase Agreement is executed. |

# EXHIBIT C

AMENDMENT NO. 1 TO

INVESTMENT BANKING AGREEMENT

THIS AMENDMENT, dated February 24, 2005 (this "Amendment"), between **Drinks Americas, Inc.**, a Delaware corporation (the "Company"), and **Sloan Securities Corp.**, a New Jersey corporation ("SSC").

## WITNESSETH

WHEREAS, the parties hereto have heretofore entered into an Investment Banking Agreement, dated December 27, 2004 (the "Agreement"); and

WHEREAS, the Company and SSC wish to amend the Agreement to, among other things, increase the amount to be raised under the Bridge Financing,

NOW, THEREFORE, the parties hereto, in consideration of the mutual promises herein contained and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, hereby agree to amend the Agreement as follows:

1.    Definitions; References; Continuation of Agreement. Unless otherwise specified herein, each term used herein that is defined in the Agreement shall have the meaning assigned to such term in the Agreement. Each reference to "hereof," "hereto," "hereunder," "herein" and "hereby" and each other similar reference, and each reference to "this Agreement" and each other similar reference, contained in the Agreement shall from and after the date hereof refer to the Agreement as amended hereby. Except as amended hereby, all terms and provisions of the Agreement shall continue unmodified and remain in full force and effect.

2.    Amendments to the Agreement. The following changes shall be made to the Agreement:

    (a)    The last sentence of Section 1.2 shall be amended in its entirety to reads as follows:

"Prior to the consummation of the Financing, it is also contemplated that SSC shall use reasonable efforts to introduce the Company to Entities for the purposes of providing bridge financing (the "Bridge Financing") to the Company of up to $1,000,000 on terms substantially set forth in the Bridge Term Sheet, attached hereto as Schedule B."

    (b)    The first sentence of Section 2 shall be amended in its entirety to reads as follows:

"This Agreement shall take effect on February 24, 2005 and shall continue for an initial term of one hundred eighty (180) days therefrom (the "Term").

    (c)    The Term Sheet shall be amended, to the extent necessary, to reflect the amendments referred to above. In addition, the Conversion Price described therein shall be amended to mean the lower of (i) $0.45 per share or (ii) the price per share in the IB Financing.

3.    Counterparts. This Amendment may be executed in counterparts, all of which shall be one, and the same, agreement.

4.    Governing Law. This Amendment shall be governed by and construed in accordance with the laws of the State of New York.

IN WITNESS WHEREOF, the parties hereto have caused this Amendment to be duly executed on the date first above written.

SLOAN SECURITIES CORP.                      DRINKS AMERICAS, INC.

By: _____                By: _____
   James C. Ackerman                          Bruce Klein
   President and Chief Executive Officer       Chairman of the Board

2

# EXHIBIT D

1

1                    UNITED STATES SUPERIOR COURT
                     DISTRICT OF NEW JERSEY
2                    CIVIL ACTION NO. 07 Civ. 5590

3    PHILLIP KASSAI,                :

4              Plaintiffs,  :
                                         DEPOSITION OF:
5         -vs-                :
                                      JAMES L. ACKERMAN
6    DRINKS AMERICA HOLDINGS,   :
     LTD.,
7                              :
              Defendants.
8    ----------------------------

9

10                    TRANSCRIPT of testimony as taken

11   by and before HELEN DOHOGNE, a Certified Shorthand

12   Reporter and Notary Public of the State of New

13   Jersey, at the law offices of SLOAN SECURITIES,

14   Two Executive Drive, Fort Lee, New Jersey, on

15   December 17, 2007, commencing at 11:50 a.m.

16

17

18

19

20

21

22

23

24

25

□

2

```
 1   A P P E A R A N C E S :

 2          MOSKOWITZ & BOOK
            1372 Broadway
 3          New York, New York 10018
            (212) 221-7999
 4          BY:  SUSAN J. WALSH, ESQ.
            Attorneys for the Plaintiffs
 5
            SHELDON H. GOPSTEIN, ESQ.
 6          130 West 42nd Street
            New York, New York 10030
 7          (212) 363-2400
            Attorneys for the Defendants
 8
            THE HAMBURGER LAW FIRM
 9          West Palisade Avenue & James Street
            Englewood, New Jersey 07631
10          BY:  ROBERT ROSS, ESQ.
            (201) 705-1200
11          For the Witness

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

☐

```
 1                  I N D E X
```

```
 2   WITNESS            DIRECT  CROSS  RE-DIRECT  RE-CROSS

 3   JAMES L. ACKERMAN

 4   Mr. Gopstein       4

 5

 6

 7                    E X H I B I T S

 8   Number              Description              I.D.

 9   D-E      Deposition Subpoena                  4

10   D-F      Deposition Subpoena                  4

11   D-G      Securities Purchase Agreement       82
             By and Between Drinks Americas
12           Holdings, Ltd., and the
             Investors Named Herein
13
     D-H      Letter dated September 29, 2005     82
14
     D-I      Promissory note                     85
15
     D-J      Drinks Americas Holdings, Ltd.,     86
16           Registration Rights Agreement

17   D-K      Escrow deposit agreement            88

18   D-L      Escrow deposit agreement            88

19           EXHIBITS RETAINED BY COUNSEL

20

21

22

23

24

25
```

☐

                                                    4

```
 1                 (Deposition subpoena is marked as

 2   D-E for identification.)

 3                 (Deposition subpoena is marked as
```

4     D-F for identification.)

5     J A M E S   L.   A C K E R M A N,

6           Two Executive Drive

7           Fort Lee, New Jersey, sworn:

8     DIRECT EXAMINATION BY MR. GOPSTEIN:

9           Q.     Good morning, Mr. Ackerman.  My

10    name is Sheldon Gopstein.  I represent Drinks

11    Americas Holdings, Ltd., the defendant in an

12    action brought by Phillip Kassai now pending in

13    the United States District Court for the Southern

14    District of New York.

15               I'm going to ask you some questions

16    here today.  You're under oath.  Do you understand

17    the meaning of your oath?

18    A.     Yes.

19         Q.     And I want to first show you what

20    has been marked previously as Defendant's Exhibits

21    E and F.  They are the deposition subpoenas.

22               Did you receive those subpoenas and

23    are you testifying in connection with those

24    subpoenas here today?

25    A.     Yes, but I'm not appearing at the law

☐

5

1     office of Sheldon H. Gopstein.  We're doing the

2     deposition here at my office at Two Executive

3     Drive.

4          Q.     Other than the location, are you

```
 5    testifying here today pursuant to those subpoenas?

 6    A.     Yes.

 7           Q.      And what is your capacity with

 8    respect to Sloan Securities Corp.?  What is your

 9    title?

10    A.     I am the CEO and president.

11           Q.      And with respect to Sloan Equity

12    Partners, are you -- what is your affiliation?

13    A.     I am a minority partner.

14           Q.      Did you get a chance to -- when you

15    received the subpoenas did you get a chance to

16    look at the request for documents?

17    A.     Yes.

18           Q.      Did you make a diligent search for

19    documents that are called for in the subpoenas?

20    A.     We have not had sufficient time to do a

21    full search.

22           Q.      How much time do you think you

23    would need to do a full search for the subpoena --

24    I'm sorry, for the documents that are called for

25    in the respective subpoenas?
```

☐

                                            6

```
 1    A.     Through counsel I had indicated that I

 2    thought we'd be okay by the first week in January.

 3           Q.      Okay.  And so with that

 4    understanding and having spoken with your counsel

 5    before, we're going to proceed with the deposition

 6    here today and I'm going to ask you as many
```

```
 7   questions as I can relevant to the case and about

 8   the documents that you have produced.

 9              We're obviously going to need to

10   keep the deposition record open pending the

11   production of additional documents.

12        Q.    Mr. Ackerman, have you ever been

13   deposed before?

14   A.    Yes.

15        Q.    In a litigation or by the NESD?

16   A.    By FINRA.

17        Q.    Have you ever been deposed in any

18   court case of any kind other than a regulatory

19   proceeding?

20   A.    Good question.

21        Q.    Every once in a while I ask a good

22   question.

23   A.    I don't believe so.

24        Q.    Have you ever been a party to a

25   lawsuit, a plaintiff or a defendant to any
```

□

7

```
 1   lawsuit?

 2   A.    Yes.

 3        Q.    Could you just briefly tell me

 4   about that?

 5   A.    Sure.  I owned a car that my wife was

 6   driving while she was four or five months pregnant

 7   and a cab driver who was not paying attention
```

8    plowed into her in New York City.

9         Q.    We don't need to go any further.

10   A.    Oh, I'm sorry.

11        Q.    You were involved in an auto

12   dispute that turned into some kind of a

13   litigation?

14   A.    Correct.

15        Q.    Right?

16              Have you been involved as a

17   plaintiff or a defendant in a lawsuit other than

18   the car accident?

19   A.    Is an arbitration through FINRA considered

20   litigation?

21        Q.    Okay.  Let's clarify that.  Yes.

22   Let me --

23   A.    Sure.

24        Q.    Let's include litigation or

25   arbitration.

☐

                                            8

1    A.    The answer is yes.

2         Q.    What arbitrations have you been

3    involved in?

4    A.    I have brought an arbitration against a

5    former registered rep of Sloan Securities.

6         Q.    What is the name of that registered

7    rep?

8    A.    Harry Friedman.

9         Q.    Does that have anything whatsoever

10    to do with Drinks Americas or Phil Kassai?

11    A.    No.

12              MR. ROSS:  I can represent to you

13    that none of the current litigations which are the

14    only ones that Mr. Ackerman will testify to have

15    anything to do with Drinks Americas.

16        Q.    All right.  Let's go then to

17    regulatory proceedings.  Have you or your firm

18    been the subject of any regulatory proceedings by

19    NESD now FINRA, New York Stock Exchange or any

20    others?

21    A.    Yes.

22        Q.    Please describe those.

23              MR. ROSS:  Do the best you can.

24    You're the witness.

25    A.    Do you want me going back?  Do you want me

☐

                                              9

1    answering questions about irrelevant things?  I

2    need a little guidance here.

3        Q.    All right.  It's difficult to know

4    before you answer the question whether the subject

5    matter is relevant or not.

6    A.    As a broker dealer regulated by FINRA we

7    are subject to examinations roughly every two

8    years.  We are always asked questions and we are

9    always examined by them and have been on a regular

10    basis since our founding in 1987.

11          Q.      Have any investigations by FINRA,

12    and by that I'm referring to what used to be

13    called the NESD as well, let's include FINRA and *

14    NASDAQ together.  Have any investigations by FINRA

15    resulted in any disciplinary action?

16    A.    Yes.

17          Q.      Let's just focus on the ones that

18    resulted in some disciplinary action.

19    A.    Sure.  Many years ago I was fined for

20    acting as a FINOP.  I don't remember whether it

21    was $2,000 or $3,000.  Seven years ago, something

22    like that.  And then 2003 I believe it was we

23    entered into a settlement with what was then the

24    NESD.  The firm was accused of hanging a

25    registered rep's license.  We entered into a

☐

                                                        10

 1    settlement for $6,000.

 2          Q.      What else?

 3    A.    That's it.

 4          Q.      Those two?

 5    A.    Yes.

 6          Q.      Are there any currently pending

 7    FINRA investigations or investigations by any

 8    other regulatory authorities concerning you or

 9    Sloan Securities Corp.?

10    A.    Yes.

11          Q.      Can you tell me the nature of those

12    investigations?

13  A.     They are dealing with the operations of the

14  firm.  Again, we get reviewed every two years and

15  all sorts of parts of the firm get reviewed.

16          Q.     Okay.  In answering one of the

17  questions by plaintiff's counsel I thought you

18  indicated that there was some sort of an ongoing

19  investigation regarding actions taken by Dan Myers

20  or the firm in connection with Drinks Americas.

21  Is that true?

22  A.     I'm not sure how to answer that question.

23  That's --

24          Q.     All right.  Then --

25  A.     -- it's a very open ended question.  I'm

11

1   not sure how to answer that.

2           Q.     Let me try to rephrase it then.  Is

3   there anything ongoing at FINRA regarding

4   activities by Dan Myers while he was employed at

5   Sloan Securities?

6   A.     Yes.

7           Q.     What is the nature of that

8   investigation?

9   A.     A lack of supervision of -- a lack of

10  proper supervision of Dan Myers.

11          Q.     So you are personally being charged

12  with a failure to supervise --

13  A.     Yes.

14          Q.      -- with respect -- specifically

15    with respect to Dan Myers?

16    A.    Yes.

17          Q.      Have you been charged with any --

18    with a failure to supervise any other employees?

19    A.    Yes.

20          Q.      Who was that?

21    A.    Harry Friedman.

22          Q.      All right.

23                  MR. ROSS:  I'm not sure that's

24    accurate.

25                  THE WITNESS:  You've got to help me

☐

                                                    12

1     with this.

2                  MR. ROSS:  At the risk of

3     testifying here, I'll just -- let me try to

4     clarify what's going on.

5                  To the extent that the FINRA

6     investigation has anything at all to do with

7     anything remotely connected to Drinks Americas, it

8     is, as Jim stated accurately, a lack of

9     supervision over Dan Myers in particular.

10                 There is no mention whatsoever

11    about Drinks Americas, any of the transactions

12    that relate to Drinks Americas in particular.

13                 Mr. * Myers --

14                 THE WITNESS:  Right --

15                 MR. ROSS:  -- had his own counsel

16    and had his own disciplinary action that, you

17    know, had nothing to do with Sloan Securities, was

18    not represented by our firm or anyone paid for by

19    Sloan Securities.  He had his own defense counsel,

20    so whatever outcome occurred, occurred there.

21             As far as what's existing for this

22    firm, meaning Sloan Securities Corp. currently,

23    the only thing relating to Mr. Myers, Kassai or

24    Drinks -- I shouldn't say Mr. Kassai -- nothing

25    relates to Mr. Kassai.  To the extent that Drinks


                                                13


1    Americas has any relation whatsoever is with

2    respect to whatever Mr. Myers' activities were and

3    to the extent that that relates to Sloan

4    Securities it's an alleged failure to supervise

5    Mr. Myers, and any substantive allegations against

6    Mr. Myers have been handled by the NESD/FINRA

7    separately with Mr. Myers himself.

8    BY MR. GOPSTEIN:

9         Q.    What is the status of the

10   proceeding against Sloan Securities today?

11   A.    Pending.

12        Q.    Pending.  Have you given an

13   on-the-record interview at the NESD?

14   A.    Yes.

15        Q.    Have you since -- have you received

16   a Wells notice?

17    A.     Yes.

18           Q.     Have you entered into an AWC?

19    A.     No.

20           Q.     So the action -- the procedure is

21    just pending?

22    A.     Correct.

23           Q.     Are you negotiating a settlement at

24    this point?

25    A.     The matter is pending at this point.

□

                                                                        14

1            Q.     Does the failure to supervise have

2     anything to do with anything that Dan Myers did at

3     Signature Bank to your knowledge?

4     A.     I don't know how to respond to that.

5     It's -- there's nothing dealing with Signature

6     Bank in the Wells notice.  I guess that's the best

7     way to put it.

8            Q.     All right.  What activities are you

9     alleged to have failed to supervise properly

10    according to FINRA?

11    A.     Just overall acting as a * proper 24.

12           Q.     What is it that Mr. Kassai has

13    allegedly done wrong that you failed to supervise

14    according to FINRA?

15    A.     Mr. Kassai has not been alleged to have

16    done anything wrong.

17           Q.     What is the nature of your failure

18    to supervise as you understand it according to the

19    FINRA proceeding?

20    A.    Right now I'm disputing what -- what it is,

21    so I'm not sure how to answer your question.

22              MR. GOPSTEIN:  All right.  Let

23    me -- to the extent the documents are not

24    confidential, I don't believe that they are, I

25    would call for the production of the Wells notice

15

1    and any other documents relating to the ongoing

2    investigation at FINRA.  Mr.  --

3              MR. ROSS:  I'm not sure exactly

4    what that request means.  I need to see it in

5    writing because you're talking about thousands and

6    thousands of pages having been produced to FINRA

7    most of which I believe was sent electronically,

8    so I'm not even sure that I have -- I know I don't

9    have copies of the vast majority of it.

10              MR. GOPSTEIN:  I certainly -- let

11    me just be clear.  I certainly don't want you to

12    produce all the documents to me that you produced

13    to FINRA.

14              I started off by saying the Wells

15    notice.  The Wells notice would clearly tell me

16    the scope of what they're looking at and what

17    they're investigating, so what I'd like to see --

18              THE WITNESS:  With all due respect,

19    why is that any of your business?

20              MR. GOPSTEIN:  Because it is.

21              With all due respect, I'm calling

22    for the production of the Wells notice and the

23    response to the Wells notice, and if I need to go

24    further I will.

25              MR. ROSS:  There's been no written

                                            16

1    response to the Wells notice, and I'd ask you

2    for -- for either attorney because I --

3    unfortunately I wasn't -- I should have been

4    expecting, but I did not expect that we would be

5    asked to produce additional documents, and I would

6    need a formal request, an amendment to what you

7    already have out there.

8              MR. GOPSTEIN:  I'll be more than

9    happy to put it in writing.  When you say you

10    didn't expect to be asked to produce --

11              MR. ROSS:  I didn't bring a pad and

12    paper to right it down expecting you would ask for

13    a host of extra documents.

14              MR. GOPSTEIN:  That's fine.  I'm

15    going to send you a written request for at least

16    the Wells notice in connection with this

17    proceeding, and also obviously we're looking for

18    the full production of documents that your client

19    indicated he hasn't yet had a chance to produce,

20    and we'll talk about the timing of that.

21              MR. ROSS:  I just want to clarify

22    one thing, too, because we exchanged e-mails, you

23    and I and Susan collectively on Friday.

24              On Friday I produced the documents

25    that were able to be located which are pretty

17

1    significant.  I've got them here in a mini Redwell

2    here.

3              Mr. Gopstein indicated that they

4    were not responsive as to the dates, so I think

5    they were -- some documents maybe that preceded

6    the ones that we did produce we did have someone

7    here pretty much throughout the week trying to

8    locate documents.

9              I don't know that other documents

10   necessarily exist.  In other words, what

11   Mr. Ackerman has said, it will probably take us

12   until the beginning of January to get them

13   together.

14              What I'm saying is we've had

15   someone trying to get them together for the better

16   part of a week, and I don't know that there are in

17   fact any additional outstanding documents.

18              To the extent there are, we'll get

19   them together and produce them based on your

20   e-mail saying we didn't produce I believe it was

21   the `04 documents, but we did produce the `05

22   documents.

23          MR. GOPSTEIN:  Right.  I don't want

24    to spend a whole lot more time on the record here,

25    but I'll certainly confirm that there was a

☐

                                                            18

1     production of documents by e-mail on Friday;

2     however, it is clear to me that the documents

3     weren't complete, and that's why I sent you my

4     e-mail, and it's even clearer now that your client

5     has said he just doesn't know whether this is a

6     complete production, hasn't had a chance to

7     determine whether it is or it isn't.

8               THE WITNESS:  Correct.

9               MR. GOPSTEIN:  I have good reason

10    to believe it's not.

11              MR. ROSS:  Okay.

12              MR. GOPSTEIN:  Let's just leave it

13    at that and hopefully --

14              MR. ROSS:  Okay.

15              MR. GOPSTEIN:  -- we'll get --

16              MR. ROSS:  To the extent you're

17    going to ask for additional documents today on the

18    record that were not part of either of the

19    subpoenas, I'm going to request those in writing.

20              MR. GOPSTEIN:  You got it.

21    BY MR. GOPSTEIN:

22        Q.    Mr. Ackerman, when is the last time

23    you spoke with Phillip Kassai?

24    A.    A few weeks ago.

```
25          Q.     What did you talk about?
```

19

```
 1   A.     We talked about the dealings with Sloan

 2   Asset Management.

 3          Q.     Do you still have ongoing business

 4   affairs with Mr. Kassai?

 5   A.     We and Phil, myself and Dan are partners in

 6   a company called Sloan Assets Management.

 7          Q.     What is the business of Sloan Asset

 8   Management?

 9   A.     Great question.  It's -- we have other

10   partners there.  Joshua Segal and Michael Appleby,

11   and Phil, Dan and I funded the startup to finance

12   insurance premiums for large insurance policies.

13             The business -- we put money in.

14   We haven't gotten any money out and we are

15   currently in a dispute with the operating partner

16   who is Josh Segal, so I talked to Phil and Dan

17   about these things.

18          Q.     When was Sloan Asset Management

19   formed approximately?

20   A.     `05?  Early `05?

21          Q.     And when is the last time you spoke

22   to Dan Myers?

23   A.     Last week.

24          Q.     What did you talk to him about?

25   A.     Sloan Asset Management.
```

20

```
 1        Q.      Anything else?
 2   A.    No.
 3        Q.      Have you had occasion to speak to
 4   Phil Kassai or Dan Myers about anything having to
 5   do with this lawsuit?
 6   A.    At any time, yes.
 7        Q.      Let's take it one at a time.  When
 8   have you spoken with Phil Kassai about this
 9   lawsuit?
10   A.    I don't remember.
11        Q.      Was it this year, 2007?
12   A.    Yes.
13        Q.      Did you also speak with him -- what
14   did you talk about in sum and substance?
15   A.    The suit.
16        Q.      What about the suit?  What did you
17   say to him and what did he say to you?
18   A.    He said to me that he was bringing a suit
19   against Drinks Americas.
20        Q.      And what did you say?
21   A.    I said, okay, why.  He said, because I
22   think Drinks screwed us.
23        Q.      What did you say?
24   A.    I said, you're probably right.
25        Q.      And what did he say?
```

21

```
 1   A.      He said the stock was 45 cents and it went

 2   up to three fifty.  They didn't respond to any of

 3   our requests for warrants, and so I'm going to sue

 4   them.

 5          Q.      And what did you say?

 6   A.      Good luck.

 7          Q.      Did he ask you why you weren't

 8   suing them?

 9   A.      Yes.

10          Q.      What did you say?

11   A.      I said I had enough problems at the moment.

12   I didn't need to get involved in another lawsuit

13   and go through the expense of hiring an attorney.

14          Q.      And when you said you had enough

15   problems at the moment, what problems were you

16   referring to?

17   A.      The arbitrations and the FINRA examinations

18   that we're going through.

19          Q.      Okay.  Did that conversation that

20   you're describing happen all at once or are you

21   summarizing several conversations?

22   A.      Several.

23          Q.      All right.  Can you break them down

24   for me?  Did they differ in any way?

25   A.      I don't remember.
```

☐

22

1          Q.       Did you offer him any assistance in

2     the lawsuit, tell him you would help him in any

3     way?

4     A.     I said I would produce whatever documents

5     are necessary.

6          Q.       When is the last time or did you

7     ever speak to Dan Myers about the lawsuit?

8     A.     Yes.

9          Q.       When?

10    A.     On -- when we were trying to figure out how

11    many warrants we were entitled to, Danny was the

12    investment banker on the deal, and so he had close

13    hands-on knowledge on it, and we literally worked

14    together to figure out the 217,000 -- I think it's

15    500 warrants that we feel that we're entitled to

16    in addition to the 300,000 that were issued to

17    Sloan Equity Partners.

18         Q.       So is it your belief that your --

19    that Sloan Securities or Sloan Equity Partners is

20    actually entitled to 517,500 warrants from Drinks

21    Americas?

22    A.     I believe you have the documents that show

23    what we believe.

24         Q.       I'm asking you from your

25    recollection because I don't have any such

☐

23

1     document that says you're entitled to 517,500

2    warrants.

3    A.    Sloan Equity Partners was erroneously

4    issued a stock warrant for 300,000 warrants.  It

5    should have been to Sloan Securities Corp.  We

6    sent a letter to Drinks Americas asking that that

7    warrant be executed, and then we sent a request

8    for another 217,500 warrants to be split up as the

9    letter states.

10        Q.    In what way was the warrant for the

11    300,000 shares issued in error as you say?

12    A.    It should have been --

13        Q.    Or I think the word you used was

14    erroneous.

15    A.    Sure.

16        Q.    How was it erroneous?

17    A.    It should have been issued to Sloan

18    Securities Corp. as opposed to Sloan Equity

19    Partners.

20        Q.    Why was it issued to Sloan Equity

21    Partners?

22    A.    My understanding is because that's what Dan

23    Myers requested of Mr. Bruce Klein.

24        Q.    Were you involved in the

25    negotiation or execution of that warrant for

☐

                                                    24

1    300,000 shares?

2    A.    No.

3        Q.    Just to be clear, I'm going to put

4    it in front of you so we make sure we're talking

5    about the same thing.  Plaintiff's Exhibit 5 was

6    previously marked at another deposition.  It is a

7    stock purchase warrant dated May 9, 2005.

8    A.    That's the one.

9         Q.    Is that the document that you're

10   referring to?

11   A.    Yes.

12        Q.    And you believe that this was

13   erroneously issued to Sloan Equity Partners when

14   it should have been issued to Sloan Securities

15   Corp., correct?

16   A.    Correct.

17        Q.    All right.  Did Sloan Equity

18   Partners have any right or entitlement to any

19   warrants whatsoever when this was executed?

20   A.    Yes and no.

21        Q.    Please explain.

22   A.    Sloan Securities Corp. is the party to the

23   investment banking agreement.  Remuneration under

24   the investment banking agreement can only be paid

25   to a broker dealer; however, the broker dealer has

25

1    the right to give compensation to whichever

2    registered reps it wants.

3              My agreement with Phil Kassai and

4    Dan Myers was to split up any warrants that we got

5   as follows:  40 percent for Mr. Kassai, 40 percent

6   for Mr. Myers and 20 percent for myself.

7              Sloan Equity Partners was a

8   partnership between the three of us that we had

9   formed to invest in certain companies that we were

10  raising money for and put warrants into those --

11  into that partnership name at some point.

12      Q.    So the intent was to receive

13  warrants or compensation for various companies and

14  then to use Sloan Equity Partners as a vehicle for

15  holding --

16  A.    Sometimes.  If you take a look at the

17  letters that we sent to Drinks you'll see we

18  parceled it up among the reps that we felt were

19  entitled to the warrants there and asked that they

20  be assigned as such.

21      Q.    Okay.  I'll show you what has been

22  marked as Defendant's Exhibit B.  It is a letter

23  dated April 2, 2007 from Sloan Securities to Bruce

24  Klein, Chairman.

25              Is this the type of letter that

26

1   you're referring to?

2   A.    Yes.

3              MS. WALSH:  Off the record for a

4   second.

5              (Discussion off the record.)

6   BY MR. GOPSTEIN:

```
 7        Q.        Does the April 2, 2007 letter from

 8   Sloan to Drinks ask for any warrants to be issued

 9   to Sloan Equity Partners?

10   A.     No.

11        Q.        Why not?

12   A.     Because we're assigning them directly to

13   the registered reps that would be entitled to

14   them.

15        Q.        So then, again, on May 9, 2005 why

16   did the warrant get issued to Sloan Equity

17   Partners?

18   A.     As I stated previously, it was an error.

19        Q.        An error by Dan Myers?

20   A.     I was told that Dan Myers had asked -- by

21   Dan Myers that he had asked that it be put into

22   this name.

23        Q.        Did you ever ask him why he did

24   that?

25   A.     I did.
```

□

                                                        27


```
 1        Q.        What did he say?

 2   A.     He claims I told him to.

 3        Q.        That is not true, is it?

 4   A.     No, that is absolutely not.

 5        Q.        Is it your understanding that a

 6   broker dealer can only receive compensation in its

 7   own name and cannot assign the compensation prior
```

8    to receiving it?

9    A.    I think I stated that in the answer to my

10   earlier question.

11        Q.    I wanted to follow up on that.  You

12   actually did.

13   A.    Right.

14        Q.    What is your understanding of the

15   rules at FINRA regarding the receipt of

16   compensation?

17   A.    Compensation has to come to a broker

18   dealer.  Then a broker dealer can pay registered

19   reps as it sees fit, but only registered people.

20        Q.    But the compensation must be

21   initially paid to the broker dealer?

22   A.    Right.

23        Q.    So it would have been improper for

24   the compensation, in this case, the stock purchase

25   warrant, to go directly to Sloan Equity Partners?

□

                                                        28

1    A.    Which is why I pointed it out as an error

2    in correspondence to Drinks.

3         Q.    And is it your understanding that

4    it would be a violation of FINRA rules for the

5    warrant to be paid directly to Sloan Equity

6    Partners?

7    A.    Yes.  Because Sloan Equity Partners is not

8    a registered entity.

9         Q.    Other than being owned by the

10     principals or former principals of Sloan

11     Securities Corp., what relationship does Sloan

12     Equity Partners have to Sloan Securities Corp.?

13     A.     I have to correct what you just said.  The

14     only principal of Sloan Securities that was a

15     partner of Sloan Equity Partners is me.

16            Q.     At no time was Phillip Kassai an

17     officer or director of Sloan Securities Corp.?

18     A.     No.

19            Q.     And was Dan Myers ever an officer

20     or executive director of Sloan Securities?

21     A.     No.

22            Q.     What was Dan Myers' title or

23     position at Sloan Securities Corp. while he was

24     employed there?

25     A.     Managing director of investment banking.

☐

                                                   29

1             Q.     What was Phillip Kassai's position?

2      A.     Managing director of investment banking.

3             Q.     Did you indicate that Phillip

4      Kassai resigned voluntarily?

5      A.     Yes.

6             Q.     And -- but you terminated Dan

7      Myers, correct?

8      A.     Correct.

9             Q.     And if you could I don't want to

10     repeat what was testified to earlier this morning,

11    but could you just summarize the reasons why you

12    terminated Dan Myers?

13    A.    He was found to have violated a number of

14    our WSP's written supervisory procedures of the

15    firm, and he was found to have violated a number

16    of FINRA rules.

17        Q.    And did any of those violations

18    have anything to do with Drinks Americas?

19    A.    I don't know.

20        Q.    Well --

21    A.    The ones that we found, no.

22        Q.    Not the ones that you found?

23    A.    Correct.

24            MS. WALSH:  Whenever it's time for

25    a break, there's something I need to tell you,

☐

                                                    30

1    Sheldon.  It's probably that buzzing on the phone.

2            (Discussion off the record.)

3            MR. GOPSTEIN:  That was Mr. Ross'

4    office calling in error by the way, but we

5    appreciate their diligence in following up.

6            So we're back here, and what was

7    the last question.

8            (The follow was read back:

9            "QUESTION:  And did any of those

10    violations have anything to do with Drinks

11    Americas?

12            "ANSWER:  I don't know.

```
13                "QUESTION:  Well --

14                "ANSWER:  The ones that we found,

15   no.

16                "QUESTION:  Not the ones that you

17   found?

18                "ANSWER:  Correct.")

19                THE WITNESS:  Can I take a minute

20   break here?

21                MR. GOPSTEIN:  Sure.

22                (A short recess is taken.)

23   BY MR. GOPSTEIN:

24        Q.    Mr. Ackerman, is there something

25   that you needed to clarify because I saw you kind
```

31

```
1   of shaking your head a minute ago.  Feel free to

2   clarify something if you need to.

3   A.    Very good.

4        Q.    Is there anything?

5   A.    I'm sure we'll get to it.

6        Q.    Okay.  We were on the subject of

7   the reasons you terminated Dan Myers.

8   A.    Right.

9        Q.    And I had asked you whether any of

10   those reasons had anything to do with --

11   A.    Drinks Americas.

12        Q.    -- Drinks Americas.

13   A.    And the answer was no.
```

14        Q.      Okay.  Did you subsequently

15   determine that Dan Myers did anything improper in

16   relation to your client, Drinks Americas?

17   A.    Yes.

18        Q.      Was that --

19   A.    I was hoping you'd get to the question.

20        Q.      Was that after you fired him?

21   A.    Yes.

22        Q.      Okay.  What did you put on his U-5

23   at the time that you terminated him in general --

24   in sum or substance?

25   A.    I don't remember.  My chief compliance

32

1   officer would have done it.  I don't remember.  We

2   can certainly produce it, but I don't remember.

3              MS. WALSH:  Sorry.  Are we just

4   going to reserve all objections on both mine and

5   your --

6              MR. GOPSTEIN:  I think that's what

7   we're doing on both sides.

8              MS. WALSH:  Sorry to interrupt.

9              THE WITNESS:  That's okay.

10        Q.      If you don't mind I would also call

11   for the production of Dan Myers' U-5.

12   A.    Sure.

13        Q.      And any amendments to the U-5.

14   A.    Sure.

15              MS. WALSH:  It's publicly filed.

16              THE WITNESS:  Right.

17      Q.      Although you say that your

18  compliance officer handled this -- by the way, who

19  was your compliance officer at the time?

20  A.      Ford Prigot, P-R-I-G-O-T.

21      Q.      Did you have conversations with

22  your compliance officer prior to filing Dan Myers'

23  U-5?

24  A.      Yes.

25      Q.      And did you talk about the reasons

33

1   he was being fired?

2   A.      Yes.

3       Q.      Did you talk about what you were

4   going to put on his U-5?

5   A.      Yes.

6       Q.      What --

7   A.      I don't remember exactly what we ended up

8   putting on the U-5.  As I stated previously, we'll

9   be happy to give you a copy.

10      Q.      Did you ever or did the firm amend

11  Dan Myers' U-5 at any time?

12  A.      His U-5?

13      Q.      His U-5.

14  A.      Not that I remember.

15      Q.      Because according to, and correct

16  me if I'm wrong, but you indicated that you found

17    subsequent wrongdoing after he had already been

18    terminated.

19    A.    No, that's incorrect.  Now let me tell

20    you --

21         Q.    Go ahead.

22    A.    Okay.  When Phil Kassai told me he was

23    going to sue Drinks Americas --

24         Q.    Give me an approximate time frame.

25    A.    I don't remember.  I told him exactly what

34

1    I said to you earlier in my statement.

2              I then received a phone call from

3    an attorney who said they were representing Drinks

4    Americas.

5         Q.    Was it Joe Kannella?

6    A.    Yes.

7         Q.    When was this?

8    A.    I don't remember.

9         Q.    2006?  2007?

10    A.    I don't remember if it was late `06 or `07.

11    I can check and see when the date was.  I really

12    just don't remember but he insinuated to me that

13    Dan Myers had done something wrong, and that was

14    the first that I knew about anything possibly

15    happening, so I did not have any proof of

16    anything.  I had no firsthand knowledge of

17    anything.

18              An insinuation from a lawyer for

19    Drinks Americas that Dan Myers had raised money

20    for Drinks and not given it to Drinks but taken it

21    himself and then subsequently given it back to

22    investors who had put that money up is what was

23    insinuated to me.  I had no proof of anything.  I

24    had no knowledge of anything.  That was the first

25    that I had heard of it.

                                                        35

1         Q.      Did you investigate that

2    allegation?

3    A.    Well, he was no longer an employee of Sloan

4    Securities at that point.

5         Q.      But the allegation was that he had

6    done this while he was employed at Sloan

7    Securities?

8    A.    Yes, yes, that is correct.

9         Q.      Did you determine whether it was

10   true or not?

11   A.    I called Danny and I asked him pointblank,

12   and he said under advice of counsel he really

13   can't get into anything, but that he had made

14   right whatever he had done as he was doing and all

15   of the things that he was doing.

16        Q.      Did Joe Kannella tell you that an

17   investor had actually called Drinks Americas and

18   asked where his stock was and that's how they knew

19   that Sloan had raised money?

20    A.    Honestly I don't remember that.

21        Q.    Do you remember anything else that

22    Joe Kannella told you during that conversation?

23    A.    He insinuated that it wouldn't be in Sloan

24    security's interests to pursue the warrants that

25    we were entitled to.  He insinuated that Mr. Klein

                                                    36

1    had signed the $300,000 warranty and wasn't paying

2    attention at the time and didn't really mean to do

3    it, and I questioned him about that because I

4    didn't understand that comment.

5        Q.    So did he tell you that Bruce Klein

6    had signed the May 9, 2005 warrant without

7    authority?

8    A.    Yes.  That is what he claimed.

9        Q.    Did you --

10    A.    I asked him how does a CEO -- excuse me,

11    how does a chairman of a company sign a warrant

12    without authority.

13        Q.    Did he explain to you that Bruce

14    Klein is a non-executive member of the board?

15    A.    No, he did not.

16        Q.    Did he explain to you that there

17    was never any corporate resolution whatsoever

18    authorizing Bruce Klein to sign that warrant?

19            MS. WALSH:  Objection.

20    A.    No, he did not is the answer to the

21    question.

22          Q.      But he simply told you that Bruce

23   Klein didn't have authority to sign it?

24   A.      Correct.

25          Q.      And so Joe Kannella was disputing

37

1    the validity of the stock warrant, correct?

2    A.      Correct.

3          Q.      And he also told you that Dan Myers

4    or that he thought Dan Myers had done something

5    improper with respect to money raised for Drinks

6    Americas?

7    A.      He insinuated that.  He didn't out and out

8    say anything.

9          Q.      Okay.  Have you subsequently found

10   out whether or not what Joe Kannella insinuated is

11   true?

12   A.      No.

13          Q.      Have you inquired or made any

14   investigation whatsoever?

15   A.      I spoke to Dan, as I said.

16          Q.      But Dan refused to answer your

17   question?

18   A.      Pretty much, yes.

19          Q.      Did you find anything else out from

20   Phillip Kassai or anyone else?

21   A.      I spoke to Phil about it.  He had no

22   knowledge of it.

23      Q.      All right.  Is it your testimony

24   that while Dan Myers was allegedly doing this you

25   had no knowledge of it whatsoever?

                                                              38

 1   A.      What are we talking about?

 2           Q.      Well, would you describe in your

 3   own words what you believe Dan Myers was accused

 4   of doing?

 5   A.      I believe I did that earlier, that he was

 6   accused of raising money and then not giving it to

 7   Drinks Americas.

 8           Q.      So let's call it, for lack of a

 9   better term, diverting money that was supposed to

10   go to Drinks Americas elsewhere.  Is that --

11   A.      I have -- I don't know.

12           Q.      Okay.  I'm just -- I want to just

13   call it something.  The event.  You want to call

14   it the event of diverting money?  Okay.

15                   Did you do anything to investigate

16   or inquire whether Dan Myers had in fact diverted

17   money from Drinks Americas for his own use?

18   A.      As I stated before, I called Dan and I

19   called Phil.

20           Q.      And that's it?

21   A.      Checked -- took a look at e-mails.  Didn't

22   see anything there.

23           Q.      When money is raised by Sloan

24   Securities Corp. for a client like Drinks

25    Americas, for instance, where does that money go?

☐

                                                                        39

 1    A.     It goes into an escrow account.

 2           Q.      And what bank were you using at the

 3    time that -- at the time that you were dealing

 4    with Drinks Americas?

 5    A.     Signature Bank.

 6           Q.      Did you have any other banks?

 7    A.     No.

 8           Q.      So all of Sloan Security's business

 9    accounts were at Signature Bank?

10    A.     No.  All of Sloan Securities' escrow

11    account for escrow banking is at Signature Bank.

12           Q.      Did you have business accounts

13    outside of Signature Bank?

14    A.     Oh, yes.

15           Q.      Where?

16    A.     Bank of America.

17           Q.      But no investor monies --

18    A.     Correct.

19           Q.      -- or escrow funds were at Bank of

20    America?

21    A.     Correct.

22           Q.      Did you have separate escrow

23    accounts at Signature Bank for each particular

24    deal, for each particular client, for each

25    particular investor, how did that work?

40

1   A.      For each particular deal we entered into an

2   escrow agreement with the bank and with the

3   client.

4          Q.      Who would be the signatories on the

5   account on these escrow accounts?

6   A.      Me.

7          Q.      Just you?

8   A.      Yes.

9          Q.      And what would the title of the

10  escrow account be?  For instance, for Drinks

11  Americas what would the title be?

12  A.      Escrow account for Drinks Americas.  I mean

13  it would be a general name of the client.

14         Q.      It would be under the name Drinks

15  Americas or would it be Sloan Securities Corp. for

16  the benefit of Drinks Americas, or how --

17  A.      I guess it would be Sloan Securities for

18  the benefit -- I don't remember, but, yes, it

19  would be something along those lines.

20         Q.      Okay.  The reason I ask is that I

21  have been in touch with Sloan -- I'm sorry, I've

22  been in touch with Signature Bank and they can't

23  find a single account, so what they've told me is

24  I'm probably not giving them the proper name or

25  proper title.

41

1                    I certainly don't have the account

2       numbers.  What I'm going to do now and pursuant to

3       your counsel's request, I'm going to be more than

4       happy to put this in writing as well, I'm going to

5       call for the production of the account numbers and

6       titles of each and every escrow account that Sloan

7       Securities had at Signature Bank that had anything

8       to do with Drinks Americas or their investors,

9       okay?

10      A.      Ah-hum.

11              Q.      Are we talking about one account,

12      two accounts, ten accounts?  Do you have any idea

13      how many that would be?

14      A.      Probably just one or two.

15              Q.      Just one or two.

16      A.      Yes.

17              Q.      Okay.  If possible I would

18      appreciate the account numbers also.  That would

19      help us trace them more quickly.

20      A.      Okay.

21              Q.      If you were the sole signatory on

22      the escrow accounts set up by Sloan Securities

23      Corp. for Drinks Americas, how could it be that

24      Dan Myers would be able to divert money out of

25      that account for his own purpose?

☐

42

```
 1   A.     First of all, let me correct one thing.

 2   When an escrow account is set up between Sloan

 3   Securities and a client, there are actually two

 4   signatures required.  There's a signature of mine

 5   and a signature of a representative of the client.

 6   Most often it's usually the CEO or the chairman of

 7   the client.

 8        Q.     Do you know who --

 9   A.     Now --

10        Q.     -- on behalf of Drinks was the

11   co-signer on the escrow --

12   A.     I don't remember.  We have to look at the

13   documents.

14        Q.     To the best of your recollection --

15   A.     To the best of my recollection it would

16   have been Bruce Klein because he signed all of the

17   documents with us including the investment banking

18   agreements.

19        Q.     But it would have definitely been

20   you and someone else from Drinks?

21   A.     That is correct.

22        Q.     So go ahead.

23   A.     To answer your question about Dan Myers, it

24   would have to be something illegally done without

25   my knowledge.
```

□

                                                    43

```
 1        Q.     Are you aware whether Dan Myers has
```

2    forged your signature or any Drinks Americas'

3    signature?

4    A.    That I don't know.

5         Q.    Was Dan Myers ever an authorized

6    signatory on any escrow accounts?

7    A.    No.

8         Q.    At Signature Bank?

9    A.    No.

10        Q.    Who was the account manager or

11   officer at Signature Bank with whom you dealt?

12   A.    It was the manager.  I don't remember his

13   name.  I don't remember his name.  I'd have to

14   look it up for you.

15        Q.    Could we leave a blank in the

16   transcript and if possible get me that information

17   even before the transcript comes back?

18   A.    Sure.

19        Q.    Again, the name of the person at

20   Signature Bank that you primarily dealt with --

21   A.    Sure.

22        Q.    -- in connection with your escrow

23   accounts?

24   A.    Ah-hum.

25        Q.    Do you have any information as to

□

                                                      44

1    what funds or how many -- or how much money was

2    allegedly diverted from Signature Bank by Dan

3    Myers?

4   A.     No.

5          Q.     Do you know whether it was in

6   connection with the December `04 investment

7   banking agreement or the September `05 investment

8   banking agreement?

9   A.     As I previously stated, I didn't even know

10  it happened, so the answer is no.

11         Q.     When is the very first time that

12  you learned that it did happen or that it may have

13  happened?

14  A.     The phone call from Drinks Americas'

15  attorney, Joe.

16         Q.     Joe Kannella?

17  A.     Kannella, yes.

18         Q.     And you don't remember when that

19  was?

20  A.     No.

21         Q.     Do you have any record, diary,

22  calendar, anything that would indicate

23  approximately when that phone call -- phone

24  conversation took place?

25  A.     I don't think so.

☐

45

1          Q.     Is there any document that would

2   help refresh your recollection as to when that

3   call took place?

4   A.     That I don't know.

5          Q.      If you were to try to investigate

6     and go back and recreate what date that was, how

7     would you do that?

8     A.      I'm not sure.

9          Q.      Mr. Ackerman, I'm going to show you

10    what has been previously marked as -- actually,

11    let's work off of the one that you already have in

12    front of you which is Defendant's Exhibit B.

13    Could you take a look at Defendant's Exhibit B.

14               We've already talked about the

15    cover page but attached to Exhibit B is the

16    December 27, 2004 investment banking agreement,

17    correct?

18    A.      Yes.

19         Q.      Are you familiar with that

20    agreement?

21    A.      Yes.

22         Q.      What was your role in the drafting

23    or negotiation of that agreement?

24    A.      Dan Myers negotiated most of it, of the

25    business points with Mr. Klein.

☐

                                                      46

1               My attorneys actually drafted the

2     document, and then I reviewed it before executing

3     it.

4          Q.      And that is your signature on the

5     agreement at the end, on page 11?

6     A.      Yes.

7          Q.      Is it accurate to say that in

8     essence this December 27, 2004 investment banking

9     agreement calls for Sloan Securities to do an

10    initial bridge financing and then a six to ten

11    million dollar additional financing?

12    A.     Yes.

13         Q.      Okay.

14    A.     Bridge financing is supposed to be up to

15    $550,000 on terms essentially set forth in bridge

16    terms sheet.  It's on page three, paragraph 1.2.

17         Q.      Okay.  Try to slow down if you

18    could when you're reading so that the court

19    reporter gets that.

20              Where were you just reading from?

21    A.     Page three of the document you handed me,

22    section 1.2 under financing, the last sentence of

23    that paragraph right before section 1.3.

24         Q.      Are we looking at the same page?

25              MR. ROSS:  Starting with "prior."



                                                    47



1          Q.      I see.  So you're referring to the

2     term "bridge financing" at the end of paragraph

3     1.2?

4     A.     That whole sentence, yes.

5          Q.      Okay.  And isn't it accurate that

6     the amount of the bridge financing was actually

7     raised to 1,350,000?

8    A.    No.  The actual financing was raised to

9    1.350.

10        Q.    Well, how much of --

11   A.    But I don't --

12        Q.    How much of a bridge financing did

13   you complete?

14   A.    I don't know that it was a bridge

15   financing.  I think it was a regular old financing

16   for 1,350,000.  We completed 1,350,000 of

17   financing.

18        Q.    You did?

19   A.    Ah-hum.

20        Q.    But you were supposed to do a

21   bridge financing followed by a subsequent equity

22   raise, right?

23   A.    Right.  And we did a 1.350 equity raise.

24        Q.    You did?

25   A.    I believe so.

☐

                                                          48

1        Q.    And what is the basis for your

2    statement that you did no bridge financing at all

3    and just an equity raise, is that your testimony?

4    A.    I think that's the way it worked out.

5        Q.    Let's take a look at Schedule B.

6    It says "Bridge financing term sheet."  The amount

7    is $550,000, correct?

8    A.    That's what it says on Schedule B, yes.

9        Q.    And the investment is a senior

10    convertible promissory note and warrant, correct?

11    A.    Yes.

12         Q.    And in fact that's what was issued,

13    was it not, was senior convertible promissory

14    notes convertible to stock, correct?

15    A.    Yes, that's correct.

16         Q.    And so you raised a bridge

17    financing or you did a bridge financing initially,

18    did you not, for Drinks Americas?

19    A.    Again, we raised 1.35 million dollars for

20    them, and we did it, as you stated, with the

21    senior convertible promissory note and warrants.

22         Q.    Okay.  And you raised the

23    $1,350,000 pursuant to the terms on this Schedule

24    B, correct?

25    A.    Correct.  Except the amount is different.

☐

                                                    49


 1    It was almost three times.

 2         Q.    Okay.  And in fact the investment

 3    banking agreement was amended, was it not?

 4    A.    I believe so.

 5         Q.    So let me show you what has been

 6    previously marked as Defendant's Exhibit C,

 7    amendment number one to the investment banking

 8    agreement dated February 24, 2005.

 9              Are you familiar with that

10    document?

11              MS. WALSH:  I'm just going to ask

12    you that provide us with copies of all defendant

13    exhibits like I did with the plaintiff's one.

14              MR. GOPSTEIN:  Sure.

15              MS. WALSH:  Thanks.

16    A.    Yes.

17         Q.    I want you to take a look at

18    paragraph 2A.  There's no dispute that the bridge

19    financing was increased to a million dollars

20    pursuant to this amendment, is there?

21              MS. WALSH:  Objection.

22    A.    Counsel for the other side showed me an

23    amendment moving it to 1.350 before.  I don't

24    think this is the same document.

25         Q.    Well, I'm asking you about this

☐

                                                  50

 1    document, and then we'll get to that some other

 2    time.

 3              This is an amendment to the

 4    investment banking agreement, is it not?  By the

 5    way, I don't think counsel showed you any

 6    amendments to the investment banking agreement.

 7    She showed you an amendment to a securities

 8    purchase agreement.

 9    A.    Oh, okay.

10         Q.    Two different documents, correct?

11    A.    Gotcha, yes.  This is the amendment to the

12    investment banking agreement, yes.

13          Q.      And this amendment amends the

14    December 27, 2004 agreement, correct?

15    A.     Yes.

16          Q.      And pursuant to this amendment the

17    bridge financing was raised to a million dollars,

18    correct?

19    A.     Yes.

20          Q.      But in fact you raised -- or Sloan

21    raised a total of 1,350,000 for Drinks Americas,

22    correct?

23    A.     Correct.

24          Q.      Thank you.

25                  Now, do you know whether there were

□
                                                    51

1     any other amendments to the investment banking

2     agreement other than what has been marked as

3     Defendant's Exhibit C?

4     A.     I don't remember any others.

5          Q.       This is marked amendment number

6     one.  Do you have any idea if there was ever an

7     amendment number two?

8     A.     I don't remember any others.

9          Q.       What is your understanding of what

10    was issued by Drinks Americas in connection with

11    the raise of 1,350,000 by Sloan Securities?

12    A.     They issued the senior convertible

13    promissory notes to the investors and they issued

14    the warrants to the investors.

15          Q.      Now, the warrants that were issued

16    to the investors were issued subsequently,

17    correct?

18    A.    Yes.

19          Q.      The warrants were not

20    simultaneously issued at the time the promissory

21    notes were issued, correct?

22    A.    I believe that's correct.

23          Q.      And the warrants might or might not

24    have been exercised according to the terms of the

25    promissory note, correct?

☐

52

1    A.    Yes, that's correct.

2          Q.      But ultimately they were exercised?

3    A.    Yes.

4          Q.      Do you know whether they were all

5    exercised or some?

6    A.    No, it would have been the individual

7    investors' decisions.

8          Q.      Do you know whether Drinks Americas

9    had to consent to the exertion of the warrants?

10   A.    I don't remember what the document said.

11         Q.      Do you know whether Drinks Americas

12   had to consent in order for the notes to be

13   converted to warrants?

14   A.    Again, I don't remember what the document

15   said.  I remember going through the process

16    because there were a couple of investors who asked

17    me to help them convert, and we sent them to

18    Drinks and they were converted.

19         Q.    Do you know whether there were any

20    amendments to the term sheet Schedule B to the

21    December 27, 2004 agreement other than the

22    amendment number one to the agreement itself?

23    A.    I don't remember any others.

24         Q.    Was Sloan paid its commissions for

25    raising $1,350,000 for Drinks Americas?

☐

                                                              53

1    A.    We were paid the cash commissions, yes.

2         Q.    How was Sloan paid its cash

3    commissions?

4    A.    Do you mean was it paid by a wire or a

5    check?

6         Q.    Yes.  Did you --

7    A.    I --

8         Q.    Let me ask you.  Did the money come

9    into Sloan and then you deducted it and then gave

10    the balance of the proceeds, or how did that work?

11    A.    Sure.  All of the money came into the

12    escrow account, and then a disbursement from the

13    escrow account is prepared and signed off on by

14    myself and an officer of Drinks, and so we would

15    have to wire the money to Drinks that they were

16    entitled to pursuant to a piece of paper, and we

17    would have gotten a wire from the bank for our

18    commission.

19         Q.    Okay.  So Drinks would have

20    received the net proceeds of the private

21    placement, correct?

22    A.    Correct.

23         Q.    All right.  And your fees or

24    commissions would have been wired directly from

25    Signature Bank, but with the approval of Drinks?

54

1    A.    Yes.

2         Q.    And those monies were paid in full,

3    correct?

4    A.    Yes.

5         Q.    Do you have any accounting or is

6    there any such accounting that would indicate the

7    exact amount of those commissions?

8    A.    Yes.

9         Q.    And how they were paid?

10    A.    Sure.

11         Q.    Would you -- would it be too

12    difficult to produce those?  Would you have those

13    documents readily available?

14    A.    Again, give the list.

15         Q.    Right.  Okay.  It's one of the

16    things I believe was already included but let me

17    specifically --

18                    MS. WALSH:  This is the account

19    Drinks signs off of as well as Sloan, you're

20    calling for the production of it from him.

21            MR. GOPSTEIN:  We're trying to get

22    an accounting of the monies paid to Sloan

23    Securities via the escrow account.

24            MS. WALSH:  I just want to make

25    sure it's the same account we're referencing, it's

55

1    the one with defendant's signature required on it

2    as well, that account?

3            MR. GOPSTEIN:  I don't know how

4    many accounts there were but certainly this is --

5    these escrow accounts were set up by Sloan

6    Securities, and they should have the financial

7    records showing monies that were paid to them, and

8    I think they do have those records, and I'm

9    calling for the production of those records.

10   BY MR. GOPSTEIN:

11           Q.    Were any warrants or purported

12   rights to any warrants assigned from Drinks

13   Americas to Phillip Kassai at any -- I'll withdraw

14   that.  I meant to say Sloan obviously, so let me

15   rephrase it again.

16           Were any warrants or purported

17   rights to any warrants assigned by Sloan

18   Securities to Phillip Kassai at any time?

19   A.    Yes.

20        Q.      When and how?

21    A.    You'd have to look at the document that we

22    sent to Drinks.

23        Q.      Well, the documents you sent to

24    Drinks, some of them simply request the exercise

25    of warrants.

                                                          56

1                  Other than requests of that nature

2    that were sent to Drinks Americas, did Sloan

3    Securities actually assign or attempt to assign

4    any warrants to Phillip Kassai?

5    A.    Yes, I believe we did.

6        Q.      When?

7    A.    Probably around the time that we sent those

8    letters in requesting that they be issued to the

9    people that we listed there.

10        Q.      Okay.  Do you know whether you've

11    produced those assignments in connection with the

12    subpoenas?

13    A.    No, I don't know.

14        Q.      Do you believe that those

15    assignments actually exist?

16    A.    I don't know.  Again, I would have to

17    check --

18                  MR. ROSS:  Do you want to do this

19    on or off the record?

20                  MR. GOPSTEIN:  I'd rather do it on

21    the record.  Let me just finish a couple of

22    questions, and then you can clarify this if you'd

23    like.

24    BY MR. GOPSTEIN:

25        Q.     For instance, let me put before you

 

57

1    what your attorney was just looking at, it's

2    Defendant's B, the first page of Defendant's B,

3    and it's a letter from Sloan -- from yourself to

4    Bruce Sloan.  Is that the assignment that you're

5    referring to?

6    A.    Yes.

7              MR. ROSS:  Do you understand the

8    question?

9              THE WITNESS:  Yes.

10              MR. ROSS:  He's asking was there a

11    separate assignment like you might make --

12    A.    Right.  I don't think so.  On the letter,

13    April 2nd, 2007, it states "Please allow this

14    letter to serve as Sloan's desire to assign and

15    exercise the warrant as follows."

16              And then it lists four different

17    people and the number of shares to be assigned to

18    them with their respective Social Security

19    numbers.

20        Q.     Pursuant to this letter dated April

21    2, 2007, you were expressing your desire to assign

22    and exercise certain warrants, correct?

23    A.    Yes.

24         Q.    But the warrants had not in fact

25    been assigned or exercised at any time prior to

58

1    this letter, correct?

2    A.    That is correct.  The warrants hadn't been

3    produced by Drinks.

4         Q.    So you were asking for these --

5    whatever warrants you thought you were entitled to

6    to be assigned to these various people?

7    A.    Yes, that's accurate.

8         Q.    At any time up to this moment today

9    are you aware as to whether Phillip Kassai has

10   ever actually had any warrants or rights to any

11   warrants assigned to him in connection with Drinks

12   Americas?

13   A.    Well, yes.  This here (indicating).

14        Q.    Well, this is a letter expressing a

15   desire to assign.  I'm asking you whether there's

16   actually been an assignment.

17   A.    There would not -- there would not be a

18   separate piece of paper because the separate piece

19   of paper normally would be attached to the warrant

20   for the 217,500 shares that we believed we were

21   entitled to, but that warrant was not issued.

22   That was part of the problem, so normally --

23        Q.    So Drinks Americas refused to

24   exercise -- withdrawn.  Drinks Americas refused to

25    issue the 217,500 warrants, correct?

☐

                                                              59

 1    A.    Correct.

 2          Q.    And so the only warrant that

 3    actually was issued was the May 2005 warrant that

 4    was issued, according to your testimony,

 5    erroneously to Sloan Equity Partners, correct?

 6    That's the only one that was actually issued?

 7    A.    That is correct.  Aside from those two

 8    individual investors, the only one that was ever

 9    issued to pay Sloan Securities Corp. was exactly,

10    as you just stated, the one for 300,000 that was

11    erroneously issued to Sloan Equity Partners.

12          Q.    Has that warrant, the 300,000

13    warrant, ever been assigned to Phillip Kassai?

14    A.    By a separate piece of paper or by a

15    request by me?  I would have to look --

16          Q.    In any way.

17    A.    I would have to look at the documents.

18          We sent a transmittal letter to

19    Drinks with the actual warrant.

20          Q.    Asking for something to happen?

21          MS. WALSH:  Well, I object.

22          MR. GOPSTEIN:  You can just ignore

23    that.  She can object.  It's her right.

24    A.    Okay.  We asked -- I believe you should

25    have a copy of that.  That was sent to Drinks.

60

1         Q.      And what did it say?

2    A.    I believe it asked for the warrant to be

3    exercised, and I don't remember if we broke it

4    down as to the numbers as to who got what.

5              MS. WALSH:  I'm going to object to

6    the -- asking him to quote verbatim from a

7    document that has been produced.

8              MR. GOPSTEIN:  You can object.

9              MS. WALSH:  So if you have a

10   document that you can show him.

11             MR. ROSS:  Do you have a document

12   that you can put in front of him you can ask him

13   about?

14             MR. GOPSTEIN:  No.

15             THE WITNESS:  You don't have that

16   document.

17   BY MR. GOPSTEIN:

18        Q.    I don't have the -- I don't know

19   what you're referring to.  That's why I'm asking.

20   A.    I'm referring to the request that Sloan

21   Securities Corp. sent to Drinks Americas asking

22   that the warrant be properly issued to Sloan

23   Securities Corp. and then converted.

24        Q.    So this is the warrant that was

25   erroneously issued to Sloan Equity Partners --

61

1    A.    Yes.

2        Q.    -- you're saying you requested that

3    it be issued to Sloan Securities Corp.?

4    A.    In writing, yes.

5        Q.    Did Sloan Equity Partners ever

6    write anything or make any demand of Drinks

7    Americas since --

8            MS. WALSH:  Objection --

9        Q.    -- since it was issued to Sloan

10   Equities Partners?

11   A.    Yes.  I believe we actually all executed a

12   document affirming that it should be issued to

13   Sloan Securities Corp.

14       Q.    And then Sloan Securities Corp.

15   wanted it reissued to various people, correct?

16   A.    I don't remember what the document actually

17   said.  We can look at the document but that is, as

18   I stated previously, that is our normal course,

19   that once we execute a warrant we assign it to the

20   individual reps according to how we parcel it out.

21       Q.    Okay.  Other than demands that were

22   made by Sloan Securities Corp. to Drinks Americas

23   to either exercise or assign or do something with

24   these warrants, there's no actual assignment of

25   the warrant from either Sloan Securities or Sloan

1   Equity Partners to Phillip Kassai, is there?

2            MS. WALSH:  Objection.

3   A.    I believe that's incorrect actually.

4        Q.    Where is that document?

5   A.    Counsel showed it to me an hour and a half

6   ago.  We had documents that Dan Myers, Phil Kassai

7   and myself, James Ackerman, executed assigning

8   those warrants from Sloan Equity Partners to Sloan

9   Securities Corp.

10       Q.    Without the consent of Drinks

11  Americas?

12  A.    Well, asking that it be reissued and

13  assigned.

14       Q.    That's this letter, isn't it?

15            MS. WALSH:  No.

16  A.    No, that is not.  There's another document.

17  No.

18       Q.    There's another document again

19  asking Drinks Americas to do that for you,

20  correct?

21  A.    Yes.  But you asked if there's a document

22  for the assignment of and the answer to your

23  question is yes.

24            MR. GOPSTEIN:  Well, possibly

25  counsel, since she has these documents with her,


□

                                          63


1   would help us out because I am not sure what

2    you're referring to and would you mind?

3             MS. WALSH:  I am happy to.

4             These are documents that were

5    produced by plaintiffs that bear the Bates stamps

6    numbers PK, as in Phil Kassai, 091, 092, 093 and

7    090.  They were also marked at the deposition as

8    Plaintiff's 29, Plaintiff's 31 and Plaintiff's 30

9    MR.

10            GOPSTEIN:  Let me take a quick look

11   at them to see -- it may be duplicates of the same

12   documents.

13            (Discussion off the record.)

14            (Luncheon recess at 1:02 p.m.)

15            (Afternoon session resumed at 1:45

16   p.m.)

17            (Ms. Walsh is no longer present at

18   the deposition.)

19   BY MR. GOPSTEIN:

20       Q.    Good afternoon, Mr. Ackerman.  I'm

21   going try to piece together some of the documents

22   here that we began to discuss earlier.

23            Let me first show you what has been

24   marked as Plaintiff's Exhibit 31.  It's a two-page

25   document.  It's a fax cover sheet from Amy May to

☐

                                                    64


1    Phil Kassai with a letter attached to it dated

2    December 15,2006.

3             Are you familiar with these two

4    documents?

5    A.    Yes.

6         Q.    Could you explain to me what you

7    were trying to accomplish in the letter dated

8    December 15, 2006?

9    A.    Yes.  As I had stated earlier, the stock

10   purchase warrant issued May 9th, 2005 for 300,000

11   shares was issued erroneously to Sloan Equity

12   Partners and should have been issued to Sloan

13   Securities Corp.  That's what I state here in the

14   letter, and I ask Drinks Americas to please

15   re-issue the warrant.

16              I also ask for additional warrants

17   that we never got.

18        Q.    What is the basis of your request

19   for an additional 67,500 warrants in this letter?

20   A.    That was for the raise that we did of the

21   1.350.  Just my math was bad, which was pointed

22   out to me later.  It should have been the 217,500

23   shares, but that was for the raise.  We had never

24   gotten any warrants for that either, so I was

25   trying to clean everything up as I could.

☐

1         Q.    What were you demanding in this

2    letter, 367,500 warrants?

3    A.    Well, we had already been issued the

4    300,000 and I was asking that it be reissued to

5    Sloan Securities Corp., and then I was asking for

6    the 67,500 warrants that were due under the

7    investment banking agreement that we had never

8    received.

9         Q.     Where were you due or pursuant to

10   what clause and what agreement were you due 67,500

11   warrants?

12   A.    I believe it was the December 2004 and I

13   think I --

14        Q.     Do you want to take a look at it?

15   A.    No.  Actually I think I cited it in another

16   letter when I asked for them to be reassigned.

17        Q.     I'm just trying to be clear here.

18   Wasn't the 300,000 -- wasn't the stock purchase

19   warrant for 300,000 shares issued May 9, 2005

20   allegedly for service rendered pursuant to the

21   investment banking agreement of December 2004?

22   A.    It would have been covered under that, yes,

23   but I don't think that that had covered the money

24   raise as well.

25        Q.     What money raise?

 

66

1    A.    The $1,350,000.

2         Q.     Okay.  So your saying that the

3    warrant for 300,000 shares issued on May 9, 2005

4    was not in consideration for the raising of

5    $1,350,000?

6    A.    I think it was for signing up the

```
 7   investment banking agreements.
 8          Q.      Can you point to any language in
 9   any document that entitles Sloan Securities Corp.
10   or Sloan Equity Partners to 300,000 warrants on
11   the execution of any document?
12   A.     The language actually said a hundred
13   thousand I believe.
14          Q.      Are you sure you're talking about
15   the December `04 agreement?
16   A.     No.  It could be the `05.
17          Q.      All right.
18   A.     No, I'm not sure.
19          Q.      Okay.  Take a look at the December
20   `04 agreement --
21   A.     Sure.
22          Q.      -- and show me where you get any
23   warrants on the execution of that agreement.
24   A.     Sure.
25                  Okay.  This one is the one that
```

67

```
 1   allows for the 214,500 warrants.  This is the --
 2          Q.      You mean two hundred seventeen
 3   five?
 4   A.     Yes.  Excuse me, thank you, the two hundred
 5   seventeen five.
 6          Q.      And when you say this is the one,
 7   you're referring to the December `04 agreement?
```

8    A.    I believe so, yes.

9         Q.    All right.  Are you entitled to any

10   warrants at all for arranging a bridge financing

11   pursuant to the December 2004 investment banking

12   agreement?

13   A.    I don't know.  I guess that's the subject

14   of this litigation.

15        Q.    How then would you be entitled to

16   warrants for 300,000 shares pursuant to that

17   agreement?

18   A.    I don't know.

19        Q.    So what is the basis for your

20   demand for 67,500 warrants in your December 15,

21   `06 letter?

22   A.    That was an erroneous calculation.  Those

23   would have been the 217,500 under the agreement

24   for raising the 1.35 million.

25        Q.    So you're saying that instead of

□

68

1    demanding 67,500 warrants you should have demanded

2    217,500 warrants?

3    A.    Yes.

4         Q.    So are you then saying that you're

5    entitled to 217,500 warrants plus the 300,000

6    warrants?

7    A.    It's possible.  That's what was issued to

8    us.

9         Q.    What I'm trying to get at is what

10    was your understanding what you're entitled to.  I

11    know you indicated that the 300,000 warrant was

12    issued erroneously to Sloan Equity Partners.

13    A.    Right.

14          Q.    I'm trying to determine how the

15    number was arrived at.

16    A.    You'd have to ask Mr. Klein.

17          Q.    How about -- were you involved in

18    any way, shape or form in the preparation or the

19    execution of the stock purchase warrant for

20    300,000 shares dated May 9, 2005?

21    A.    No.

22          Q.    Did you authorize Dan Myers --

23    well, withdrawn.

24                Who prepared the stock purchase

25    warrant dated May 9, 2005?

☐

                                              69

1    A.    You would have to ask Mr. Klein.  I don't

2    know.  My answer is I don't know.  You would have

3    to ask Mr. Klein.

4          Q.    Did you have any role whatsoever in

5    the preparation of that document?

6    A.    I did not.

7          Q.    Did you authorize the preparation

8    of that document?

9    A.    It's not for me to authorize a public

10    company to issue a warrant, so the answer to your

11    question is no.

12          Q.       Well, were you involved in the

13    execution of the warrant?

14    A.     Again, a warrant being issued by a public

15    company, I don't have authority to do that.

16          Q.       Well, do you know whether that

17    warrant was issued in your office on Madison

18    Avenue in New York?

19    A.     No, I have no idea.

20          Q.       Do you know who prepared it?

21    A.     No.  You asked me that before and I said

22    you'd have to ask Mr. Klein.

23          Q.       Frankly we have asked Mr. Klein

24    and --

25    A.     Super.


                                                      70


1           Q.       -- and we've also asked Mr. Myers.

2     A.     Super.

3           Q.       And apparently the document was

4     drafted by * Littman and Crux, your attorneys.

5     A.     Okay.

6           Q.       Does that help -- now that I've

7     told you --

8     A.     No.

9           Q.       -- does that help refresh your

10    recollection?

11    A.     No.

12          Q.       Did you direct your attorneys to

13  draft the stock purchase warrant on May 9, 2005?

14  A.     I did not.

15         Q.     Did you direct Dan Myers to have

16  your attorneys draft that document?

17  A.     I did not.

18         Q.     Other than what you've testified to

19  here today do you have any knowledge at all of how

20  the stock purchase warrant dated May 9, 2005 came

21  about?

22  A.     I do not.

23         Q.     Do you know what the May 9, 2005

24  stock purchase warrant relates to in terms of why

25  it was issued?

☐

71

1   A.     I was assuming that it related to the

2   investment banking agreement that we signed in

3   2005 where we were entitled to warrants for

4   signing that and we had never received.

5          Q.     So that brings us back to my

6   earlier question.  What is your understanding as

7   the president of Sloan Securities Corp. who

8   handled this account with Drinks Americas as to

9   your -- as to the reason or the entitlement of

10  300,000 warrants of shares?

11  A.     I've already answered it to the best of my

12  ability.

13         Q.     Is there any document that you're

14    aware of that gives you the right to 300,000

15    warrants?

16    A.    I believe the 2005 one gives us the right

17    to a hundred thousand.

18         Q.     But the 2005 investment banking

19    agreement was executed in September of 2005,

20    correct?

21    A.    Right, right.

22         Q.     So the May 9, 2005 warrant

23    predated --

24    A.    Correct.

25         Q.     -- the 2005 investment banking

                                                    72

1    agreement?

2    A.    Right.

3         Q.     So it couldn't have been related to

4    that, correct?

5    A.    If -- that's your answer.

6         Q.     Well, let me ask you -- let me get

7    your answer.  Is it even possible --

8    A.    No, it does not seem likely.

9         Q.     Let me finish the question.

10             Is it even possible that the stock

11    purchase warrant that was issued on May 9, 2005

12    had anything to do with the investment banking

13    agreement that was subsequently signed in

14    September of 2005?

15    A.    No.

16       Q.      So it could only have related to

17  the prior investment banking agreement from

18  December of 2004, correct?

19  A.      Correct.

20       Q.      All right.  Try then to the best of

21  your abilities to explain to me where or how under

22  the 2004 investment banking agreement Sloan

23  Securities or Sloan Equity Partners was entitled

24  to warrants for 300,000 shares.

25  A.      I don't see anything under here.

                                              73

1        Q.      Let me put before you now what has

2   been previously marked as Plaintiff's Exhibit 30,

3   and we have different versions of them as we

4   indicated off the record.  They appear to be the

5   same letter but signed by different parties.

6                It's a letter dated January 25,

7   2007 on the letterhead of Sloan Equity Partners.

8   And I'll show the different versions of it.  In

9   fact one of the versions is marked Plaintiff's

10  Exhibit 6.

11               Could you tell me what you were

12  trying to accomplish with this letter on January

13  25, 2007?

14  A.      Yes.  This letter which was signed by

15  myself, Dan Myers and Phil Kassai was assigning

16  the 300,000 warrants to the individuals that were

17    entitled to receive them, and we listed the

18    individuals and the number of shares that they

19    should be getting, and this was sent to

20    Mr. Klein's attention, the chairman of Drinks

21    Americas.

22         Q.    Again, as indicated earlier, this

23    is nothing more than your expression of a desire

24    to assign and exercise the warranty; correct?

25    A.    No.  This is my intention to assign the

☐

74

1    warrant as is my right as CEO of Sloan Securities

2    Corp. for a warrant that should have been issued

3    to Sloan Securities Corp.

4              We did not have any other documents

5    to do it, and I -- you know, this was our attempt

6    to assign them as is stated here.

7         Q.    Let me direct your attention to the

8    second sentence.  Could you just read that second

9    sentence.

10   A.    "As such please allow this letter to serve

11   as SEP's" -- or Sloan Equity Partners' -- "desire

12   to assign and exercise the warranty as follows."

13        Q.    So prior to January 25, 2007 the

14   warrant had not been assigned or exercised as of

15   yet?  You were desiring to do that, correct?

16   A.    Correct.

17        Q.    Let's then move ahead to April 2,

18   2007, and Plaintiff's Exhibit 18.  Again, could

19   you just read the last phrase of that first

20   sentence starting with the word "please?"

21   A.     "Please allow this letter to serve as

22   Sloan's desire to assign and exercise the warrant

23   as follows."

24        Q.     Okay.  So you're again on April 2nd

25   of 2007 indicating your desire to assign and

☐

                                                        75

1   exercise the warrant; correct?

2   A.     This is the assignment as far as I'm

3   concerned.

4             MR. ROSS:  Excuse me.  I just want

5   to point out for the record that the document that

6   you showed us -- showed the witness, Plaintiff's

7   Exhibit 6, actually relates to 300,000 shares, and

8   the document you're now questioning which is

9   Plaintiff's Exhibit 18 is with respect to the

10   217,000, so they're actually talking about two

11   different things.  These are two different

12   documents issued by two different parties or

13   letters I should say.

14             THE WITNESS:  Talking about two

15   different ones.

16             MR. ROSS:  I just want to point

17   that out.

18   BY MR. GOPSTEIN:

19        Q.     Right.  The first letter that we

20   were talking about which is Plaintiff's Exhibit 6

21   is from Sloan Equity Partners, correct?

22   A.     Correct.

23          Q.     And they are indicating their

24   desire to assign and exercise the warrant for

25   300,000 shares, correct?

                                                              76

1    A.     Correct.

2           Q.     And prior to that time it had not

3    been assigned or exercised.  Correct?

4    A.     Correct.

5           Q.     Okay.  So then we move to

6    Plaintiff's Exhibit 18 which is a letter from

7    Sloan Securities Corp. to Drinks Americas

8    regarding the warrant for 217,500 shares.

9                  Again, here Sloan Securities Corp.

10   is indicating their desire to assign and exercise

11   the warrant; correct?

12   A.     Ah-hum, yes.

13          Q.     Prior to this letter on April 2,

14   2007 there had not been any assignment or exercise

15   of the warrant.  You were desiring to do so,

16   correct?

17   A.     Yes, correct.

18          Q.     So this day as we sit here today

19   has either the warrant for 300,000 shares or the

20   alleged warrant for 217,500 warrants actually been

21   assigned or exercised?

22    A.      Not to my knowledge, no.

23            Q.      Does any of this help refresh your

24    recollection as to when you heard from Joe

25    Kannella that the warrant or the warrants were in

                                                    77

1     dispute or not authorized or words to that effect?

2     A.      No.

3             Q.      It doesn't help you?

4     A.      No.

5             Q.      Can you tell me where in the

6     2004 -- the December 2004 investment banking

7     agreement Sloan Securities is entitled to 217,500

8     shares or warrants for shares?

9     A.      I believe it says in the letter.  I believe

10    it cites a paragraph.

11            Q.      Paragraph 4.1.

12    A.      (The witness nods his head.)

13            Q.      Do you know what section of 4.1 you

14    were referring to, and I'll show you the document?

15    A.      No.  I would have to --

16            Q.      Would it be 4.1A or 4.1B?

17    A.      A.

18            Q.      Does 4.1A deal with the bridge

19    financing, according to your understanding of the

20    agreement?

21                    (Discussion off the record.)

22            Q.      Your answer is?  I'm sorry.

23      A.      No.

24                      MR. ROSS:  Could you repeat the

25      question just to make sure we're accurate.

                                                                78

 1              Q.      Yes.  Does paragraph 4.1A have

 2      anything to do with the bridge financing?

 3      A.      I'm not sure what you mean by having

 4      anything to do with.

 5              Q.      Let me rephrase it.  Let me

 6      rephrase that.

 7                      Does paragraph 4.1A deal with

 8      compensation that you might be entitled to in

 9      connection with the bridge financing?

10      A.      4.1 -- 4.1 in my opinion has to do with

11      both any financing and a bridge financing.

12              Q.      I'm talking about 4.1A as opposed

13      to 4.1B.

14      A.      Correct.

15              Q.      Isn't it true that -- let me ask it

16      a different way then.  Isn't it true that

17      paragraph 4.1B deals with the compensation due to

18      Sloan Securities Corp. for the bridge financing?

19      A.      Not solely, no.

20              Q.      Well, do you see the word "bridge

21      financing" anywhere in 4.1A?

22      A.      No, I do not see the word "bridge

23      financing" anywhere in 4.1A.

24              Q.      I'll take it back.  Thanks.

25                    Have you ever had any conversations

                                                                    79

1    with Dan Myers about the preparation or execution
2    of the May 2005 stock purchase warrant?
3    A.     Yes.
4           Q.     When is the first time you talked
5    to him about that?
6    A.     I don't remember.
7           Q.     What did you talk about to the best
8    of your recollection?
9    A.     We talked about the -- I -- the first time
10   we talked about it I was upset that it had been
11   issued to Sloan Equity Partners because that was a
12   wrong thing that was done, and I wanted to get it
13   corrected.
14          Q.     And when is the last time you
15   talked to Dan Myers about that?
16   A.     I don't remember.
17          Q.     Have you -- what else have you
18   talked to him about beside the fact that you
19   thought it was a mistake to issue it to Sloan
20   Equity Partners?
21   A.     That it had to get changed to Sloan
22   Securities Corp. and how dare he direct that it go
23   into that, and how furious I was.
24          Q.     And was this sometime shortly after
25   the warrant was issued or was it sometime after

80

 1   that?

 2   A.    It was way after it was issued.

 3        Q.    When is the first time that you

 4   even knew that the stock purchase warrant had been

 5   issued, the May 9 warrant?

 6   A.    I want to say late 2006 maybe.

 7        Q.    So you found out about this

 8   approximately a year and a half after it was

 9   signed?

10   A.    Correct.  Right.

11        Q.    Who were the people at Sloan

12   Securities who worked on raising money for Drinks

13   Americas?

14   A.    Dan Myers, Phil Kassai, Frank Engracia,

15   Patrick Murphy and myself.

16        Q.    Did you supervise all of the other

17   individuals in connection with the firm's

18   relationship with Drinks Americas?

19   A.    No.

20        Q.    Who did?

21   A.    It was split up because there were

22   different offices.  Dan was in one office, so I

23   was supervising him and Phil Kassai, and then

24   Patrick was his own OSJ, office supervisory

25   jurisdiction, and so he was the supervisor there,

81

1    and he and Frank worked together with their

2    investors.

3         Q.      What office did Dan and Phil work

4    out of?

5    A.      444 Madison Avenue.

6         Q.      And were you primarily responsible

7    for supervising them at that office?

8    A.      Yes.

9         Q.      Who brought the client, Drinks

10   Americas, into the company?

11   A.      Dan Myers.

12        Q.      Was he the primary investment

13   banker on the deal?

14   A.      Yes.

15        Q.      I don't have the documents that

16   were marked by plaintiff's counsel earlier today,

17   but some of these documents were produced on late

18   Friday by your counsel, and so if I'm re-marking

19   them I apologize.

20             I want to should you what I'm going

21   to call the securities purchase agreement dated

22   November 2005, and we'll mark that as

23   Defendant's G.

24             (Securities Purchase Agreement By

25   and Between Drinks Americas Holdings, Ltd., and

82

1     the Investors Named Herein is marked as D-G for

2     identification.)

3          Q.     That's an unsigned document.

4     That's all I got from your attorney.  Do you

5     recognize that?

6     A.     Yes.

7          Q.     What is the intent of that

8     document?

9     A.     For Drinks Americas to sell certain

10    securities to investors that were brought to them

11    by Sloan Securities.

12          Q.     Did that securities purchase

13    agreement have anything to do with the December

14    2004 investment banking agreement or did that

15    relate to the September `05 agreement?

16    A.     I'm not sure.  I would have to examine all

17    the documents again.  I'm not sure.

18          Q.     I'm going to show you what we will

19    refer to as Defendant's H?

20                 (Letter dated September 29, 2005 is

21    marked as D-H for identification.)

22          Q.     It's a December 29, 2005 investment

23    banking agreement that I also received from your

24    attorney.  Do you recognize that document?

25    A.     Yes.

☐

                                                    83

1          Q.     Did you negotiate that document?

2    A.    With Dan and with Bruce Klein, yes.

3         Q.    What was the purpose of the second

4    investment banking agreement?

5    A.    This is when we were looking to do the

6    bridge financing.

7         Q.    Well, hadn't you already done a

8    bridge financing for Drinks Americas the year

9    before or in the spring of 2005?

10   A.    I'm trying to -- when the 1.35 was done?

11        Q.    Yes.

12   A.    Yes.  We had done that before.

13        Q.    So were you doing an additional

14   bridge financing?

15   A.    I guess we were looking to raise more money

16   for them.

17        Q.    In what form?  Take a look at it

18   and try to describe --

19            MR. ROSS:  Can we see the other

20   one, the previous agreement?

21            MR. GOPSTEIN:  Sure.  It's actually

22   right here.

23   A.    Oh, yes, right, we were trying to raise

24   between six million and ten million for them.

25            MR. ROSS:  Can I see this for a

□

84

1    minute.

2            THE WITNESS:  Sure.

3            MR. ROSS:  I just want you to

4    compare this to the December 27th because six and

5    ten million is also mentioned there, so I don't

6    know if that's just a continuation of that desire

7    or if it refreshes you in any way.

8    A.    No.

9         Q.    I'm trying to get at the exact same

10   question.

11            What was the reason for the second

12   investment banking agreement a year later?

13   A.    I don't remember.

14        Q.    Was it just to try to raise some

15   more capital?

16   A.    It looks that way, yeah.  I would have to

17   take a look at the documents and see if there's

18   any difference.

19        Q.    Okay.  Based upon your

20   recollection, other than telling me the difference

21   between the two documents, what was going on at

22   the time that --

23   A.    That Drinks needed more money.  We were

24   trying to raise more money for them.

25        Q.    Okay.  Now, could you go back and

☐

1    take a look at the Defendant's Exhibit G, the

2    securities purchase agreement, which is unsigned

3    and dated November.

4            Does that help refresh your

```
5    recollection as to whether that was a pro forma

6    document that was generated in connection with the

7    September `05 agreement?

8    A.    It really doesn't.

9         Q.    You have no idea?

10   A.    I really don't remember.

11        Q.    How about Defendant's I?

12             (Promissory note is marked as D-I

13   for identification.)

14        Q.    The ten percent senior convertible

15   promissory note also appears to be a blank

16   document dated November of 2005.  Do you recognize

17   that?

18   A.    I think this is what we used for the

19   investors with the 1.35 million that we raised for

20   them.

21        Q.    Are you sure about that?

22   A.    No.  Am I sure, no.

23        Q.    Does it --

24   A.    But I remember it being a ten percent

25   senior convertible promissory note.
```

                                                    86

```
1         Q.    All right --

2    A.    So am I sure that this is the exact

3    document, no.

4         Q.    But didn't you raise the 1,350,000

5    in the early part of 2005?

6    A.    Ah-hum.
```

7      Q.      Okay.  So this is a blank document

8   in November of 2005.  Wouldn't that tell you that

9   this is a document that was generated in

10  connection with the second investment banking

11  agreement?

12  A.    It could be.  I don't remember.

13      Q.      You're just not sure?

14  A.    The second investment banking agreement --

15      Q.      Dated September 2nd of 2005.

16  A.    Right.  It could be.

17      Q.      Okay.  And similarly I'm going to

18  show you what I'm going to refer to as

19  Defendant's J.

20              (Discussion off the record.)

21              (Drinks Americas Holdings, Ltd.,

22  Registration Rights Agreement is marked as D-J for

23  identification.)

24  BY MR. GOPSTEIN:

25      Q.      We had a brief colloquy off the

☐

87

1   record and may or may not shed some light on some

2   of this, so let's try.

3              Defendant's J is a registration

4   rights agreement also dated November 2005 and also

5   a blank document.  Do you recognize that?

6   A.    No, not really.

7      Q.      Do you know whether that document

8      was generated in connection with the September `05

9      agreement or the December `04 agreement?

10     A.     Wait a second.

11            MR. GOPSTEIN:  Let's go off the

12     record.

13            (Discussion off the record.)

14     BY MR. GOPSTEIN:

15     Q.     We're back on the record.

16            Do you have an understanding of

17     what this registration rights agreement might be?

18     A.     It looks like an agreement to register the

19     stock holdings and underlying warrants of my

20     clients who invested in the transaction

21     previously, and it also has a list of other

22     security holders that it looks like that Drinks

23     Americas is registering their stock holdings as

24     well.

25            MR. GOPSTEIN:  Okay.  Now, let me

☐

88

1      show you two escrow deposit agreements, and we'll

2      mark these as Defendant's K and L.

3             (Escrow deposit agreement is marked

4      as D-K for identification.)

5             (Escrow deposit agreement is marked

6      as D-L the for identification.)

7      BY MR. GOPSTEIN:

8      Q.     Could you shed some light on these

9      escrow deposit agreements?  Tell me what they were

10    used for.  Just read off the dates on the two of

11    them.

12    A.     The 17th day of November 2005.

13           Q.     And the other one is?

14    A.     22nd day of November 2005.

15           Q.     Do you know what these escrow

16    agreements were used for?

17    A.     No, I don't.

18           Q.     No idea?

19    A.     No.

20           Q.     Did you sign them?

21    A.     I don't remember.

22                  MR. ROSS:  Is that what we were

23    discussing earlier?  (Indicating).

24           Q.     Any idea?

25    A.     No, I don't.


☐

                                                            89


1            Q.     Is that not your signature on page

2     ten of Defendant's Exhibit L?

3     A.     That is my signature.

4            Q.     And is it also your signature on

5     pages ten and 12 of Exhibit K?

6     A.     Yes, that's my signature.

7            Q.     Do you recall signing these

8     documents?

9     A.     I do not.

10           Q.     You have no understanding of what

11    was to be accomplished in these escrow agreements?

12    A.     Uh-huh.

13         Q.     That's a no?

14    A.    That's a no.

15         Q.     Okay.  Did Sloan Securities Corp.

16    raise any money for Drinks Americas at any time

17    other than the bridge financing that you did of

18    $1,350,000?

19    A.     No.

20         Q.     So there was no money raised

21    whatsoever pursuant to the second investment

22    banking agreement --

23    A.     Correct.

24         Q.     -- in --

25    A.     Sorry.

☐

                                                    90

1         Q.     -- in September of 2005, right?

2    A.     Correct.

3         Q.     Did you indicate or do you recall

4    indicating to Drinks Americas that you had

5    investors lined up or you had any financing in

6    place in connection with the September `05

7    investment banking agreement?

8    A.     I don't recall making an indication of that

9    to Drinks.

10         Q.     Do you know why you were not

11    successful in raising any money pursuant to the

12    second investment banking agreement in September

13    of `05?

14    A.    I don't remember.

15         Q.    Are you aware that Dan Myers has

16    signed an affidavit in connection with this

17    litigation?

18    A.    No.

19         Q.    You've not seen it?

20    A.    No.

21         Q.    Have you talked to him about it?

22    A.    No.

23         Q.    Have you talked to Phil Kassai

24    about Dan Myers' affidavit?

25    A.    No.

□

                                                    91

1          Q.    Dan was the principal investment

2     banker on -- in connection with Drinks Americas,

3     correct?

4     A.    Yes.

5          Q.    And he would be most knowledgeable

6     in connection with what did or did not take place

7     in relation to Drinks Americas?

8     A.    Generally, yes.

9               MR. GOPSTEIN:  I have no further

10    questions.  Thank you.

11              (Discussion off the record.)

12              MR. ROSS:  Robert Ross representing

13    Mr. Ackerman.

14            Mr. Ackerman was the subject of two

15    subpoenas from both Mr. Kassai's counsel and

16    Drinks Americas' counsel.  One subpoena was in his

17    capacity as president CEO of Sloan Securities

18    Corp.  One subpoena was issued to Sloan Equity

19    Partners.

20            MR. GOPSTEIN:  Can I correct you?

21            MR. ROSS:  Please do.

22            MR. GOPSTEIN:  Mr. Ackerman

23    actually received two subpoenas from my firm.  He

24    received a subpoena for Sloan Securities Corp. and

25    a subpoena for Sloan Equity Partners.  He received

92

1    a third subpoena from plaintiff's counsel, and I

2    don't know what that was.

3            MR. ROSS:  That's correct.  Which

4    was also very similar in sum and substance in

5    terms of on whose behalf Mr. Ackerman is

6    appearing.

7            Mr. Ackerman, as he stated in the

8    testimony, was a minority or is a minority member

9    of Sloan Equity Partners, but has stated on the

10    record that he doesn't have the -- or if he didn't

11    I'm stating on the record -- doesn't have the

12    authority or is not taking that position to bind

13    that company in these proceedings.

14            So to the extent that he's

15    testifying today, he's testified as the CEO and

```
16    president of Sloan Securities Corp. and also as a

17    member of Sloan Equity Partners but not as a

18    representative of Sloan Equity Partners, meaning

19    that whatever testimony he gave today is not

20    necessarily the position of Sloan Equity Partners

21    as an entity, if anyone has such a position or

22    cares about such a position.  Okay?  Is that

23    accurate, Jim?

24                THE WITNESS:  Yes.

25                MR. GOPSTEIN:  We'll leave it I
```

                                                          93

```
 1    guess to the court to determine whether -- what

 2    effect his testimony might have on various

 3    entities.

 4                I'm okay with the fact that he was

 5    here testifying as a -- as the president CEO of

 6    Sloan Securities Corp. and as a, I believe, 40

 7    percent partner of Sloan Equities.

 8                THE WITNESS:  20 percent.

 9                MR. GOPSTEIN:  20 percent, I'm

10    sorry.

11                THE WITNESS:  That's okay.

12                MR. GOPSTEIN:  As a 20 percent

13    partner of Sloan Equity Partners, and whatever

14    impact his testimony has is what it has.

15                MR. ROSS:  Okay.

16                MR. GOPSTEIN:  Thank you.
```

```
17                    (The proceedings are concluded at

18      2:42 p.m.)

19

20

21

22

23

24

25
```

☐

94

```
1                    C E R T I F I C A T I O N

2

3                    I, HELEN DOHOGNE, a Certified

4      Shorthand Reporter and Notary Public of the State

5      of New Jersey, do hereby certify that prior to the

6      commencement of the deposition the witness was

7      duly sworn by me to tell the truth, the whole

8      truth and nothing but the truth.

9                    I DO FURTHER CERTIFY that the

10     foregoing is a true and accurate transcript of the

11     testimony as taken stenographically by and before

12     me at the time, place and on the date herein

13     before set forth.

14                    I DO FURTHER CERTIFY that I am

15     neither a relative nor employee nor attorney nor

16     counsel of any of the parties to this action and

17     that I am neither a relative nor employee of said

18     attorney or counsel and that I am not financially
```

```
19    interested in the outcome of the case.

20

21

22

23                    C.S.R. License Number 30XI00079800
                      Notary Public of the
24                    State of New Jersey
                      My Commission Expires 12-20-09
25
```

# EXHIBIT E

12-12-07 phillip kassai v drinks america holdings - kassai.txt
00001
```
 1
 2              UNITED STATES DISTRICT COURT
 3              SOUTHERN DISTRICT OF NEW YORK
 4
 5
    PHILLIP KASSAI,
 6
                    Plaintiff,
 7
               vs.           No. 07 Civ 5590
 8
    DRINKS AMERICA HOLDINGS, LTD.,
 9
                    Defendant.
10   ------------------------------------------
11
12
13
14              DEPOSITION OF PHILLIP KASSAI
15                New York, New York
16            Wednesday, December 12th, 2007
17
18                 Reported by:
19                Jeremy Frank, MPM
20
21
22
23
    HUDSON REPORTING & VIDEO, INC.
24  124 West 30th Street, 2nd Fl.
    New York, New York 10001
25  Tel: 212-273-9911  Fax: 212-273-9915
```
00002
```
 1
 2                          December 12th, 2007
 3                          2:15 p.m.
 4
 5          Deposition of PHILLIP KASSAI, held at
 6   the offices of Moskowitz & Book, LLP, 1372
 7   Broadway, New York, New York, pursuant to
 8   Notice, before Jeremy Frank, a Notary Public
 9   of the State of New York.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```
00003
```
 1
```
                              Page 1

```
             12-12-07 phillip kassai v drinks america holdings - kassai.txt
 2       A P P E A R A N C E S:
 3
 4               MOSKOWITZ & BOOK, LLP
 5               Attorneys for Plaintiff
 6                    1372 Broadway, Suite 1402
 7                    New York, NY 10018
 8               BY:   SUSAN J. WALSH, ESQ.
 9
10               LAW OFFICES OF SHELDON H. GOPSTEIN, ESQ.
11               Attorneys for Defendant
12                    130 West 42nd Street
13                    New York, NY 10036
14               BY:   SHELDON H. GOPSTEIN, ESQ.
15
16
17
18
19
20
21
22
23
24
25
 
00004
 1
 2                    IT IS HEREBY STIPULATED AND AGREED,
 3       by and between counsel for the respective
 4       parties hereto, that the filing, sealing and
 5       certification of the within deposition shall
 6       be and the same are hereby waived;
 7                    IT IS FURTHER STIPULATED AND AGREED
 8       that all objections, except as to the form
 9       of the question, shall be reserved to the
10       time of the trial;
11                    IT IS FURTHER STIPULATED AND AGREED
12       that the within deposition may be signed
13       before any Notary Public with the same force
14       and effect as if signed and sworn to before
15       the Court.
16
17
18
19
20
21
22
23
24
25
 
00005
 1                         Kassai
 2       P H I L L I P   K A S S A I,   called as a
 3       witness, having been duly affirmed by a Notary
 4       Public, was examined and testified as follows:
 5       EXAMINATION BY
 6       MR. GOPSTEIN:
 7               Q.    State your name for the record.
 8               A.    Phillip Kassai.
 9               Q.    State your address for the record.
10               A.    16 Auerbach Lane, Lawrence, New
                                      Page 2
```

```
                12-12-07 phillip kassai v drinks america holdings - kassai.txt
11    York 11559.
12         Q.    Good afternoon, Mr. Kassai.  My
13    name is Sheldon Gopstein, I represent the
14    defendant in this case, Drinks Americas in an
15    action that you brought against them that's
16    pending in the Federal Court, it is actually
17    Drinks Americas Holdings, LTD.
18              What is your office address?
19              MS. WALSH:  I am just going to
20    reserve all objections for the record.
21              MR. GOPSTEIN:  Have we been
22    operating under that stipulation all
23    along or not, I thought we were.
24              MS. WALSH:  I don't know that we
25    were but I want to reserve them for today

00006
1                        Kassai
2     for Mr. Kassai.
3              MR. GOPSTEIN:  Okay.
4              It is my understanding that we had
5              been operating under the stipulation that
6              all objections except as to form were
7              reserved, of course there are other
8              grounds.
9         Q.    But Mr. Kassai, what is your
10    business address?
11         A.    444 Madison Avenue, 18th floor,
12    New York, New York 10022.
13         Q.    Have you ever been deposed before?
14         A.    No.
15         Q.    Have you ever been a party in a
16    lawsuit meaning either a plaintiff or a
17    defendant in a lawsuit?
18         A.    Yes.
19         Q.    Other than this one?
20         A.    Yes.
21         Q.    Can you tell me is it a presently
22    pending case?
23         A.    Yes.
24         Q.    Okay.
25              Can you give me the caption or who

00007
1                        Kassai
2     the parties in that dispute are?
3         A.    Dell, D-e-l-l.
4         Q.    Dell Computers?
5         A.    Yes.
6              MS. WALSH:  You have to say yes or
7              no, its for him to get the transcript.
8         A.    Yes, Dell Computers.
9         Q.    Is Dell the plaintiff or the
10    defendant in that case?
11         A.    Plaintiff.
12         Q.    Who are the defendants?
13         A.    Phil Kassai.
14         Q.    Who else?
15         A.    That's it.
16         Q.    What is the basis of that lawsuit
17    in sum and substance?
18         A.    This dates back to 2003 where the
19    plaintiff says there is money owed for a
                         Page 3
```

```
              12-12-07 phillip kassai v drinks america holdings - kassai.txt
20    computer and the defendant denies that.
21         Q.    Okay.
22               Have you ever been involved in any
23    other lawsuits as a plaintiff or a defendant?
24         A.    Yes.
25         Q.    Either civil or criminal?
```
00008
```
 1                         Kassai
 2         A.    Yes.
 3         Q.    Okay.
 4               Tell me what that other proceeding
 5    was about.
 6         A.    I sued my landscaper.
 7         Q.    Other than that?
 8               Tell me have you ever been
 9    involved as a plaintiff or defendant in any
10    civil or criminal proceeding other than Dell,
11    the action with your landscaper and the
12    current action?
13         A.    No.
14         Q.    That's it?
15         A.    That would be it.
16         Q.    Okay.
17               You have not been deposed before
18    in any of those cases?
19         A.    No.
20         Q.    Or in any other case?
21         A.    No.
22         Q.    Since this is the very first time
23    you have ever given a deposition, let me just
24    give you some of the ground rules.  If you
25    don't understand anything I'm asking you,
```
00009
```
 1                         Kassai
 2    don't answer the question, ask me to rephrase
 3    it and I'll be more than happy to do that.  If
 4    you need to take a break for any reason, you
 5    should tell me and I'll be more than happy to
 6    accommodate you.  If you need to speak to your
 7    attorney, I would ask that you not do so while
 8    a question is pending.  I need you to answer
 9    the question first and then if for some reason
10    you need to confer with your attorney, you can
11    do it at that time.
12               Are you under, are you taking any
13    medication or is there any reason why you
14    wouldn't be able to give complete and truthful
15    testimony here today?
16         A.    No.
17         Q.    Okay.
18               MR. GOPSTEIN:  Can we go off the
19    record.
20               (Whereupon, an off-the-record
21    discussion was held.)
22               (Time noted:  2:20 p.m.)
23               (Time noted:  2:29 p.m.)
24         Q.    Mr. Kassai, are you currently
25    employed?
```
00010
```
 1                         Kassai
```
                                      Page 4

```
                12-12-07 phillip kassai v drinks america holdings - kassai.txt
 2              A.    Self-employed.
 3              Q.    What is your business?
 4              A.    Merchant banking.
 5              Q.    Are you a self-employed merchant
 6      banker at 444 Madison Avenue on the 18th
 7      floor?
 8              A.    Yes.
 9              Q.    You rent space there?
10              A.    Yes.
11              Q.    What is the name of the entity
12      that rents the space that you're working in?
13      In what entity have you leased the space, in
14      your own name or --
15              A.    Phillip Kassai, yes.
16              Q.    You're the actual tenant of that
17      space?
18              A.    Yes.
19              Q.    Do you have the entire 18th floor?
20              A.    No.
21              Q.    What portion of the 18th floor do
22      you occupy?
23              A.    A single office.
24              Q.    Who do you rent that single office
25      from?
⌐
00011
 1                        Kassai
 2              A.    Realex Capital, R-e-a-l-e-x.
 3              Q.    How long have you been in that
 4      space renting from Realex Capital?
 5              A.    Since my resignation from Sloan.
 6              Q.    Which was when?
 7              A.    I'm not, the exact date is not
 8      known to me, sometime in June '06, I would
 9      say.
10              Q.    In June 2006 you resigned from
11      Sloan Securities and you became a
12      self-employed merchant banker?
13              A.    Yes.
14              Q.    You have been doing that from
15      June 2006 to the present?
16              A.    Correct.
17              Q.    Is Sloan Securities also located
18      at 444 Madison Avenue?
19              A.    To the best of my knowledge, they
20      are.
21              Q.    Did you work at 444 Madison when
22      you were employed by Sloan?
23              A.    Yes.
24              Q.    What floor?
25              A.    23rd.
⌐
00012
 1                        Kassai
 2              Q.    Okay.
 3                    Where did you work before Sloan?
 4              A.    Before Sloan I worked also on the
 5      18th floor.
 6              Q.    For who?
 7              A.    Myself.
 8              Q.    As what?
 9              A.    Merchant banker.
10              Q.    How long were you a self-employed
                              Page 5
```

12-12-07 phillip kassai v drinks america holdings - kassai.txt
11    merchant banker before you joined Sloan?
12              A.    About one year.
13              Q.    So this is approximately June '05
14    to June '06?
15              A.    Its thereabouts, yes.
16              Q.    Did you also rent space when you
17    were self-employed?
18              A.    Yes.
19              Q.    Also on the 18th floor?
20              A.    Yes.
21              Q.    Then you moved to the Sloan space
22    for a period of time?
23              A.    Yes.
24              Q.    Then you rented space on your own
25    again?

00013
1                        Kassai
2               A.    Yes.
3               Q.    Does your current business have a
4     business name other than your name?
5               A.    There is different entities that
6     are created to do business through.  I'm not
7     quite sure what your --
8               Q.    For instance, do you have a d/b/a,
9     do you do business under any name like Kassai
10    Merchant Banking or some other assumed name?
11              A.    No, there are several entities
12    that deals get done through, there is not one
13    specific name.
14              Q.    Do you create entities for the
15    particular deal or do you have existing
16    entities that you work through already?
17              A.    Both.
18              Q.    Okay.
19                    Tell me the names of the entities
20    that you have established that you work your
21    deals through on occasion?
22              A.    They would be Ocean Drive Capital.
23              Q.    Is that a corporation?
24              A.    An LLC.
25              Q.    Is that a New York LLC?

00014
1                        Kassai
2               A.    Yes.
3               Q.    Go ahead.
4               A.    And Iska Capital Partners.
5               Q.    Can you spell that?
6               A.    I-s-k-a Capital Partners.
7               Q.    What type of an entity is that?
8               A.    An LLC.
9               Q.    Anything else?  Any other entities
10    that you do your business through as a
11    merchant banker?
12              A.    No.
13              Q.    Who are the members of Ocean Drive
14    Capital?
15              A.    The members of Ocean Drive Capital
16    would be Phillip Kassai.
17              Q.    That's you, right?
18              A.    That would be me.
19              Q.    Who else?
                            Page 6

```
          12-12-07 phillip kassai v drinks america holdings - kassai.txt
20          A.    And Mr. Dan Myers.
21          Q.    Okay.
22                Is that 50/50?
23          A.    Yes.
24          Q.    Do you currently do deals with Dan
25    Myers using the Ocean Drive Capital entity?

00015
 1                         Kassai
 2          A.    No.
 3          Q.    But Mr. Myers and yourself are
 4    still members, the sole members of that
 5    entity?
 6          A.    Correct.
 7          Q.    Okay.
 8                Does Ocean Drive Capital have any
 9    assets, does it own anything?
10          A.    No.
11          Q.    For what purpose is Ocean Drive
12    Capital in existence today?
13          A.    Its not dissolved.
14          Q.    Do you intend to use it to do
15    deals?
16          A.    No.
17          Q.    Have you ever done a deal in Ocean
18    Drive Capital?
19                MS. WALSH:  Objection.
20          Q.    You can answer.
21                MS. WALSH:  Your time frames are a
22          little broad.  I didn't want to interfere
23          but your time frames and your relevance
24          because of that.
25                You can answer.

00016
 1                         Kassai
 2          Q.    Have you done any deals in Ocean
 3    Drive Capital?
 4          A.    Please define deals.
 5          Q.    Have you closed any transactions
 6    involving Ocean Drive Capital?
 7          A.    No.
 8          Q.    Why was Ocean Drive Capital
 9    formed?
10          A.    As an LLC as well as to establish
11    a name.
12          Q.    Have you ever used Ocean Drive
13    Capital for any purpose?
14          A.    Yes.
15          Q.    Okay.
16                How have you used the entity?
17          A.    The entity has a checking account
18    and at one point had a securities account
19    which was used for holding securities or
20    warrants.
21          Q.    Where was the securities account
22    maintained?
23          A.    When?
24          Q.    Did it have more than one
25    securities account?

00017
 1                         Kassai
                           Page 7
```

```
          12-12-07 phillip kassai v drinks america holdings - kassai.txt
 2            A.   When?
 3            Q.   At any time.
 4            A.   Not to my knowledge.
 5            Q.   Okay.
 6                 So what securities firm did you
 7       open an account in in the name of Ocean Drive
 8       Capital?
 9            A.   To the best of my knowledge, one
10       was opened at Pond Securities.
11            Q.   Okay.
12                 When?
13            A.   I am not sure of the date.
14            Q.   Is it still open?
15            A.   Not to my knowledge.
16            Q.   Were any securities deposited in
17       Pond Securities in the name of Ocean Drive
18       Capital?
19            A.   I believe so.
20            Q.   What securities?
21            A.   I would have to go through
22       statements to check that out.
23                 MR. GOPSTEIN:  I would ask that you
24            do so and inform us when you return the
25            transcript.
```
```
00018
 1                      Kassai
 2                 MS. WALSH:  I reserve my
 3            objections.
 4                 _____
 5       _____
 6       _____
 7       _____
 8            Q.   When was Ocean Drive Capital
 9       formed?
10            A.   I don't recall the exact date.
11            Q.   All right.
12                 But it still is in existence
13       today?
14            A.   Yes.
15            Q.   Okay.
16                 Tell me about Iska Capital
17       Partners, when was that formed?
18            A.   Prior to Ocean Drive Capital.
19            Q.   Can you give me a year?
20            A.   Not off the top of my head, no.
21            Q.   Is Iska Capital still in
22       existence?
23            A.   Yes.
24            Q.   For what purpose was Iska Capital
25       formed?
```
```
00019
 1                      Kassai
 2            A.   To make investments.
 3            Q.   who are the members of Iska
 4       Capital?
 5            A.   I'm the member.
 6            Q.   You're the sole member?
 7            A.   No, my wife is a member as well.
 8            Q.   Other than yourself and your wife,
 9       are there any other members of Iska Capital?
10            A.   No.
                              Page 8
```

12-12-07 phillip kassai v drinks america holdings - kassai.txt
```
11          Q.    Have there ever been any other
12    members of Iska Capital?
13          A.    No.
14          Q.    Other than yourself and Dan Myers,
15    have there ever been any other members of
16    Ocean Drive Capital?
17          A.    No.
18          Q.    Okay.
19                Do you still do business, any sort
20    of business with Dan Myers?
21          A.    There are past investments or
22    deals that we worked on together and those
23    deals continue to go forward so yes, there is
24    on those specific deals there is a working
25    relationship.
```
00020
```
1                       Kassai
2           Q.    Okay.
3                 So you have an ongoing working
4     relationship with Dan Myers, but if I
5     understand you correctly, it all relates to
6     old business?
7           A.    Correct.
8           Q.    You're not currently doing any new
9     deals or doing any new transactions involving
10    Dan Myers?
11          A.    Correct, not.
12          Q.    Is there any reason why you're not
13    today?
14          A.    We don't work together anymore.
15          Q.    Is that the only reason?
16          A.    We don't work together anymore.
17          Q.    I'm just asking you if that's the
18    only reason.  I understand you gave that as a
19    reason.  Is that the only reason you're not
20    working with Dan Myers anymore?
21                Do you understand the question?
22          A.    I think I answered the question.
23          Q.    I understand that that is a
24    reason.  My question is, is that the only
25    reason, are there any other reasons why you
```
00021
```
1                       Kassai
2     are no longer working with Dan Myers on any
3     business?
4           A.    Not to my knowledge.
5           Q.    Do you currently have a good
6     working relationship with Dan Myers?
7                 MS. WALSH:  I object, it misstates
8           the testimony.
9           Q.    Let me rephrase it.
10                Do you still have a good
11    relationship with Dan Myers?
12          A.    No.
13          Q.    Would you say that you are no
14    longer on good terms personally or
15    professionally?
16                MS. WALSH:  It assumes facts aren't
17          in evidence but --
18          Q.    You know him personally, correct?
19          A.    Correct.
```
                              Page 9

```
             12-12-07 phillip kassai v drinks america holdings - kassai.txt
20           Q.    You have worked with him
21     professionally?
22           A.    Correct.
23           Q.    Are you still on good terms with
24     him?
25           A.    Define good terms.
```

00022
```
 1                      Kassai
 2              MR. GOPSTEIN:  Read back the last
 3     answer if you could to the prior
 4     question, and maybe you should follow it
 5     up if you wouldn't mind.
 6              (Record read.)
 7           Q.    Why do you no longer have a good
 8     relationship with Dan Myers?
 9           A.    We no longer work together.
10           Q.    That doesn't necessarily mean that
11     you don't have a good relationship.
12              Is there anything other than the
13     fact that you are physically not working
14     together in the same office that would lead
15     you to say that you don't have a good
16     relationship with him?
17           A.    Please rephrase, I'm not
18     understanding the question.
19           Q.    I'm trying to follow up on an
20     answer that you gave.  Rather than suggesting
21     anything, I just wanted to use the words that
22     you used.  Let me rephrase this.
23              How would you describe your
24     relationship today with Dan Myers?
25           A.    Cordial.
```

00023
```
 1                      Kassai
 2           Q.    Is there any animosity or conflict
 3     that you are aware of between yourself and Dan
 4     Myers at present?
 5           A.    At present, no.
 6           Q.    Okay.
 7              So would you say you are presently
 8     on good terms with Dan Myers even though you
 9     don't work together?
10           A.    I think I answered the question.
11           Q.    Well, let's try to get a clearer
12     answer.
13              Would it be fair to say that you
14     are presently on good terms with Dan Myers
15     even though you don't work together anymore?
16              MS. WALSH:  I think it was asked
17           and answered so I object.  You can
18           answer.
19           A.    I'll answer what I answered
20     earlier, I think I answered the question.
21           Q.    I need you to answer it again
22     because I don't think you answered that
23     question, so I need you to tell me what your
24     answer is.
25           A.    I said we have a cordial
```

00024
```
 1                      Kassai
```
                              Page 10

```
                12-12-07 phillip kassai v drinks america holdings - kassai.txt
 2      relationship.
 3          Q.    Okay.
 4                When, if ever, did you not have a
 5      cordial relationship with Dan Myers?
 6          A.    I don't know if there was a time.
 7          Q.    The reason I ask you that is
 8      because you carefully said at present that the
 9      relationship is cordial.  I thought that
10      implied that it may not have been cordial at
11      some other time, so --
12          A.    That's your implication, I
13      answered your question when you asked at
14      present.
15                MS. WALSH:  Just answer the
16          questions.
17          Q.    I'm going to be even more clear.
18                Throughout the time that you have
19      known Dan Myers has your relationship with him
20      always been cordial?
21          A.    Yes.
22          Q.    Have you ever had an instance
23      where you were in conflict with Mr. Myers on
24      any business transaction?
25          A.    Yes.

00025
 1                      Kassai
 2          Q.    Okay.
 3                Could you please describe that.
 4          A.    Through the course of any working
 5      relationship there are times where things
 6      arise which can impact a relationship.
 7          Q.    Can you point to any specific
 8      conflict that you had with Dan Myers?
 9          A.    I don't know, nothing comes to the
10      top of my head right now.
11          Q.    Have you ever had a conflict or
12      disagreement with Dan Myers concerning any of
13      the issues involved in this case?
14          A.    Define conflict.
15          Q.    Disagreement.
16          A.    Yes.
17          Q.    Tell me about it.
18          A.    Whether or not to raise capital
19      for Drinks Americas.
20          Q.    And what was your position and
21      what was his position?
22          A.    My position was not to raise money
23      for the company.
24          Q.    And Dan wanted to raise money?
25          A.    Yes.

00026
 1                      Kassai
 2          Q.    Why didn't you want to raise money
 3      for Drinks Americas?
 4          A.    I felt that it was a poorly run
 5      company with poor management and no execution
 6      plan.
 7          Q.    Was there a discussion about this
 8      whether or not to raise money at Sloan
 9      Securities?
10          A.    Yes.
                        Page 11
```

12-12-07 phillip kassai v drinks america holdings - kassai.txt
```
11          Q.   Who else was involved in that
12    discussion?
13          A.   To the best of my knowledge, this
14    goes back numerous years, I would have to
15    assume Jim Ackerman was involved as well as
16    the other bankers who were there at the time.
17          Q.   Who were the other bankers?
18          A.   I don't recall.
19          Q.   Was Jim Ackerman the president of
20    Sloan Securities while you were there?
21          A.   Jim Ackerman is and was the CEO,
22    president of Sloan Securities, yes.
23          Q.   Okay.
24               By the way, what do you do in your
25    merchant banking business today, what type of
```
00027
```
1                     Kassai
2     transactions are you involved in?
3           A.   Transactions that make money or
4     try to make money.
5           Q.   How do you do that?
6           A.   Look for opportunities where the
7     fundamentals and financials could hopefully
8     make money.
9           Q.   What services do you provide for
10    your clients?
11          A.   Many.
12          Q.   Describe them.
13          A.   Advisory work, M and A work.
14          Q.   Do you raise money for your
15    clients from time to time?
16          A.   No.
17          Q.   Do you solicit investors who are
18    willing to invest in any of your clients?
19          A.   No, its nonsolicited.
20          Q.   Nonsolicited.
21               You do M and A work, merchant
22    banking, what else?
23          A.   And I had advisory work.
24          Q.   What type of advisory work?
25          A.   Helping with cap tables,
```
00028
```
1                     Kassai
2     financials, working a company through
3     difficult times or good times, helping them
4     reassess or assess potential opportunities.
5           Q.   Do you have any partners in your
6     business today?
7           A.   Which business?
8           Q.   The merchant banking business that
9     you conduct at 444 Madison Avenue?
10          A.   No.
11          Q.   You work entirely on your own in
12    that office?
13          A.   Yes.
14          Q.   What is your educational
15    background by the way, what degrees have you
16    earned?
17          A.   I have a BA and a masters.
18          Q.   Where did you earn your BA?
19          A.   At Ner Israel Rabbinical College.
```
                          Page 12

                12-12-07 phillip kassai v drinks america holdings - kassai.txt
    20          Q.    Is that in Israel?
    21          A.    No, it is in Maryland.
    22          Q.    How do you spell that?
    23          A.    N-e-r Israel.  I-s, do I need to
    24     spell the rest?
    25          Q.    Its a rabbinical college?

00029
    1                      Kassai
    2          A.    Yes.
    3          Q.    Where did you get your masters?
    4          A.    Johns Hopkins.
    5          Q.    What was your masters in?
    6          A.    Finance.
    7          Q.    When did you get your masters at
    8     Johns Hopkins?
    9          A.    I don't remember the exact year, I
   10     would have to refer back to my CV; it was a
   11     while ago.
   12          Q.    Can you extrapolate back, did you
   13     go directly from the rabbinical college to
   14     John Hopkins?
   15          A.    Yes.
   16          Q.    Try to remember when you got your
   17     BA and you'll probably be able to figure out
   18     when you got your masters.
   19                Does that help you?
   20          A.    From the period of '95 to '97,
   21     somewhere around there, not exactly sure.
   22          Q.    That is when you got your masters?
   23          A.    Correct.
   24          Q.    How old are you?
   25          A.    34.

00030
    1                      Kassai
    2          Q.    You think you got your masters
    3     somewhere between '95 and '97?
    4          A.    Yes.
    5          Q.    By the way, do you have a CV?
    6          A.    Yes.
    7          Q.    Do you have a copy of it with you?
    8          A.    No.
    9                RQ
   10                MR. GOPSTEIN:  I would call for the
   11          production of Mr. Kassai's curriculum
   12          vitae.
   13          Q.    What did you do after --
   14                MS. WALSH:  Have you ever asked for
   15          it before?
   16                MR. GOPSTEIN:  Probably not.
   17          Q.    What was your first employment
   18     after Johns Hopkins?
   19          A.    Morgan Stanley.
   20          Q.    What did you do at Morgan Stanley?
   21          A.    I was a financial advisor.
   22          Q.    What department?
   23          A.    No specific department.
   24          Q.    Who did you report to?
   25          A.    Jim Wambles (phonetic).

00031
    1                      Kassai
                         Page 13

```
                 12-12-07 phillip kassai v drinks america holdings - kassai.txt
 2              Q.     What was his title at the firm?
 3              A.     Managing director.
 4              Q.     Managing director of any
 5      particular department?
 6              A.     No.
 7              Q.     How long were you at Morgan
 8      Stanley?
 9              A.     Little over three years.
10              Q.     What did you do after that?
11              A.     Went to Spencer Trask.
12              Q.     What was Spencer Trask?
13              A.     A venture capital firm.
14              Q.     Where are they located?
15              A.     Midtown Manhattan.
16              Q.     What did you do there, what type
17      of work?
18              A.     Assessed potential companies for
19      capital raises, helped with the companies,
20      advised, raised capital, negotiated.
21              Q.     How long were you there?
22              A.     Little over a year.
23              Q.     What did you do after that?
24              A.     Went to work at Sunrise
25      Securities.

00032
 1                            Kassai
 2              Q.     Where is that located?
 3              A.     Midtown Manhattan.
 4              Q.     What did you do at Sunrise
 5      Securities?
 6              A.     Pretty much the same thing I did
 7      prior.
 8              Q.     What department did you work in at
 9      Sunrise Securities?
10              A.     No department.
11              Q.     How long were you there?
12              A.     Two and a half years roughly.
13              Q.     Okay.
14                     After that did you rent space at
15      444 Madison Avenue?
16              A.     Yes.
17              Q.     As a merchant banker?
18              A.     Yes.
19              Q.     On your own or did you have
20      partners at that time?
21              A.     One of my partners at that time
22      was Dan Myers.
23              Q.     How did you meet Dan Myers?
24              A.     In synagogue.
25              Q.     Where?

00033
 1                            Kassai
 2              A.     In Lawrence, New York.
 3              Q.     Is that where you live?
 4              A.     Yes.
 5              Q.     You still live in Lawrence?
 6              A.     Correct.
 7              Q.     Does Dan Myers live in Lawrence?
 8              A.     To the best of my knowledge.
 9              Q.     Do you still attend the same
10      synagogue?
```

12-12-07 phillip kassai v drinks america holdings - kassai.txt
```
11          A.   Sometimes.
12          Q.   Do you see him there on occasion?
13          A.   Sometimes.
14          Q.   Okay.
15               When you see him there do you
16   greet each other?
17          A.   Yes.
18          Q.   When was the last time that you
19   saw Dan Myers anywhere?
20          A.   Two evenings ago.
21          Q.   Where?
22          A.   A mutual individual who lives in
23   the Five Towns was making a Hanukkah party and
24   I attended it.  I was invited and I assume
25   that Mr. Myers was invited as well.
```

00034
```
1                      Kassai
2          Q.   Did you have a chance to talk at
3   the Hanukkah party?
4          A.   No.
5          Q.   You didn't say a word to Dan?
6          A.   No.
7          Q.   Did you acknowledge each other?
8          A.   No.
9          Q.   Is there a reason why you didn't
10  talk?
11          A.   I wasn't in the mood.
12          Q.   Okay.
13               When was the last time that you
14  met or spoke to Dan Myers before the Hanukkah
15  party?
16          A.   I don't recall.
17               It could have been the Saturday
18  before there was another party that we clearly
19  were both invited to or I shouldn't say that,
20  let me, I was invited, I have to assume he was
21  invited as well.
22          Q.   Okay.
23               So you actually see Dan Myers at
24  social functions fairly regularly either at
25  social functions or at the synagogue?
```

00035
```
1                      Kassai
2          A.   Yes.
3          Q.   And with respect to the continuing
4   old business that you have with Dan Myers,
5   when is the last time that you spoke to Dan
6   about any of that old business that's still
7   alive?
8          A.   Probably about a week or two ago.
9          Q.   What did you talk about?
10          A.   Deals that we had worked on in the
11  past.
12          Q.   Which deals?
13          A.   Format Health, Basic Care, Sky
14  Frames, Polestar (phonetic).
15          Q.   Are those deals that you worked
16  together with Dan at Sloan Securities or --
17          A.   Yes.
18          Q.   All of them were at Sloan?
19          A.   Yes.
```
                        Page 15

12-12-07 phillip kassai v drinks america holdings - kassai.txt
```
20         Q.    Okay.
21               Are you still entitled to
22  compensation or what is --
23         A.    Yes.
24         Q.    On all four of those deals?
25         A.    Yes.
⬚
00036
1                       Kassai
2          Q.    Are they still being worked on or
3   have the deals been concluded and you're just
4   discussing the compensation?
5          A.    Both.
6          Q.    Okay.
7                Do you know Dan Myers generally in
8   your opinion to be an honest person?
9                MS. WALSH:  I am going to object.
10               MR. GOPSTEIN:  Okay.
11         Q.    Yes or no?
12         A.    To the best of my knowledge, yes,
13  an honest person.
14         Q.    Have you ever known Dan Myers to
15  say or do anything dishonest?
16         A.    Are you asking if he's ever lied?
17         Q.    That you know of.
18         A.    Yes.
19         Q.    When has he lied that you know of?
20               MR. GOPSTEIN:  Let the record
21         reflect that the witness is thinking.
22         A.    I would say with regard to certain
23  transactions there were times when he was not
24  fully telling the truth.
25         Q.    Which transactions?
⬚
00037
1                       Kassai
2          A.    Specifically to this matter at
3   hand, Drinks Americas.
4          Q.    Who did he lie to?
5          A.    To the best of my knowledge, he
6   lied to me and Sloan Securities.
7          Q.    What did he lie about and when?
8          A.    I do not know exact dates,
9   specifically with regard to monies earmarked
10  for the company.
11         Q.    When you say the company, you mean
12  Drinks Americas?
13         A.    Drinks Americas, correct.
14         Q.    What did he say to you or to Sloan
15  that was untruthful?
16         A.    As the money was coming in
17  supposedly going to escrow for Drinks
18  Americas, it seems that was not the case.
19         Q.    Where was the money going?
20         A.    I do not know.
21         Q.    So money was coming in to Sloan
22  Securities?
23         A.    No, it doesn't come into Sloan.
24         Q.    Where did it come?
25         A.    Supposedly it went to the escrow.
⬚
00038
1                       Kassai
```
                            Page 16

                    12-12-07 phillip kassai v drinks america holdings - kassai.txt
2          Q.    Sloan Securities had an escrow
3     account at Signature Bank?
4               MS. WALSH:  Is there a time frame
5          here?
6          Q.    What time frame are we talking
7     about?
8          A.    I assume we are talking about from
9     when the investment banking, original
10    investment banking, the first investment
11    banking agreement dated December '04 until the
12    period of time after let's call it October,
13    November '06.
14         Q.    Okay.
15              And money was coming in to Sloan
16    Securities' escrow account at Signature Bank;
17    is that correct?
18         A.    To the best of my knowledge, yes.
19         Q.    That money was coming in from
20    investors who thought they were investing or
21    going to invest in Drinks Americas?
22              MS. WALSH:  Object to the form as
23         to what the investors thought.
24         Q.    What was the money that was coming
25    in to the escrow account to be used for?

00039
1                      Kassai
2               MS. WALSH:  According to who?  I
3          have to object, I'm sorry, its vague.
4          Q.    What is your understanding of why
5     monies were coming in to Sloan Securities'
6     escrow account at Signature Bank?
7          A.    I believe it was for a further
8     deposit to be distributed among Sloan and
9     Drinks Americas.
10         Q.    Who was the money coming from?
11         A.    Various investors.
12         Q.    Was this the bridge loan or was
13    this investors in equity?
14         A.    It was convertible equity.
15         Q.    Are you saying there were some
16    people who were willing to lend money to
17    Drinks Americas that were depositing money in
18    the Sloan Securities escrow account?
19         A.    What I'm saying is it was
20    convertible equity.
21         Q.    I'm past that already.
22              Whoever these people were, were
23    they intending to invest or to lend money to
24    Drinks Americas?
25              MS. WALSH:  I'm going to --

00040
1                      Kassai
2          A.    Invest.
3          Q.    Excuse me?
4          A.    Invest.
5          Q.    They were intending to invest
6     monies in Drinks Americas?
7          A.    Yes.
8          Q.    For that purpose they wrote checks
9     which were deposited in the Sloan Securities
10    escrow account at Signature Bank, correct?
                              Page 17

                12-12-07 phillip kassai v drinks america holdings - kassai.txt
11          A.    I believe so.
12          Q.    Are you saying the money that was
13     earmarked to go to Drinks Americas was
14     diverted for some other purpose?
15          A.    I'm saying that was what I was led
16     to believe, yes.
17          Q.    Do you know that that happened?
18          MS. WALSH:  I object to the form
19     and to the time frame, your questions are
20     really broad.
21          MR. GOPSTEIN:  He gave me a time
22     frame.
23          MS. WALSH:  Okay.
24          A.    The question again, please?
25          Q.    How do you know that monies that

00041
1                        Kassai
2      were earmarked for investment in Drinks
3      Americas were diverted for some other purpose,
4      how do you know that?
5          A.    I was told.
6          Q.    Who told you?
7          A.    Jim Ackerman.
8          Q.    When did Jim Ackerman tell you
9      that?
10         A.    Most likely in August, August '07.
11         Q.    August of 2007?
12         A.    Yes.
13         MR. GOPSTEIN:  I have got to take a
14     five-minute break.
15         Off the record.
16         (Whereupon, an off-the-record
17     discussion was held.)
18         (Time noted:  3:12 p.m.)
19         (Time noted:  3:18 p.m.)
20         Q.    Was August 2007 the first time
21     that you learned that money had been diverted
22     out of Sloan Securities' escrow account that
23     was supposed to go to Drinks Americas?
24         A.    I don't understand your question.
25         Q.    You said --

00042
1                        Kassai
2          A.    How is money, I don't know how
3      money can be diverted out of an escrow
4      account.
5          Q.    Didn't you say money was supposed
6      to go to Drinks Americas but it was diverted
7      elsewhere?
8          A.    Correct, but I don't know if money
9      can be diverted out of an escrow account.  I'm
10     not, I don't know exactly when the money was
11     diverted or how much money was diverted.
12         Q.    Okay.
13         A.    And yes, that was the first time I
14     learned of that.
15         Q.    Is it accurate to say that
16     sometime in August 2007 you learned for the
17     first time that investor money that was
18     deposited in a Sloan Securities escrow account
19     earmarked for Drinks Americas was actually
                            Page 18

12-12-07 phillip kassai v drinks america holdings - kassai.txt
20      used for some other purpose?
21          A.    Yes, that was the first time.
22          Q.    What exactly did Jim Ackerman tell
23      you when you learned about this for the first
24      time in August 2007?
25          A.    I don't exactly remember verbatim

00043
1                          Kassai
2       word for word what he said.
3           Q.    In sum and substance, what did he
4       say?
5           A.    That Dan Myers had done things
6       while collectively all of us were working
7       under Sloan that was unbeknownst to myself and
8       him as well.
9           Q.    Are you saying that Jim Ackerman
10      said that Dan Myers did this all on his own?
11          A.    Yes, I am.
12          Q.    Did Dan Myers have signature
13      authority, sole signature authority at
14      Signature Bank?  No pun intended.
15          A.    I don't know.
16          Q.    Were you a signatory on any of the
17      Sloan Securities bank accounts at Signature
18      Bank?
19          A.    No.
20          Q.    Was Jim Ackerman?
21          A.    I said I don't know.
22          Q.    Were you ever involved in any
23      banking transactions transferring funds or
24      depositing funds for investment bank
25      transactions at Sloan Securities?

00044
1                          Kassai
2               MS. WALSH:  That's pretty compound.
3           A.    Be more specific, please.
4               MS. WALSH:  I'm going to object.
5           Q.    Did you interact with Signature
6       Bank on behalf of Sloan Securities at any
7       time?
8           A.    No.
9           Q.    Who was the bank officer at
10      Signature Bank who handled Sloan Securities'
11      accounts?
12          A.    I do not know.
13          Q.    Have you ever communicated with
14      anyone at Signature Bank concerning any
15      accounts of Sloan Securities?
16          A.    No.
17          Q.    What else did Jim Ackerman tell
18      you about what Dan Myers had supposedly done?
19          A.    That's really the only thing that
20      comes to mind right now.
21          Q.    Did you go and talk to Dan Myers
22      about this after Jim Ackerman told you what
23      Dan had done?
24          A.    Immediately right after?
25          Q.    At any time.

00045
1                          Kassai
                        Page 19

```
            12-12-07 phillip kassai v drinks america holdings - kassai.txt
 2              A.    Yes.
 3              Q.    When was the first time you talked
 4      about this subject to Dan Myers or with Dan
 5      Myers?
 6              A.    Most likely subsequent to that
 7      conversation.
 8              Q.    What did you talk about?
 9              A.    What exactly transcribed (sic) or
10      happened at that juncture.
11              Q.    What did Dan Myers tell you about
12      what had happened?
13              A.    He wasn't very specific.  He had
14      just said that there were things that were
15      done that he was sorry for, and he had worked
16      with Drinks Americas to rectify the situation
17      and he's dealing with it.
18              Q.    Did you ask him specifically what
19      he had done?
20              A.    I had asked him specifically what
21      he had done, yes.
22              Q.    What did he say?
23              A.    He said it was really irrelevant.
24              Q.    All right.
25                    Were you in involved in
```

00046
```
 1                          Kassai
 2      communicating with investors or potential
 3      investors in the course of raising money for
 4      Drinks Americas?
 5              A.    Very seldomly.
 6              Q.    Who was?
 7              A.    Dan Myers.
 8              Q.    Who else?
 9              A.    Dan Myers.
10              Q.    Jim Ackerman didn't talk to any of
11      the investors?
12              A.    Not to my knowledge.  He may or
13      may have not, I have no idea, you would have
14      to ask him.
15              Q.    What was your role in connection
16      with the December 2004 investment banking
17      agreement?
18                    MS. WALSH:  I object to the form of
19              the question.
20                    MR. GOPSTEIN:  You can object.
21              Q.    What was your role?
22              A.    I had no role, I was an employee
23      of Sloan Securities.
24              Q.    Did you work on the transaction?
25              A.    Define work.
```

00047
```
 1                          Kassai
 2              Q.    Did you perform any service in
 3      connection with the December 2004 investment
 4      banking agreement?
 5              A.    Yes, I gave Dan Myers two of my
 6      contacts.
 7              Q.    What else did you do?
 8              A.    That was it.
 9              Q.    Did you communicate with Drinks
10      Americas?
```

                                Page 20

                12-12-07 phillip kassai v drinks america holdings - kassai.txt
11          A.    Unless they were in the office,
12     no, to the best of my knowledge.
13          Q.    So are you saying that your sole
14     involvement in its entirety with respect to
15     the December 2004 investment banking agreement
16     between Sloan and Drinks was simply referring
17     two contacts to Dan Myers and that's all you
18     did?
19          A.    You can call it simply, but that
20     is, they were the two largest investors in
21     that equity raise.
22          Q.    What were the names of the two
23     investors or the two contacts that you gave to
24     Dan Myers?
25          A.    Cornell Capital and Triage.

00048
1                          Kassai
2           Q.    Did you deal with Cornell and
3      Triage in connection with their proposed
4      investment in Drinks Americas?
5           A.    No.
6           Q.    Who did?
7           A.    I have to assume Dan Myers.
8           Q.    Do you know which investor or
9      potential investors' funds were diverted?
10          A.    No idea.
11          Q.    Do you know how much money was
12     diverted out of the Sloan escrow account?
13          A.    No idea.
14          Q.    Do you know for what period of
15     time it was diverted?
16          A.    No idea.
17          Q.    Do you know what happened to the
18     money?
19          A.    No idea.
20          Q.    Did the money ultimately go to
21     Drinks Americas?
22          A.    To the best of my knowledge, yes.
23          Q.    What money --
24          A.    I assume that.
25          Q.    What money, if you know, was

00049
1                          Kassai
2      originally diverted but then somehow made its
3      way to Drinks Americas?
4           A.    I already stated that I didn't
5      know any money was diverted until almost two
6      years later.
7           Q.    I understand that, I'm asking you
8      now for your understanding today based upon
9      what you learned so far, what happened to the
10     monies that were diverted or used for some
11     other purpose, what happened to that money?
12          A.    I have to assume it made its way
13     to Drinks Americas as Drinks Americas only
14     paid us the cash portion of the commission for
15     the 1.35 million.
16          Q.    But that's just an assumption,
17     you're just guessing, you don't know that to
18     be the case?
19          A.    I don't know that what's the case?
                          Page 21

12-12-07 phillip kassai v drinks america holdings - kassai.txt
```
20        Q.    That the money that was originally
21   diverted was then somehow given to Drinks
22   Americas, you don't know that for a fact?
23             MS. WALSH:  Do you know how much
24        money?  If you have a document or
25        something that you can identify it would
```
00050
```
 1                     Kassai
 2        make the questions less vague and less
 3        objectionable.
 4             MR. GOPSTEIN:  We are getting that
 5        information from Signature Bank, I don't
 6        know the exact amount.
 7        A.    I don't know the amount either.
 8        Q.    What I'm trying to get at is how
 9   do you know or are you just guessing or
10   assuming that the money actually eventually
11   went to Drinks Americas?
12             MS. WALSH:  What the money, I
13        object.
14        Q.    The money that was diverted?
15        A.    I told you my assumption is that
16   the money made its way to or back to Drinks
17   Americas because Drinks Americas paid
18   commissions on those dollars.
19        Q.    Did anyone ever tell you that the
20   1,350,000 that was raised had nothing to do
21   with the money that was diverted but that the
22   money that was diverted was actually other
23   monies.
24             Did you ever hear of that?
25        A.    No.
```
00051
```
 1                     Kassai
 2        Q.    Okay.
 3             Did you ever hear anyone, Jim
 4   Ackerman or Dan Myers or anyone else tell you
 5   that the money that was diverted was actually
 6   returned to the investors or potential
 7   investors and never went to Drinks Americas?
 8        A.    I don't know.
 9             I mean it might have been that Dan
10   could have been made mention to that at the
11   time that when I confronted him after,
12   subsequent to the Jim Ackerman phone call, I
13   don't recall.
14        Q.    Okay.
15        A.    It was irrelevant to me at that
16   point.
17        Q.    While you were at Sloan and this
18   December 24th investment banking agreement was
19   in place, did you on occasion keep track of
20   how the deal was progressing?
21        A.    Not really.
22        Q.    Why not?
23        A.    At the firm there were many
24   transactions going on simultaneously, this
25   wasn't one I was really working on.
```
00052
```
 1                     Kassai
```
                              Page 22

```
                12-12-07 phillip kassai v drinks america holdings - kassai.txt
  2              Q.    Didn't you stand to gain some sort
  3    of compensation if the deal successfully
  4    concluded?
  5              A.    Yes.
  6              Q.    But you just weren't interested or
  7    you --
  8              A.    That's not what I said.
  9              Q.    You were too busy?
 10              A.    Too busy.
 11              Q.    Did you know, for instance, what
 12    investors were investing at any particular
 13    point in time?
 14              A.    I stated the only two investors
 15    that I knew or cared about were the ones that
 16    I mentioned previously.
 17              Q.    Okay.
 18              Do you know what Dan Myers
 19    supposedly used the money for that was
 20    diverted?
 21              A.    No idea.
 22              Q.    When Mr. Myers said he was working
 23    it out with the company, do you know how he
 24    was working it out?
 25              A.    No idea.

00053
  1                           Kassai
  2              Q.    Do you know today what arrangement
  3    or work out was --
  4              A.    No.
  5              Q.    -- accomplished?
  6              A.    No.
  7              Q.    Do you know when Jim Ackerman
  8    first became aware of the fact that money had
  9    been diverted away from Drinks Americas that
 10    was supposed to go to Drinks Americas?
 11              A.    No.
 12              MS. WALSH:  Objection.  You're
 13         asking him what Jim Ackerman knew and
 14         when?
 15              MR. GOPSTEIN:  I'm asking if he
 16         knows.
 17              A.    No idea.
 18              Q.    When Jim first told you about
 19    this, did he tell you when he first found out
 20    about it?
 21              A.    Not to my recollection, no.
 22              Q.    Did you ever ask him, "Jim, when
 23    did you find out about this," or "How long
 24    have you known about this?"
 25              A.    Not to my recollection, no.

00054
  1                           Kassai
  2              Q.    Have you ever had a conversation
  3    with Jim Ackerman as to why he didn't tell you
  4    this before August 2007?
  5              A.    No.
  6              Q.    Did you consider this to be a
  7    pretty serious matter when you found out about
  8    it?
  9              MS. WALSH:  Objection.
 10              MR. GOPSTEIN:  I'll rephrase it.
                            Page 23
```

12-12-07 phillip kassai v drinks america holdings - kassai.txt
```
11          Q.   Is it your understanding that this
12     would be --
13               MS. WALSH:  This is what I'm
14          objecting to, your term this.
15               MR. GOPSTEIN:  Okay, so I'll
16          rephrase, even though I'm not finished
17          with the question.
18          Q.   Is it your understanding that the
19     alleged diversion of money away from a client
20     to be used by one of the principals of the
21     firm was a serious regulatory matter when you
22     found out about it?
23               MS. WALSH:  Objection.  You can
24          answer.
25          A.   You're making a lot of
```

00055
```
 1                    Kassai
 2     speculations in there, I don't know how to
 3     answer it.
 4          Q.   Did you think about it?  What came
 5     to your mind when you found out that Dan Myers
 6     had allegedly used money for some other
 7     purpose that was supposed to go to Drinks
 8     Americas?
 9          A.   You're asking me what I was
10     thinking?
11          Q.   Yes.
12          A.   That that was a bad thing.
13          Q.   Okay, that's what I'm trying to
14     get at.
15               Bad in what way, a regulatory
16     standpoint?
17          A.   Yes, regulatory.
18          Q.   Did you think it was a criminal
19     offense?
20          A.   I had no idea, I didn't know the
21     facts so I couldn't comment.
22          Q.   Okay.
23               As you sit here today, do you have
24     any reason to believe that Jim Ackerman knew
25     about this diversion of funds long before
```

00056
```
 1                    Kassai
 2     August 2007?
 3          A.   I have no idea.
 4          Q.   As you sit here today, do you have
 5     any understanding or any information
 6     whatsoever that would assist us in determining
 7     when Jim Ackerman first found out about what
 8     had taken place?
 9          A.   No idea.
10          Q.   Okay.
11               You brought a claim against Drinks
12     Americas alleging an entitlement to 300,000
13     warrants to purchase stock of Drinks Americas,
14     correct?
15          A.   Me personally?
16          Q.   Yes.
17               MS. WALSH:  You want to show him
18          the complaint like I showed Mr. Kenny?
19               MR. GOPSTEIN:  Like you didn't show
```
                              Page 24

12-12-07 phillip kassai v drinks america holdings - kassai.txt
```
20          Mr. Kenny, but I'll be more than happy to
21          do that.
22               Do you have a marked copy of the
23          complaint?
24               MS. WALSH:  I don't know if I did
25          put it in or not.

00057
 1                    Kassai
 2               MR. GOPSTEIN:  I'm not going to
 3          mark this only because its a faxed copy.
 4               Let me ask you to take a look at
 5          this.
 6               MS. WALSH:  You can substitute it
 7          if you want.
 8               MR. GOPSTEIN:  If you have a copy.
 9               MS. WALSH:  I just don't want to
10          interrupt the deposition, we can
11          substitute it if that's okay with you.
12               MR. GOPSTEIN:  Okay.
13          Q.    You can take a look at your entire
14     complaint but I want you to particularly look
15     at the relief on page six at the end, and then
16     I'll ask you some questions.
17          A.    What was your question?
18          Q.    Let me, can I have it for a
19     second.
20               What exactly are you suing for in
21     the complaint that you filed against Drinks
22     Americas?
23               MS. WALSH:  Objection, are you
24          talking damages, are you talking behavior
25          that he's suing for, its vague.

00058
 1                    Kassai
 2          Q.    What relief are you asking for?
 3               MS. WALSH:  Do you know what that
 4          means?
 5          Q.    If you don't know what it is then
 6     tell me.
 7          A.    I'm not sure, I think its in the
 8     document so I'm not really sure what you're
 9     asking.
10          Q.    I'm asking for your understanding.
11               What are you asking to get from
12     Drinks Americas?
13          A.    The compensation that is due to me
14     through the various warrants and investment
15     banking agreements that were signed with
16     Drinks Americas.
17          Q.    What do you think is due to you?
18          A.    The percentages as split within
19     Sloan of the 300,000 warrants, the percentages
20     as accorded with Sloan of the warrants that
21     are due from the $1.35 million equity raise
22     for Drinks.
23          Q.    Isn't that the same thing?
24          A.    There are various documents.  So
25     I'm just making sure that we are --

00059
 1                    Kassai
                   Page 25
```

```
                12-12-07 phillip kassai v drinks america holdings - kassai.txt
  2             Q.    I'm asking what you want from
  3     Drinks Americas.  If you were to win this
  4     lawsuit, what do you think you should get?
  5             A.     Its roughly 110,000 warrants if I
  6     remember correctly all added in that are --
  7             Q.    Do you have an exact number of
  8     what you think you're entitled to?
  9                 MS. WALSH:  Are you talking dollars
 10             or warrants?
 11                 MR. GOPSTEIN:  Warrants.
 12             Q.    You're not suing for dollars, are
 13     you?
 14             A.    Both.
 15             Q.    What dollars do you think you're
 16     entitled to?
 17                 MS. WALSH:  There is a paragraph in
 18             the complaint that will be in evidence,
 19             whatever other further relief so that's a
 20             catchall paragraph.
 21             Q.    Other than the catchall, what are
 22     you asking to get from Drinks Americas?
 23             A.    Warrants, interest and costs.
 24             Q.    Okay.
 25             A.    That would cover it.
 
00060
  1                          Kassai
  2             Q.    How many warrants do you claim
  3     Drinks Americas owes you, you, Phillip Kassai?
  4             A.    I need to do the, that's a
  5     formulation and some math that needs to be
  6     done.  I don't have the exact number off the
  7     top of my head.
  8             Q.    Would it take you a short time to
  9     be able to figure it out or are we going to
 10     have to take a long break to do that?
 11             A.    It could take 10, 15 minutes.
 12             Q.    That's actually longer than I
 13     wanted to at this point.
 14             Do you have any sort of
 15     approximation in your head of what you think
 16     you're entitled to?
 17             A.    Yes, the damages should be
 18     somewhere about $300,000 when if you include
 19     the assignment and sale of the warrants.
 20             Q.    How many warrants do you think
 21     you're entitled to, if you can estimate?
 22                 MS. WALSH:  Objection, this is
 23             asked and answered.
 24                 MR. GOPSTEIN:  No, its not asked
 25             and answered.  He said he would need 15
 
00061
  1                          Kassai
  2     minutes to give me an exact number.
  3             Q.    I'm asking without taking a
  4     15-minute break since you have apparently
  5     never done it before, do you have an
  6     approximate number?
  7             A.    125,000 warrants.
  8             Q.    You think you're entitled to
  9     approximately 125,000 warrants?
 10             A.    Yes.
                                        Page 26
```

12-12-07 phillip kassai v drinks america holdings - kassai.txt
```
11        Q.    And what percentage --
12             MS. WALSH:  Can we go off the
13        record before you ask another question,
14        can we go off the record a second.
15             MR. GOPSTEIN:  Yes.
16             MS. WALSH:  Off the record.
17             (Whereupon, an off-the-record
18        discussion was held.)
19             (Time noted:  3:45 p.m.)
20             (Time noted:  3:55 p.m.)
21        Q.    Mr. Kassai, before today have you
22   ever sat down and calculated the exact numbers
23   of warrants that you believe Drinks Americas
24   owes you?
25             MS. WALSH:  In the universe, not
```

00062
```
 1                    Kassai
 2        just in this case?  Is that your
 3        question, otherwise I object.
 4        Q.    Is there any allegation that
 5   Drinks Americas owes you warrants outside of
 6   this lawsuit?  Is there something else I don't
 7   know about?
 8             MS. WALSH:  You can answer the
 9        question.  I may object but you have to
10        answer.
11        A.    I went through this exercise with
12   my attorneys when the case was brought.
13             MS. WALSH:  Don't talk about
14        conversations with your attorneys.
15        Q.    Okay.
16             So --
17             MS. WALSH:  Its privileged.
18        Q.    Are you saying there was a time
19   that you sat down and calculated the number of
20   warrants that you believe that you're entitled
21   to?
22        A.    Yes.
23        Q.    What is that number to the best of
24   your recollection?
25        A.    I think you asked me that question
```

00063
```
 1                    Kassai
 2   and I answered it already.
 3        Q.    What is the number of warrants
 4   that you believe you're entitled to to the
 5   best of your recollection and understanding as
 6   you sit here today?
 7        A.    I said roughly 125,000 warrants.
 8        Q.    Okay.
 9             You would need you said about
10   15 minutes or so to come up with an exact
11   number, but you think that number is close?
12        A.    Correct.
13        Q.    What percentage of the total
14   warrants that you believe are owed to Sloan
15   Securities is your percentage?
16        A.    Well, there are two warrants in
17   question here.
18        Q.    Let's --
19        A.    You say Sloan Securities, are you
                    Page 27
```

12-12-07 phillip kassai v drinks america holdings - kassai.txt
```
20      referring also to the warrants that were
21      issued into Sloan Equity Partners.
22          Q.    Yes.
23          A.    My belief is a rough estimate.
24                As I said 125,000 warrants which
25      would represent roughly 40 percent of the
```
00064
```
 1                      Kassai
 2      outstanding warrants due.
 3          Q.    Okay.
 4                So the refuse number of 125,000
 5      warrants includes all warrants that would be
 6      due to Sloan Securities or Sloan Equity
 7      Partners, correct?
 8          A.    Due to me?
 9          Q.    Yes.
10          A.    Yes.
11                In other words, you're not saying
12      40 percent of 125,000?
13          Q.    No.
14          A.    Okay, I'm just a little confused
15      with --
16          Q.    Okay.
17                Is your testimony that you are
18      entitled to 40 percent of whatever number of
19      warrants are due to Sloan Securities or Sloan
20      Equity Partners?
21          A.    Yes.
22          Q.    Okay.
23                And your understanding is that
24      40 percent is roughly equivalent to 125,000
25      warrants?
```
00065
```
 1                      Kassai
 2          A.    Yes.
 3          Q.    How do you calculate those
 4      warrants if you were going to calculate them,
 5      how would you do it?
 6          A.    There are several banking
 7      agreements as well as a warrant agreement
 8      issued by Drinks Americas to Sloan or Sloan
 9      Equity Partners or its affiliates.  And the
10      breakout within Sloan/Sloan Equity Partners
11      calls for my 40 percent as my ownership.
12          Q.    Okay, let's break that down.
13                And first of all, what is the
14      relationship of Sloan Equity Partners to Sloan
15      Securities?
16          A.    It was a special purpose vehicle
17      or LLC specifically created from my
18      understanding with this transaction so that
19      the warrants could be issued to that LLC.
20          Q.    Sloan Equity Partners was created
21      specifically for the Drinks Americas deal?
22          A.    Yes.
23          Q.    Who are the members of Sloan
24      Equity Partners?
25          A.    To my knowledge, Jim Ackerman, Dan
```
00066
```
 1                      Kassai
```

```
          12-12-07 phillip kassai v drinks america holdings - kassai.txt
 2    Myers, Phillip Kassai.
 3         Q.   Has that always been the
 4    composition of Sloan Equity Partners?
 5         A.   To my knowledge.
 6         Q.   What is the respective ownership
 7    of the three members?
 8         A.   To my knowledge it is 20 percent
 9    Jim Ackerman, 40 percent Dan Myers, 40 percent
10    Phillip Kassai.
11         Q.   And is it your understanding that
12    that is the actual ownership today?
13         A.   I'm not sure what anyone else's of
14    the members ownership is, I'm speaking only on
15    what I know as far as my ownership.
16         Q.   You believe your ownership today
17    is 40 percent of Sloan Equity Partners?
18              MS. WALSH:  You're talking about
19         today?  Today December 12th, Sloan Equity
20         Partners.
21         A.   Yes.
22         Q.   With respect to Sloan Securities
23    Corp you indicated that Jim Ackerman was the
24    president and CEO, correct?
25         A.   Yes.
```

00067
```
 1                     Kassai
 2         Q.   What title did you hold at Sloan
 3    Securities in December 2004?
 4         A.   Managing director, cohead of
 5    investment banking.
 6         Q.   What title did Dan Myers hold?
 7         A.   To my knowledge, the same title.
 8         Q.   Who were the other senior managing
 9    directors, if any, in December 2004?
10         A.   I'm not sure.
11         Q.   Were you an officer of the
12    corporation?
13         A.   No.
14         Q.   You were not a vice president,
15    secretary?
16              MS. WALSH:  Of which corporation?
17         Q.   Sloan Securities.
18              MS. WALSH:  Sorry.
19         A.   You're referring to Sloan
20    Securities?
21         Q.   Yes.
22         A.   The answer is no and no.
23         Q.   Were you ever a shareholder of
24    Sloan Securities?
25         A.   No.
```

00068
```
 1                     Kassai
 2         Q.   Was Dan Myers to your knowledge
 3    ever an officer or shareholder of Sloan
 4    Securities?
 5         A.   Do not know.
 6         Q.   By the way, what licenses
 7    securities licenses do you currently hold?
 8         A.   7, 63, 65, 31.
 9         Q.   Did you hold those licenses in
10    December 2004?
```
                              Page 29

12-12-07 phillip kassai v drinks america holdings - kassai.txt
```
11        A.    Yes.
12              Pardon me, when you say I held
13   them, rephrase the question, I didn't
14   physically hold them, they were held at Sloan
15   Securities.
16        Q.    Well, you were registered at Sloan
17   Securities, correct?
18        A.    That's a different question,
19   right.
20        Q.    But the licenses were yours?
21        A.    Yes, but I don't hold them, they
22   are held at Sloan Securities.
23        Q.    Well, we are just toying with
24   semantics here.
25              MS. WALSH:  There is a business
```

00069
```
1                     Kassai
2         significance but in general, if that's
3         what your question is.
4         Q.    What licenses did you earn in
5    December or as of December 2004?
6         A.    The ones that I previously
7    mentioned.
8         Q.    Okay.
9               MR. GOPSTEIN:  Mark the complaint
10        as Defendant's A, for identification.
11              (Defendant's Exhibit A, complaint,
12        marked for identification, as of this
13        date.)
14        Q.    Who was the director of compliance
15   at Sloan Securities while you worked there?
16        A.    I don't know.
17              My belief was that it was Ken
18   Ottensdorf (phonetic).
19        Q.    Did the firm file a form U-5 when
20   you left Sloan Securities?
21        A.    I always get confused between U-4
22   and U-5, just tell me how that again.
23        Q.    The U-4 is the uniform
24   registration statement when you first join the
25   firm.
```

00070
```
1                     Kassai
2         A.    Okay.
3         Q.    And the U-5 is the document that
4    gets filed when you leave.
5         A.    Yes, they filed a U-5.
6         Q.    Do you know what reason was given
7    for the termination of the employment?
8         A.    Resignation, my resignation from
9    Sloan.
10              Is that what you're referring to?
11        Q.    Yes.
12              Does the U-5 say that you
13   voluntarily resigned?
14        A.    Yes.
15        Q.    What is your relationship today
16   with Jim Ackerman?
17        A.    We still have various investments
18   together so that's the extent of my
19   relationship with him.
```
                                 Page 30

```
              12-12-07 phillip kassai v drinks america holdings - kassai.txt
20            Q.    You no longer work together?
21            A.    Do not work together.
22            Q.    You don't have any pending deals
23       together that haven't already closed?
24            A.    No, there are deals that Sloan had
25       worked on while I was there that are still
00071
1                         Kassai
2        potential deals that in the event they are
3        funded or some sort of commission however its
4        structured comes in, I'm entitled to some of
5        that compensation.
6             Q.    Did you have an employment
7        agreement at Sloan Securities?
8             A.    No.
9             Q.    What's the basis of your
10       continuing entitlement on some of those deals?
11            A.    There is a written agreement that
12       was executed between myself and Jim Ackerman
13       explicitly stating that any of the deals that
14       are currently open while I was still employed
15       at Sloan Securities I'm entitled to.
16            Q.    Is that a document that you signed
17       when you first joined the firm or was that
18       when you left?
19            A.    It was signed when I left.
20            Q.    Okay.
21            A.    When I was leaving.
22                  RQ
23                  MR. GOPSTEIN:  Let me call for the
24       production of that document.
25            Q.    Do you know if the document has a
00072
1                         Kassai
2        title?
3             A.    No idea.
4             Q.    Do you have a copy of it?
5             A.    Yes, I do.
6             Q.    All right.
7                   RQ
8                   MR. GOPSTEIN:  I call for the
9        production.
10            Q.    Was there any other document
11       signed while you were at Sloan Securities that
12       talks about your compensation or the terms of
13       your employment?
14            A.    None at Sloan Securities.
15            Q.    At Sloan Securities?
16            A.    No.
17            Q.    Was there anything that you signed
18       with Sloan Equity Partners?
19            A.    There is an operating agreement, I
20       must assume that there is many operating
21       agreements I signed or were a part of so I
22       can't recall if I signed to that or not, I'm
23       assuming that I did.
24            Q.    The operating agreement is where
25       it states that its a 40/40/20 split?
00073
1                         Kassai
                       Page 31
```

```
              12-12-07 phillip kassai v drinks america holdings - kassai.txt
 2            A.    Correct.
 3                  RQ
 4                  MR. GOPSTEIN:  I call for the
 5            production of the Sloan Equity Partners
 6            operating agreement.
 7                  MS. WALSH:  Can I just have one
 8            second?
 9                  MR. GOPSTEIN:  Yes.
10                  MS. WALSH:  Thanks.
11            Q.    Okay.
12                  Let's go back to the analysis of
13       the basis of why you think you're entitled to
14       approximately 125,000 warrants.  You said that
15       that's reflected in a number of documents,
16       let's go through that.
17                  First of all, is your entitlement
18       to a certain number of warrants in your
19       opinion included in the December 27th, 2004
20       investment banking agreement?
21            A.    Am I entitled to warrants as a
22       result of that?
23            Q.    Yes.
24            A.    Yes.
25            Q.    Okay.

00074
 1                          Kassai
 2                  Is it your understanding that
 3       there is language in the agreement that
 4       results in the entitlement of a certain number
 5       of warrants that you're claiming in this
 6       lawsuit?
 7            A.    Yes.
 8            Q.    Could you point to where in the
 9       agreement?
10                  MR. GOPSTEIN:  And let the record
11            reflect --
12                  MS. WALSH:  I object to the same
13            objection that you had with your
14            witnesses with respect to a legal
15            interpretation of language in the
16            document.
17                  MR. GOPSTEIN:  Right.
18                  MS. WALSH:  If you want an
19            opinion --
20                  MR. GOPSTEIN:  You can object all
21       you want, I'm going to ask questions.
22       Let me first show the witness the
23       document, let me ask the questions and we
24       will see if you still object.
25                  Let the record reflect that I'm

00075
 1                          Kassai
 2            showing the witness what has been
 3            previously marked as Plaintiff's
 4            Exhibit 4, it is the December 27th, 2004
 5            investment banking agreement between
 6            Drinks Americas and Sloan Securities
 7            Corp.
 8            Q.    Mr. Kassai, have you ever seen
 9       that document before?
10            A.    Yes.
```

12-12-07 phillip kassai v drinks america holdings - kassai.txt
```
11          Q.    Did you have any role in the
12    negotiation of that document?
13          A.    No.
14          Q.    When is the first time that you
15    saw the document?
16          A.    Most likely on its execution.
17          Q.    Okay.
18          Who negotiated that document on
19    behalf of Sloan?
20          A.    To the best of my knowledge, Jim
21    Ackerman and Dan Myers.
22          Q.    Who did they negotiate with?
23          A.    To the best of my knowledge,
24    Patrick Kenny and Bruce Klein.
25          Q.    Okay.
```
00076
```
 1                     Kassai
 2          Is it your understanding that
 3    Sloan Securities was entitled to receive a
 4    certain number of warrants pursuant to that
 5    investment banking agreement?
 6          A.    Yes.
 7          Q.    Okay.
 8          Do you believe that Sloan
 9    Securities actually performed services
10    pursuant to that agreement that entitled it to
11    receive warrants?
12          A.    Yes.
13          Q.    What services did it perform that
14    would result in its entitlement to any
15    warrants?
16          A.    The raising of equity for Drinks
17    Americas.
18          Q.    Is it your testimony and your
19    understanding that Sloan Securities raised
20    equity for Drinks Americas?
21          A.    Convertible equity, yes.
22          Q.    They in fact raised debt in a
23    series of bridge loans, did they not?
24          A.    No, they did not.
25          Q.    There was no debt that was raised
```
00077
```
 1                     Kassai
 2    whatsoever.
 3          Is that your testimony?
 4          A.    I said it was convertible.
 5          Q.    Convertible to equity?
 6          A.    Correct.
 7          Q.    Debt that was convertible to
 8    equity, correct?
 9          A.    Define debt.
10          Q.    An obligation to pay someone
11    money.
12          MS. WALSH:  Are you asking for the
13    legal or the investment bankers
14    definition?
15          MR. GOPSTEIN:  I don't know, he
16    asked me to define it, that's what I
17    mean.
18          MS. WALSH:  Okay.
19          I object to asking for a legal
```
Page 33

```
              12-12-07 phillip kassai v drinks america holdings - kassai.txt
20          conclusion.
21                  MR. GOPSTEIN:  I didn't ask, he
22          asked me.
23          Q.   All right.
24               You don't know what debt means and
25          you're an investment banker?
```

00078
```
 1                      Kassai
 2          A.    I do, it's a very broad language,
 3     debt.
 4          Q.    What do you think debt means?
 5          A.    Debt is any instrument where
 6     someone borrows or is in need of borrowing
 7     money from someone else.
 8          Q.    Isn't it true that Sloan
 9     Securities arranged for Drinks Americas to
10     borrow money from a variety of investors
11     pursuant to the December 2004 investment
12     banking agreement?
13          A.    Yes.
14          Q.    Isn't it true that Drinks Americas
15     borrowed $1,350,000 from various investors
16     with the assistance of Sloan Securities Corp?
17          A.    As I said, Sloan Securities raised
18     money for Drinks Americas.
19          Q.    We know that.
20          A.    Okay.
21          Q.    Isn't it true that Drinks Americas
22     borrowed $1,350,000 from a variety of people
23     arranged through Sloan Securities?
24          A.    Drinks Americas took $1.35 million
25     in to the company as a result of Sloan
```

00079
```
 1                      Kassai
 2     Securities' efforts, yes.
 3          Q.    Fine.
 4               Did they take the money in as a
 5     debt or did they take it in as an investment
 6     of equity?
 7          A.    There was a convertible instrument
 8     which is viewed in the banking industry as a
 9     form of equity.
10          Q.    You're saying in the banking
11     industry a promissory note --
12          A.    Convertible promissory note.
13          Q.    -- that was convertible at the
14     option of the company is considered equity in
15     the industry?
16                  MS. WALSH:  Let him finish the
17          question.
18          Q.    Is that what you're saying?
19          A.    That's not what I'm saying.
20          Q.    What are you saying?
21          A.    I simply said that the company
22     took in $1.35 million as a result of Sloan
23     Securities' efforts to raise capital for the
24     company.
25          Q.    When they took the money in,
```

00080
```
 1                      Kassai
                       Page 34
```

```
                12-12-07 phillip kassai v drinks america holdings - kassai.txt
 2      Drinks Americas issued promissory notes,
 3      correct?
 4              A.      Convertible into equity.
 5              Q.      Did they issue promissory notes,
 6      yes or no?
 7              A.      Promissory notes with the option
 8      to convert into equity, yes.
 9              Q.      And subsequently down the road
10      some of the noteholders converted their debt
11      instruments to equity; isn't that what
12      happened?
13              A.      Again, you are putting the word
14      debt in there.  They converted their note into
15      equity, yes, they converted their note into
16      equity.
17              Q.      Isn't a promissory note a debt?
18              A.      Depends how its structured.
19              Q.      It depends how its structured?
20              A.      Yes.
21              Q.      So you think that a promissory
22      note might not be a debt even though it says I
23      owe a certain amount of money?
24              A.      That's not what I said.
25              Q.      Well, in what instance, give me an

00081
 1                      Kassai
 2      example, a single example that you can think
 3      of where a promissory note from one entity to
 4      another entity is not a debt as you understand
 5      it having a masters in finance from Johns
 6      Hopkins and been through the securities
 7      industry for many years.
 8                      How is that not debt?
 9                      MS. WALSH:  Your question was give
10      an example?
11              Q.      Give me one example, yes.
12              A.      Of?
13              Q.      How a promissory note could not be
14      debt.
15              A.      It is a type of, a form of debt.
16              Q.      Okay.
17              A.      It is not straight debt.
18              Q.      And the promissory notes that were
19      issued by Drinks Americas in this case were
20      notes that were subsequently converted to
21      equity, correct?
22              A.      Its not subsequently converted,
23      the option on the onset from the money taken
24      in by Drinks Americas called for the ability
25      for the investor to allow for a conversion.

00082
 1                      Kassai
 2              Q.      And that conversion took place
 3      down the road, correct?
 4              A.      It could have taken place at any
 5      point in time.
 6              Q.      I asked you when it actually took
 7      place, not that it could have.
 8                      MS. WALSH:  Objection, there are a
 9      lot of different notes here, there a lot
10                      of different investors; you know that.
                            Page 35
```

12-12-07 phillip kassai v drinks america holdings - kassai.txt
```
11            Q.    Can you point to any investor that
12     immediately exercised their supposed option to
13     convert to equity upon receiving their notes?
14            A.    No.
15                  MS. WALSH:  You would have those
16            records, I object.
17                  MR. GOPSTEIN:  I'm asking him if he
18            knows.
19                  MS. WALSH:  If you have those
20            documents, you should produce them.
21                  MR. GOPSTEIN:  We did already.
22                  MS. WALSH:  You produced those
23            documents.
24                  Can you show him the documents?
25                  MR. GOPSTEIN:  I'm asking if he
```
00083
```
1                        Kassai
2            knows.  You can have your objection and
3            that's fine.
4            Q.    Are you aware of any noteholder
5     that immediately converted their supposed
6     option upon receipt of their note?
7                  MS. WALSH:  Objection.
8            A.    I don't know all the investors.
9            Q.    Do you know of any that did that?
10            A.    I don't know.
11            Q.    Do you know whether any of them
12     could have done that?
13            A.    Upon the date of ability to
14     convert?
15            Q.    Yes.
16            A.    I believe there were investors who
17     did.
18            Q.    Convert later on, correct?
19            A.    At the time when they were able,
20     the first available date to convert I believe
21     they converted.
22            Q.    Okay.
23                  Is it your understanding that the
24     company Drinks Americas could have stopped or
25     prevented a conversion of those notes to
```
00084
```
1                        Kassai
2     equity if they chose to do so?
3                  MS. WALSH:  I'm sorry, I have to
4            object.  Can you be more specific, its a
5            vague question.
6                  MR. GOPSTEIN:  You can object, I
7            think it's a perfectly valid question.
8                  MS. WALSH:  You will get a vague
9            answer.
10            A.    I'm not sure.
11            Q.    Do you know whether in accordance
12     with the terms of the convertible promissory
13     note Drinks Americas could have refused to
14     allow the noteholder to convert to equity?
15            A.    I don't know the terms of the note
16     offhand.
17            Q.    Okay.
18                  Getting back to my original
19     question, could you point to what you believe
```
Page 36

```
                12-12-07 phillip kassai v drinks america holdings - kassai.txt
20      to be the language that gives you the right,
21      gives Sloan the right to receive warrants
22      under the December investment banking
23      agreement, December 2004?
24              MS. WALSH:  If you're asking for a
25      legal opinion, I object as unfair.

00085
1                       Kassai
2           A.    I'm not an attorney.
3           Q.    Are you familiar with investment
4       banking agreements in general, have you worked
5       with them?
6           A.    Yes, I have.
7           Q.    All right.
8           Can you read paragraph four to
9       yourself.
10          A.    Okay.
11          Q.    Paragraph four is actually a
12      rather long paragraph so let me cut to the
13      chase.
14              Let's look at 4.1B.  Do you see
15      4.1B?
16              MS. WALSH:  He's read paragraph
17          4.1B.
18              MR. GOPSTEIN:  No, he couldn't have
19          read it, he looked at it for a second and
20          then he said yes, so I am going to try to
21          narrow it down.
22              MS. WALSH:  You can ask whatever
23          you want, if you want to withdraw your
24          request, that's fine.
25          Q.    Have you previously read this

00086
1                       Kassai
2       agreement before coming here today?
3           A.    Yes.
4           Q.    When was the last time that you
5       read it?
6           A.    I don't recall.
7           Q.    When was the first time that you
8       read it?
9           A.    I think you asked me that already,
10      I told you most likely subsequent to its
11      execution.
12          Q.    Have you reviewed any documents at
13      all in preparation for your testimony here
14      today?
15          A.    I have glanced over several
16      documents, yes.
17          Q.    What have you looked at?
18          A.    I looked over signature pages on
19      the securities purchase agreement.
20          Q.    Okay.
21          A.    I have looked at a list of the
22      possible investors.
23          Q.    What else?
24          A.    I have looked at Drinks Americas'
25      10-K and the banking agreements.

00087
1                       Kassai
                            Page 37
```

```
              12-12-07 phillip kassai v drinks america holdings - kassai.txt
  2              Q.    Okay.
  3                    Is it accurate to say that based
  4       upon the December 27th, 2004 investment
  5       banking agreement that Sloan Securities was
  6       hired to raise between 6 and $10 million of
  7       equity for Drinks Americas?
  8              A.    No.
  9              Q.    Look on the first page, paragraph
 10       1.2, financing.  Tell me if that refreshes
 11       your recollection?
 12                    MS. WALSH:  Objection, he didn't
 13              say he needed his recollection refreshed,
 14              he said no.
 15              Q.    What is your understanding of what
 16       Sloan was hired to do?
 17              A.    To raise money for Drinks
 18       Americas.
 19              Q.    Well, do you see on the first
 20       page, paragraph 1.2 that there is a range of 6
 21       to $10 million that was to be raised?
 22              A.    I do.
 23              Q.    Okay.
 24                    Do you recall whether prior to the
 25       raising of 6 to $10 million whether Sloan
```

00088

```
  1                         Kassai
  2       Securities was supposed to do some kind of a
  3       bridge financing?
  4              A.    I do not recall.
  5              Q.    Look at paragraph 4.1B.
  6                    Do you see right on the first line
  7       it talks about closing of a bridge financing?
  8              A.    Yes.
  9              Q.    Isn't that what Sloan Securities
 10       did for Drinks Americas was a bridge financing
 11       prior to the 6 to $10 million equity raise?
 12              A.    No.
 13              Q.    No?
 14              A.    No.
 15              Q.    What was the $1,350,000?
 16              A.    As I stated earlier, that was
 17       convertible equity.
 18              Q.    It wasn't bridge financing?
 19              A.    The terminology bridge financing
 20       obviously exists within paragraph B, but as I
 21       stated this was convertible equity, it was
 22       raised as convertible equity.
 23              Q.    We know that, it was debt
 24       convertible to equity, correct?
 25              A.    Yes.
```

00089

```
  1                         Kassai
  2              Q.    Okay.
  3                    What is your understanding of the
  4       term bridge financing as used in the
  5       securities industry?
  6              A.    It is money taken in by a company
  7       to bridge that company from point A to point
  8       B.
  9              Q.    All right.
 10                    And do you know whether Sloan
                                      Page 38
```

12-12-07 phillip kassai v drinks america holdings - kassai.txt
```
11    raised 6 to $10 million of equity for Drinks
12    Americas at any time?
13         A.    I don't believe they did.
14         Q.    But in fact they raised a
15    1,350,000 in the form of promissory notes
16    convertible to equity, correct?
17         A.    Correct.
18         Q.    Did you ever see the bridge
19    financing term sheet?
20         A.    Which one?
21         Q.    In connection with the December
22    2004 investment banking agreement?
23         A.    I think there were many.
24              MR. GOPSTEIN:  Let me mark this
25    document as Defendant's Exhibit B.  It is
```
00090
```
 1                    Kassai
 2    a cover letter from Sloan Securities to
 3    Bruce Klein dated April 2nd, 2007 and
 4    attached to it is a December 27th, 2004
 5    investment banking agreement with
 6    schedules including schedule B entitled
 7    bridge financing term sheet, for
 8    identification.
 9              (Defendant's Exhibit B, cover
10    letter and investment banking agreement
11    with schedules, marked for
12    identification, as of this date.)
13              MS. WALSH:  Are there any Bates
14    numbers on that at all or is it something
15    that you provided?
16              MR. GOPSTEIN:  I provided it.
17              MS. WALSH:  So it has no Bates
18    numbers?
19              MR. GOPSTEIN:  No.
20              MS. WALSH:  The record should
21    reflect that because there are duplicate
22    copies with pieces of documents on the
23    record, the sources where they were from
24    Plaintiffs there were Bates, and when
25    they were Defendants they were not Bates
```
00091
```
 1                    Kassai
 2    stamped, correct?
 3              Can we have that stipulation?
 4              MR. GOPSTEIN:  No.
 5              MS. WALSH:  You won't stipulate to
 6    that?
 7              MR. GOPSTEIN:  No.
 8              MS. WALSH:  You won't stipulate as
 9    to whether or not you did not stamp a
10    single paper that you turned over to me?
11              MR. GOPSTEIN:  I have not used
12    Bates stamps, so what's the point?
13              MS. WALSH:  I want to have it
14    identified correctly and I'd like to see
15    it.
16              MR. GOPSTEIN:  I'm marking it.
17              MS. WALSH:  Can I have a courtesy
18    copy so that I can see it?
19              Have we gotten that before?
```
                                   Page 39

```
              12-12-07 phillip kassai v drinks america holdings - kassai.txt
20                    MR. GOPSTEIN:  Yes.
21                    MS. WALSH:  Can I see it?
22                    MR. GOPSTEIN:  Yes, after he marks
23          it.
24                    MS. WALSH:  You don't have a copy
25          for me?
```
⬜
```
00092
1                          Kassai
2                    MR. GOPSTEIN:  No.
3                    This document was faxed to you last
4          week along with my cover letter saying
5          that I had just gotten it from Joe
6          Cannela asking you to withdraw the case,
7          that was the cover letter.
8                    MS. WALSH:  I'll take your word for
9          it that Defendant's Exhibit B was
10         provided to me the day that you got it.
11                   MR. GOPSTEIN:  Yes.
12         Q.    Mr. Kassai --
13                   MS. WALSH:  He's still looking at
14         the document.
15         Q.    Oh.
16         A.    Yes.
17         Q.    Mr. Kassai, first I want you to
18         look at the cover letter from Sloan Securities
19         signed by Jim Ackerman, CEO to Bruce Klein,
20         its dated April 2nd, 2007.
21                   Do you see an item two where it
22         says that 78,300 shares should be issued to
23         yourself?
24         A.    Yes.
25         Q.    Does that refresh your
```
⬜
```
00093
1                          Kassai
2          recollection as to the number of shares or
3          warrants exercisable for shares that you are
4          claiming in this lawsuit?
5          A.    No, not in its entirety.
6          Q.    What other shares or warrants are
7          you entitled to besides the 78,300 pursuant to
8          the December 2004 investment banking
9          agreement?
10         A.    There was a warrant issued for
11         300,000 warrants that is not addressed in this
12         letter here.
13         Q.    Well, this letter talks about
14         217,500 common shares arising from the
15         $1,350,000 raised by Sloan for Drinks.
16                   Are you saying that you're
17         entitled to warrants from something other than
18         the 1,350,000?
19         A.    I'm talking about an executed
20         document of a warrant for 300,000 warrants
21         from Drinks Americas to Sloan Equity Partners.
22         That is not addressed in this agreement or
23         this exhibit.
24         Q.    The warrant that you're referring
25         to is this, Plaintiff's Exhibit 5 dated
```
⬜
```
00094
1                          Kassai
                         Page 40
```

```
                12-12-07 phillip kassai v drinks america holdings - kassai.txt
 2      May 9th, 2005, correct?
 3           A.    There is an attachment that needs
 4      to go with this which is the investment
 5      banking agreement from September '05 as well.
 6           Q.    How could you attach an investment
 7      banking agreement of September '05 to a
 8      document that's dated May of '05?
 9           A.    Because there had been amendments
10      made to the financing for the company, the
11      amounts, the terms.
12           Q.    Are you saying that Sloan
13      Securities is entitled to warrants as a result
14      of the September 2005 investment banking
15      agreement?
16           A.    That's not what I'm saying.
17           I'm saying there had been
18      amendments made as a result of these two
19      documents which I hold in my hand; that's how
20      I arrive at the number of 125,000 roughly.
21           Q.    You're saying the two documents
22      that you're holding are the investment banking
23      agreement from December '04 and the stock
24      purchase warrant from May '05, correct?
25           A.    Correct.
```

00095
```
 1                        Kassai
 2           Q.    The reason those warrants were due
 3      had something to do with the 1,350,000 that
 4      was raised by Sloan for Drinks, correct?
 5           A.    Correct, and for further efforts
 6      provided by Sloan to the company.
 7           Q.    You're saying there is a third
 8      document that would entitle you to additional
 9      warrants?
10           A.    I'm saying that there is a third
11      document that would help, that needs to be
12      viewed in support of this warrant purchase,
13      this stock.
14           Q.    What document is that?
15           A.    I just stated it earlier, there is
16      a September '05 investment banking agreement.
17           Q.    I just asked you that same
18      question.
19           Are you saying the September 2005
20      investment banking agreement in any way, shape
21      or form entitles you or Sloan Securities to
22      additional compensation?
23           MS. WALSH:  You want to show it to
24      him, do you have it?
25           MR. GOPSTEIN:  No, because frankly
```

00096
```
 1                        Kassai
 2      I thought it was not relevant.  But he
 3      seems to recall it so why don't you tell
 4      me what your recollection is.
 5           Q.    How did the September 2005
 6      investment banking agreement entitle you or
 7      Sloan Securities to anything?
 8           A.    If you would look at paragraph, I
 9      would need it in front of me, so if you have
10      that.
```

                              Page 41

12-12-07 phillip kassai v drinks america holdings - kassai.txt
```
11          Q.    Maybe I do have it, here it is, I
12    do have it.  Here it is, a document dated
13    September 25th, 2005.
14                Tell me what compensation of any
15    kind Sloan Securities earned pursuant to the
16    September 29th, 2005 investment banking
17    agreement?
18          A.    In paragraph 1.1, "Advisory
19    services in consideration of such financial
20    advisory services and as a material inducement
21    for Sloan Securities to enter this agreement,
22    the company shall issue to Sloan upon
23    execution of this agreement a five-year
24    warrant to purchase 100,000 shares of the
25    company's common stock at an exercise price of
```
00097
```
1                         Kassai
2     $0.45 per share."
3           Q.    How much of these shares do you
4     believe you're entitled to?
5           A.    My 40 percent.
6           Q.    That would be 40,000?
7           A.    Yes.
8           Q.    Do you know whether the shares
9     were ever issued?
10          A.    My belief is they were not just
11    like the other warrant was not issued as well.
12          Q.    Was there any demand ever made for
13    the 100,000 shares of common stock or a
14    warrant to purchase 100,000 shares of common
15    stock pursuant to the September 29th, 2005
16    investment banking agreement?
17          MS. WALSH:  By anyone in the
18          universe?
19          MR. GOPSTEIN:  By anyone to his
20          knowledge.
21          A.    As a result of Drinks Americas'
22    failure to execute on the initial warrant it
23    was a futile exercise for us to go about
24    asking for the additional warrants that were
25    due to us.
```
00098
```
1                         Kassai
2           Q.    So you just didn't bother?
3           A.    Its not that we didn't bother, the
4     warrants in question right now is what we are
5     debating.
6           Q.    But I mean prior to this lawsuit
7     no demand was ever made for the warrants to
8     purchase 100,000 shares, correct?
9           MS. WALSH:  Do you mean by Phillip
10         Kassai or by anyone in the world?
11         MR. GOPSTEIN:  By anyone.
12         MS. WALSH:  To the extent that you
13         know and can answer.  If it involves
14         communication with an attorney, if it
15         involves privileged communications, I
16         instruct you not to answer.
17          Q.    No, did anyone including an
18    attorney ever demand a warrant for 100,000
19    shares pursuant to the September 29th, 2005
```
Page 42

```
                12-12-07 phillip kassai v drinks america holdings - kassai.txt
20     investment banking agreement?
21              MS. WALSH:  I'll object and I think
22          it calls for privileged communications.
23              MR. GOPSTEIN:  No, it doesn't.  I'm
24          asking if he knows.  Are you kidding?
25              MS. WALSH:  How do you know?

00099
1                          Kassai
2               MR. GOPSTEIN:  Its a perfectly
3           valid question.
4               MS. WALSH:  How does he know if
5           someone from Sloan Equity wrote a letter
6           with a lawyer?
7               MR. GOPSTEIN:  If he knows, he
8           knows, if he doesn't know, he doesn't
9           know.
10              MS. WALSH:  You're asking about
11          anyone in the world.  How many people in
12          the world are suing Drinks, we don't know
13          or demanding, sending demand letters.
14              MR. GOPSTEIN:  Its actually
15          interesting that its only Phillip Kassai.
16          Well, we will get to that later on.
17              MS. WALSH:  I can't instruct him
18          not to answer.  If he thinks it is going
19          to involve attorney/client
20          communications, let me talk to my client.
21              MR. GOPSTEIN:  You can't be
22          serious.  I'm asking whether he has
23          knowledge whether a demand was made by
24          anyone including an attorney for the
25          payment or the issuance of these

00100
1                          Kassai
2           warrants.  That's a perfectly valid
3           question.  You can't possibly object and
4           certainly you aren't going to direct him
5           not to answer.
6               MS. WALSH:  If that's what the
7           question is?
8               MR. GOPSTEIN:  Yes, and it's the
9           third time I asked.
10              MS. WALSH:  If it's a yes or no
11          question then he can answer it.  If
12          you're asking for --
13              MR. GOPSTEIN:  I'll ask it again,
14          hopefully you won't object.
15          Q.    Mr. Kassai, to your knowledge, has
16      anyone ever demanded the issuance of the
17      warrant for 100,000 shares pursuant to the
18      September 29th, 2005 investment banking
19      agreement prior to this lawsuit?
20          A.    A portion of it.
21          Q.    Any portion of it?
22          A.    My belief is yes.
23          Q.    Who made the demand and when?
24          A.    Anthony Cole (phonetic).
25          Q.    Who is Anthony Cole?

00101
1                          Kassai
                                 Page 43
```

```
         12-12-07 phillip kassai v drinks america holdings - kassai.txt
 2           A.    That's the attorney privilege.
 3                 MS. WALSH:  I'm going to object.
 4                 MR. GOPSTEIN:  Are you kidding me?
 5                 I'm asking about a demand that was
 6           made.  That has nothing --
 7                 MS. WALSH:  You can ask all you
 8           want to.
 9                 MR. GOPSTEIN:  You're kidding.
10                 MS. WALSH:  If you read the
11           document in your hand you might know who
12           Anthony Cole is.
13           Q.    Who is Anthony Cole?
14                 MS. WALSH:  He represented my
15           client.  The demand letters --
16                 MR. GOPSTEIN:  I don't want your
17           testimony.
18           Q.    Who is Anthony Cole?
19                 MS. WALSH:  I'm directing my client
20           not to talk about communications he made
21           with counsel.
22                 MR. GOPSTEIN:  That's obvious, I
23           haven't asked him a single question about
24           that.
25           Q.    Who is Anthony Cole?

00102
 1                          Kassai
 2           A.    He was my attorney.
 3           Q.    He was your attorney?
 4           A.    Yes.
 5           Q.    When did you hire him?
 6           A.    June or July of '07, I don't
 7           remember exactly, recall the date.
 8           Q.    For what purpose did you hire him?
 9           A.    To go after the money that is owed
10           to me by Drinks Americas.
11           Q.    Are you saying that your attorney
12           made a demand to Drinks Americas for a warrant
13           to purchase 100,000 shares pursuant to the
14           September 29th, 2005 investment banking
15           agreement?
16           A.    Its attorney jargon, I am not
17           really sure what, how it was.
18           Q.    Did you ever see such a demand
19           from your attorney to anyone at Drinks
20           Americas?
21           A.    Stating that a portion of that was
22           to be --
23           Q.    Either the entire 100,000 or any
24           portion of it?
25           A.    I believe so.

00103
 1                          Kassai
 2           Q.    Where and when did you see such a
 3           demand?
 4           A.    I think there was a letter,
 5           numerous letters sent to Drinks Americas on my
 6           behalf.
 7           Q.    Demanding what?
 8           A.    What was due do me.
 9           Q.    According to your testimony, you
10           said that you are owed 40,000 warrants
                              Page 44
```

12-12-07 phillip kassai v drinks america holdings - kassai.txt
11    pursuant to this investment banking agreement
12    because that would be your cut of this,
13    correct?
14              MS. WALSH:  Sorry, objection, that
15        is really vague.  The record doesn't
16        reflect what you're pointing out or
17        gesturing.
18              MR. GOPSTEIN:  You know what, I
19        don't care, you can object, do not speak,
20        just object.
21              MS. WALSH:  Please do not speak to
22        me like that again, I have tolerated way
23        too much from you, sir.  If you can speak
24        to me in that manner --
25              MR. GOPSTEIN:  You're going to

00104
1                        Kassai
2        tolerate more if you keep making
3        frivolous objections.
4              MS. WALSH:  It is not frivolous.
5        Q.    Are you entitled to 40,000
6    warrants?
7              MS. WALSH:  Why don't you look at
8        the Bates stamped documents that have
9        been provided to you.
10       Q.    Are you entitled to 40,000
11   warrants?
12             MS. WALSH:  To the extent you can
13       answer, answer.
14       A.    My belief is I'm entitled to that,
15   yes.
16       Q.    Did you own 40 percent of Sloan
17   Securities Corp?
18       A.    No, I don't.
19       Q.    Was this warrant ever assigned by
20   Sloan Securities Corp to Sloan Equity
21   Partners?
22       A.    I don't understand your question.
23       Q.    What entity is supposedly entitled
24   to 100,000 warrants pursuant to the September
25   29th, 2005 investment banking agreement?

00105
1                        Kassai
2              MS. WALSH:  Objection.
3        A.    I think you need to look at the
4    investment banking agreement.
5        Q.    I'm holding it up for you to see.
6              Do you have it in front of you?
7    Who was it signed with?
8        A.    It would say Sloan Securities.
9        Q.    Right.
10             You don't own 40 percent of Sloan
11   Securities Corp., do you?
12       A.    No, I don't.
13             But as I stated earlier that the
14   cut internally for commissions and all
15   compensations on deals was to be 40 percent
16   distributed to Phillip Kassai.
17       Q.    Is there any document whereby
18   Sloan Securities Corp has actually assigned
19   any of its rights under the September 29th,
                        Page 45

```
              12-12-07 phillip kassai v drinks america holdings - kassai.txt
20      2005 investment banking agreement either to
21      you or to Sloan Equity Partners?
22            A.    Please repeat the question.
23                  MR. GOPSTEIN:  Read it back,
24      please.
25                  (Record read.)
00106
1                          Kassai
2             A.    I don't know, I don't know all the
3       documents issued by Jim Ackerman to Drinks
4       Americas.
5             Q.    You certainly don't have authority
6       to act on behalf of Sloan Securities Corp, do
7       you?
8             A.    Do not.
9             Q.    Okay.
10                  I want you to take a look at the
11      bridge financing term sheet, schedule B of
12      what we marked now as Defendant's Exhibit B.
13      Its the last two pages of the document.
14            A.    Yes.
15            Q.    Could you describe what schedule B
16      is in your own words?
17            A.    This is a schedule that was
18      amended numerous times.
19            Q.    Is this what appears to be the
20      first version of it?
21            A.    To my knowledge this was one of
22      the first versions of this.
23            Q.    Okay.
24                  What is this in your own words?
25            A.    A term sheet.
00107
1                          Kassai
2             Q.    A term sheet for the bridge
3       financing, correct?
4             A.    A term sheet.
5             Q.    Does it not say bridge financing
6       term sheet in bold capital letters?
7                   MS. WALSH:  You want him to read
8             the document?  I object to your tone of
9             voice.
10            A.    Schedule B bridge financing term
11      sheet.
12            Q.    This is a term sheet for the
13      bridge financing, correct?
14                  MS. WALSH:  Objection.
15            A.    If you so call it a bridge
16      financing.  This was not the term sheet that
17      was ultimately used in the financing for
18      Drinks Americas so I'm not really sure what
19      you're going at with this.
20            Q.    Okay.
21            A.    This was one of many term sheets
22      as I stated earlier.
23            Q.    That's all right, let's deal with
24      this one.
25                  The amount was subsequently
00108
1                          Kassai
                        Page 46
```

```
          12-12-07 phillip kassai v drinks america holdings - kassai.txt
 2    changed in the later versions, correct?
 3           A.    As were the terms.
 4           Q.    Okay.
 5                 But this was the initial bridge
 6    financing term sheet that was attached to the
 7    contract, was it not?
 8                 MS. WALSH:  He's not a party to the
 9           contract, I object.
10                 MR. GOPSTEIN:  You can object all
11           you want, I'm asking him whether he
12           knows.
13                 MS. WALSH:  Fine.
14           A.    As my counsel said, I have no idea
15    which schedule ultimately was attached to the
16    back of the contract.  And just because you
17    have it stapled doesn't necessarily mean that
18    that was the one used as evidenced by the fact
19    that this bridge financing term sheet as you
20    call it was amended many times.
21           Q.    Fine.
22                 Do you see how this document at
23    the top indicates it was from Sloan Securities
24    and it says its page 14 of 15 and page 15 of
25    15?
```

00109
```
 1                        Kassai
 2           A.    I do.
 3           Q.    I just want you to realize that I
 4    didn't put these pages together, it was the
 5    way it was received.
 6                 Let's look at the bridge financing
 7    term sheet.
 8                 MS. WALSH:  By the way it was
 9           received you're referencing your Exhibit
10           B, correct, Defendant's Exhibit B?
11                 MR. GOPSTEIN:  Correct.
12                 MS. WALSH:  This was a document
13           that you provided.
14                 MR. GOPSTEIN:  Yes.
15                 MS. WALSH:  And it was provided to
16           you from Sloan Securities, is that what
17           you're saying?
18                 MR. GOPSTEIN:  It went to someone
19           from Sloan Securities, someone at fax
20           number (212) 779-9928.
21           Q.    Could you read for the record the
22    description of the investment pursuant to the
23    bridge financing term sheet, its just one
24    line.
25                 MS. WALSH:  I object to him
```

00110
```
 1                        Kassai
 2           reading.  Go ahead, you're going to make
 3           him read the document, then why did you
 4           mark it?
 5                 MR. GOPSTEIN:  Yes, one line.
 6           A.    "Senior convertible promissory
 7    (notes) and (warrants)."
 8           Q.    Now, the warrants that are being
 9    referred to on that line are the warrants that
10    are exercisable pursuant to those promissory
                         Page 47
```

```
          12-12-07 phillip kassai v drinks america holdings - kassai.txt
11  notes, correct?
12        A.    Incorrect.
13        Q.    What are they?
14        A.    They cover all the warrants that
15  are as a result of the financing of Drinks
16  Americas.
17        Q.    And how do you come up with that
18  conclusion from this document?
19              MS. WALSH:  You're making him your
20        expert?
21        Q.    I want know what is your basis for
22  making that statement.  We are talking about a
23  bridge financing term sheet that is describing
24  the investment.
25              I want to know how --

00111
1                    Kassai
2         A.    I'm not an attorney but if you
3   will turn to paragraph 4.1 --
4         Q.    Yes.
5         A.    "In addition to the foregoing upon
6   consummation of a financing or promptly
7   following a late rejection, the company will
8   issue to Sloan and/or its designees warrants
9   to the purchase such number of securities as
10  shall be equal to five percent of the number
11  of securities including stock and warrants
12  issued to investors in the financing at the
13  same time at the same per share price or
14  exercise price applicable to securities sold
15  in the financing."
16        Q.    What you read is a defined term in
17  the investment banking agreement?
18              MS. WALSH:  Are you asking him a
19        question?
20        Q.    Correct?
21              MS. WALSH:  A defined term?
22              MR. GOPSTEIN:  Yes, defined as
23        warrants.
24        Q.    Early in the investment bank
25  agreement, correct?

00112
1                    Kassai
2         A.    This is the investment banking
3   agreement.
4         Q.    Correct?
5         A.    Yes.
6         Q.    You just read from page --
7               MS. WALSH:  Exhibit Defendant's B.
8         I'll stipulate that that's what's he read
9         from.
10        Q.    What paragraph was that, 4.1?
11        A.    4.1.
12        Q.    It was 4.1, correct?
13        A.    Yes.
14        Q.    There is a definition of the term
15  warrants in paragraph 4.1, correct?
16        A.    Yes, there is.
17        Q.    The term is redefined in the
18  bridge financing term sheet, correct, in the
19  investment section?
                         Page 48
```

12-12-07 phillip kassai v drinks america holdings - kassai.txt
```
20                 MS. WALSH:  I don't have a copy of
21           it, a courtesy copy for counsel.  Are you
22           reading from it?  I'll accept in good
23           faith that you're reading from a document
24           if that's what you're telling me.
25                 MR. GOPSTEIN:  I'm asking a
```
00113
```
 1                          Kassai
 2           seasoned investment banker to interpret a
 3           document that is used at a securities
 4           firm that he worked for.
 5           A.    As I stated earlier --
 6                 MS. WALSH:  Are you asking for an
 7           interpretation, are you asking for him to
 8           read?
 9                 MR. GOPSTEIN:  His understanding.
10           A.    My understanding --
11                 MS. WALSH:  Its your deposition and
12           we're prepared to stay.
13                 MR. GOPSTEIN:  Thank you.
14                 MS. WALSH:  So if you want him to
15           read from the document during the
16           course --
17                 MR. GOPSTEIN:  I asked him for his
18           understanding of the document.  In order
19           to get his understanding of the document
20           sometimes you have to read certain
21           passages.
22           A.    My understanding is that exhibit
23    that you're referring to was not the one used
24    in any regard.  So in order to understand
25    warrants as you asked me earlier, I refer back
```
00114
```
 1                          Kassai
 2    to the investment banking agreement.
 3           Q.    Although --
 4           A.    which is clearly the agreement
 5    used as a seasoned investment banker.
 6           Q.    You're saying this bridge
 7    financing term sheet was not attached to the
 8    agreement as a schedule B?
 9           A.    I have no idea which one was
10    ultimately attached to the executed document
11    by Drinks Americas.
12           Q.    But you know that a bridge
13    financing term sheet was included in the
14    original agreement and then was amended,
15    correct?
16           A.    Correct.
17                 MS. WALSH:  I need a restroom break
18           when you have a chance.
19           Q.    Mr. Kassai, look at the end of
20    paragraph 1.2, the last sentence of paragraph
21    1.2.
22           A.    In which document?
23           Q.    The December 2004 investment
24    banking agreement, Defendant's Exhibit B.  Can
25    you do that, the last sentence of paragraph
```
00115
```
 1                          Kassai
```
Page 49

```
               12-12-07 phillip kassai v drinks america holdings - kassai.txt
 2             1.2.
 3                     A.    I don't have it.
 4                           MS. WALSH:  I'm looking at it for a
 5             second.
 6                     A.    Okay.
 7                     Q.    Doesn't it essentially say that
 8             Sloan is going to do a bridge financing prior
 9             to the consummation of the financing?
10                           MS. WALSH:  Objection.
11                           MR. GOPSTEIN:  You can object all
12             you want.
13                     Q.    Please answer the question.
14                     A.    It is my understanding that that
15             had changed numerous times.
16                     Q.    What had changed?
17                     A.    What was set out initially as a
18             small bridge financing which the number refers
19             to as $550,000 clearly was not, that was not
20             raised by Sloan for Drinks America.
21                     Q.    More than that was raised,
22             correct?
23                     A.    Substantially more than that was
24             raised.
25                     Q.    1,350,000 was raised?

00116
 1                           Kassai
 2                     A.    Correct.
 3                     Q.    They amended the bridge finance
 4             term sheet to reflect the fact they were
 5             raising more money, correct?
 6                     A.    No, they amended it to show it was
 7             no longer going to be what you're terming as a
 8             bridge financing agreement.
 9                     Q.    Show me where it says that.  Where
10             does it say its no longer going to be a bridge
11             financing?
12                           MS. WALSH:  Objection.
13                           MR. GOPSTEIN:  He just said that.
14             I'm going to take his own words and
15             ask him to explain his own words.
16                           MS. WALSH:  Go ahead.
17                     A.    If you would provide to me the
18             documentation of the amended term sheets, I
19             can show you.
20                     Q.    Okay.
21                           RQ
22                           MR. GOPSTEIN:
23                           Let me first of all make a very
24             clear demand for production of all of the
25             term sheets pursuant to any investment

00117
 1                           Kassai
 2             banking agreement entered into between
 3             Sloan and Drinks.
 4                           MS. WALSH:  I suggest that you make
 5             that of your client, sir, but I'll let
 6             you make a record.
 7                           RQ
 8                           MR. GOPSTEIN:  Let me repeat that
 9             I'm calling for the production of all
10             term sheets that Sloan prepared or
                           Page 50
```

12-12-07 phillip kassai v drinks america holdings - kassai.txt
```
11              entered into that in any way amended or
12              changed the original term sheet.  Its
13              obviously very important at this point
14              that we have all of them.  I don't think
15              we have been provided with all of them.
16              If there are numerous term sheets I want
17              to see all of them.
18                  So quite simply, I call for the
19              production of all term sheets, bridge
20              financing term sheets or other term
21              sheets in connection with the investment
22              banking agreement of December 2004 and
23              September 2005.
24                  Pursuant to your request, Mr.
25              Kassai, I'm going to mark as Defendant's
```
00118
```
 1                      Kassai
 2              Exhibit C an amendment number one to an
 3              investment banking agreement dated
 4              February 24th, 2005, for identification.
 5                  (Defendant's Exhibit C, amendment
 6              to investment banking agreement, marked
 7              for identification, as of this date.)
 8          Q.    Mr. Kassai, do you recognize
 9      Defendant's Exhibit C as --
10          A.    Yes.
11          Q.    -- amendment number one to the
12      investment banking agreement?
13          A.    Yes.
14          Q.    Okay.
15                And do you see where in paragraph
16      two the bridge financing is increased to a
17      million dollars?
18          A.    Yes, I see that.
19          Q.    So where or in what document are
20      you referring to where it says that this is no
21      longer a bridge financing, its some other kind
22      of financing?
23          A.    What I meant was that the terms of
24      this deal changed.
25          Q.    The terms of the bridge financing
```
00119
```
 1                      Kassai
 2      changed?
 3                  MS. WALSH:  Is that a question?
 4          Q.    Correct.
 5          A.    Clearly as it says amendment to.
 6          Q.    Okay.
 7                And one of the ways that the terms
 8      of the bridge financing changed is that it was
 9      increased to a million dollars on February
10      24th, 2005, correct, one of the ways?
11          A.    One of the ways, yes.
12          Q.    All right.
13                But ultimately 1,350,000 was
14      actually raised in the bridge financing,
15      correct?
16          A.    No.
17          Q.    How much was raised in the bridge
18      financing?
19          A.    I'm unaware as to the way you're
```
                            Page 51

```
            12-12-07 phillip kassai v drinks america holdings - kassai.txt
20     describing bridge financing.
21            Q.    I'm not describing it, I'm putting
22     a document in front of you that was signed by
23     Sloan Securities and Drinks Americas, its not
24     my term.
25            A.    But the term in there and I'm not

00120
 1                          Kassai
 2     a lawyer, says up to a million dollars.  So
 3     according to what you're saying, what would
 4     the $350,000 extra be categorized as?
 5            Q.    That's my question to you.
 6            A.    Okay.
 7            Q.    What was it?
 8            A.    So it is my understanding that as
 9     a result of these terms changing numerous
10     times, it was to be deemed that this was
11     convertible equity which is what I stated in
12     the beginning.
13            Q.    So are you saying that the first
14     million dollars was bridge --
15            A.    No, that's not what I'm saying.
16            Q.    -- bridge financing and 350 was
17     some sort of equity?
18            A.    Don't put words in my mouth,
19     that's not what I said.
20            Q.    Well, what are you saying?
21            A.    I said as a result of the terms
22     changing, the entire funding going to Drinks
23     Americas was a convertible equity deal.
24            Q.    Where does it say that?  Show me a
25     single document anywhere that says that.

00121
 1                          Kassai
 2            MS. WALSH:  Objection, I object to
 3         the form of that question and I object to
 4         the way of posing it to my client.
 5         That's not a fair question and you know
 6         it.
 7            Q.    I am going to repeat the exact
 8     same question.
 9            Show me a document anywhere that
10     says what you're testifying to.
11            A.    I'm not a lawyer.
12            Q.    I'm not asking you a legal
13     question, you said that somewhere it says --
14            A.    I said its my understanding, that
15     is what I said.
16            Q.    Based upon what?
17            A.    The various amendments that took
18     place.
19            Q.    What other amendments took place
20     besides amendment number one?
21            A.    I believe there was another
22     amendment.
23            RQ
24            MR. GOPSTEIN:  I call for the
25         production of any and all amendments to

00122
 1                          Kassai
                         Page 52
```

```
                  12-12-07 phillip kassai v drinks america holdings - kassai.txt
 2                the investment banking agreement.  I'm
 3                unaware of any other amendment other than
 4                amendment number one.  If there is such,
 5                then obviously we should both have it
 6                and I would call for the production.  I
 7                don't have any other amendment, for the
 8                record.
 9                Q.    Mr. Kassai, are you certain or are
10          you speculating that there was another
11          amendment to the investment banking agreement
12          other than amendment number one?
13                A.    I don't remember all the documents
14          that I have seen.  But to the best of my
15          recollection, yes, there is another amendment.
16                Q.    What do you think it says?
17                A.    I don't recall.
18                Q.    You think there is another
19          amendment that recasts the whole deal, changes
20          it from bridge financing to some sort of an
21          equity raise?
22                A.    It was always an equity raise.
23                Q.    Even though it clearly says bridge
24          financing?
25                      MS. WALSH:  Now you're badgering.
```
 
```
00123
 1                          Kassai
 2                It is your time, use it how you want to,
 3                but I object.
 4                Q.    Where does it say in the amendment
 5          to the investment banking agreement that this
 6          is an equity raise?
 7                A.    I never said it was, I said it was
 8          a convertible equity raise.  Once again you're
 9          putting words in my mouth.
10                Q.    I don't want to put any words in
11          your mouth.
12                You said there was another
13          amendment.  I want know what the other
14          amendment says because no one has ever seen
15          it.
16                      MS. WALSH:  Objection.
17                Q.    What do you think the second
18          amendment says?
19                A.    I can't speculate, I don't have it
20          in front of me.
21                Q.    Okay.
22                Do you know for sure whether a
23          second amendment or a third amendment actually
24          ever existed?
25                      MS. WALSH:  Objection, please, you
```
 
```
00124
 1                          Kassai
 2                have exhausted this.
 3                A.    You asked me that a number of
 4          times.
 5                Q.    You're not sure?
 6                A.    Correct.
 7                Q.    Okay.
 8                I want to show you what has
 9          previously been marked Plaintiff's Exhibit 5,
10          you have it in front of you.  Its the stock
```
                                Page 53

```
                  12-12-07 phillip kassai v drinks america holdings - kassai.txt
11      purchase warrant dated May 9th, 2005.
12                  Do you see right on the first page
13      sort of smack in the middle of that paragraph
14      at the bottom, it says, "(Excluding the
15      private placement to investors of notes of up
16      to $1,350,000)" --
17              A.    I do see that.
18              Q.    Okay.
19                  Do you have any reason to believe
20      that the $1,350,000 that was raised was
21      anything but promissory notes convertible to
22      equity?
23              A.    I'm not sure what you're asking.
24              Q.    Well, you indicated that you
25      thought somehow the terms changed or the

00125
1                           Kassai
2       description of what was raised changed, and so
3       I'm showing you a document that was signed in
4       May 2005 where it describes the 1,350,000 as
5       notes.
6                   According to your understanding of
7       what happened, is that an accurate description
8       of the money that was raised?
9               A.    No, because it doesn't describe
10      what the money was actually raised for.  It
11      was, if you want to get technical and again
12      I'm not a lawyer, but it was a convertible
13      note, it doesn't talk about anything with
14      regard to conversion, and I think notes is
15      just the short terminology for what the
16      company is attributing the $1.35 million
17      raise.
18              Q.    I thought I asked you that precise
19      question so maybe if you would listen
20      carefully, you might not have a problem with
21      it or you might.
22              A.    I was listening carefully.
23                  MS. WALSH:  I would like to take
24          the restroom break.
25              Q.    Let me finish the question and we

00126
1                           Kassai
2       are done.
3                   Do you have any reason to believe
4       the $1,350,000 that was raised by Sloan for
5       Drinks Americas was anything but promissory
6       notes convertible to equity?
7                   MS. WALSH:  Objection, this
8           question had been asked and answered.  I
9           mean --
10                  MR. GOPSTEIN:  He hasn't answered
11          it, it has been asked and he hasn't
12          answered it.
13                  MS. WALSH:  He can answer it.
14              A.    I believe the $1.35 million raised
15      was a promissory convertible note into equity.
16              Q.    So the description on the first
17      page of this document stock purchase warrant
18      is accurate, correct?
19              A.    No, its not accurate.
                              Page 54
```

        12-12-07 phillip kassai v drinks america holdings - kassai.txt
20          Q.    They are notes, right?  They are
21  promissory notes that were convertible to
22  equity?
23          A.    You just said promissory notes,
24  the word promissory doesn't even exist there,
25  how can be it be accurate?

00127
1                         Kassai
2           Q.    Are you saying you don't know what
3   the word notes means?
4           A.    Are you saying you don't know what
5   the word promissory means?
6           Q.    I do, I'm asking the questions
7   here and you're going to answer them.
8                 The question is what is your
9   understanding of the term notes in the
10  securities business or the financial industry
11  really?
12          A.    A note means an obligation to pay
13  something.
14          MR. GOPSTEIN:  Let's take a
15          bathroom break.
16                Off the record.
17                (Whereupon, an off-the-record
18          discussion was held.)
19                (Time noted:  5:15 p.m.)
20                (Time noted:  5:27 p.m.)
21          Q.    Mr. Kassai, when you found out
22  that Dan Myers had allegedly diverted funds
23  earmarked for Drinks Americas, did you tell
24  him that you were going to report that to any
25  authorities?

00128
1                         Kassai
2           A.    No.
3           Q.    Have you reported it to any
4   authorities?
5           A.    No.
6           Q.    Do you intend to?
7           A.    No.
8           Q.    When is the last time you spoke to
9   Jim Ackerman?
10          A.    I believe you asked me that
11  question and I answered it.
12          Q.    When was the last time you spoke
13  to Jim Ackerman about this case?
14          A.    I believe it was sometime most
15  likely in September to the last of my
16  recollection.
17          Q.    Of this year?
18          A.    Of this year.
19          Q.    What did you talk about?
20          A.    We talked about the warrants due
21  to Sloan from Drinks Americas.
22          Q.    Did Jim Ackerman say that he
23  thought that Sloan was owed warrants as well?
24          A.    Yes.
25          Q.    Do you know why neither Jim

00129
1                         Kassai
                        Page 55

```
           12-12-07 phillip kassai v drinks america holdings - kassai.txt
 2     Ackerman nor Sloan Securities nor Sloan Equity
 3     Partners has brought any lawsuit against
 4     Drinks Americas?
 5                 MS. WALSH:  Objection.
 6         A.    I couldn't speculate on that.
 7         Q.    Did you ever ask Jim Ackerman,
 8     "Hey, why aren't you suing those guys?"
 9         A.    I couldn't care less.
10         Q.    You never asked him that?
11         A.    I didn't need to.
12         Q.    Regardless of whether you needed
13     to or not, did you ever ask him anything along
14     those lines as to why he's not suing?
15         A.    I don't recall.
16         Q.    Did he ever tell you why he's not
17     suing?
18         A.    No.
19         Q.    As you sit here today do you have
20     any idea why he's not suing?
21         A.    No idea.
22         Q.    Would it be accurate to say that
23     Sloan Securities did not raise any equity for
24     Drinks Americas in connection with the
25     investment banking agreement?
```

00130
```
                         Kassai
 2                 MS. WALSH:  Objection, I'm sorry, I
 3     didn't understand it.  You can answer if
 4     you do.
 5         Q.    I'll say it again.
 6         A.    I don't think its accurate.
 7         Q.    I thought it was pretty clear.
 8               Is it accurate to say Sloan
 9     Securities did not raise any equity for Drinks
10     Americas in connection with the December 2004
11     investment banking agreement?
12         A.    I answered, I believe that's not
13     accurate.
14         Q.    So if Mr. Myers said that under
15     oath you think he would be giving false
16     testimony?
17         A.    I don't know what Mr. Myers said
18     or I'm not understanding what your --
19         Q.    I just want to know if Mr. Myers
20     said that under oath, do you think that would
21     be a false statement?
22         A.    That there was never equity
23     raised --
24         Q.    That Sloan did not raise any
25     equity for Drinks Americas in connection with
```

00131
```
                         Kassai
 2     the investment banking agreement?
 3         A.    I can't answer on behalf of Dan
 4     Myers.
 5         Q.    I'm not asking you to answer on
 6     behalf of him.  I want to know whether that's
 7     an accurate statement?
 8         A.    Whether Dan Myers --
 9         Q.    No, let me rephrase.
10               Is it accurate to say that Sloan
                         Page 56
```

12-12-07 phillip kassai v drinks america holdings - kassai.txt
```
11      Securities did not raise any equity for Drinks
12      Americas in connection with the investment
13      banking agreement between the two firms?
14              A.    Please describe how you're
15      defining equity.
16              Q.    Equity is not debt.  Equity as I
17      understand it and as I would be asking the
18      question is an investment in return for which
19      you receive equity in the company that you're
20      investing?
21              A.    Your statement is inaccurate.
22              Q.    What do you believe equity is?
23              A.    I believe its anytime a company
24      takes in capital that effects the net value of
25      a company.
```
00132
```
1                         Kassai
2               Q.    Anything that effects the net
3       value of a company.
4                     Let's say you take in a straight
5       loan, a straight loan with a straight
6       promissory note.  That effects the value of
7       the company, doesn't it, that has to go to the
8       balance sheet, correct; yes or no?
9               A.    Correct.
10              Q.    You think that's equity?
11              A.    Again, how are you defining a
12      loan?
13              Q.    You said that equity is anything
14      that a company takes in that effects the
15      finances.
16                    Is that what you said?
17              A.    No, I didn't say finances.
18              Q.    What was the word you used?
19              A.    The value.
20              Q.    The value.
21                    Wouldn't a loan affect the value
22      of a company?
23              A.    Sure it could.
24              Q.    So if you take in a straight loan
25      are you saying that is equity?
```
00133
```
1                         Kassai
2               A.    One is not inclusive of the other.
3               Q.    One has nothing do with the other,
4       correct, debt is debt and equity is equity,
5       right?
6               A.    Not all the time.
7                     When there is a convertible
8       instrument, that is what is the topic at hand.
9               Q.    Right.
10              A.    Okay.
11              Q.    And the notes that we are talking
12      about here today were debt instruments that
13      were convertible to equity.
14                    Isn't that a fair statement of
15      what happened?
16              A.    That's a rough, fair statement,
17      yes.
18              Q.    Okay.
19                    Is it accurate to say that Sloan
```
Page 57

12-12-07 phillip kassai v drinks america holdings - kassai.txt
20   Securities successfully raised $1,350,000 in a
21   bridge financing in the form of debt
22   convertible to equity?
23          A.    It is fair to say that Sloan
24   raised $1.35 million of convertible equity for
25   Drinks Americas.

00134
1                       Kassai
2           Q.    There was no debt involved?
3           A.    That was the convertible, the
4    convertible from the promissory note into
5    equity.
6           Q.    That was pursuant to the bridge
7    financing that Sloan did for Drinks Americas,
8    correct?
9                 MS. WALSH:  Objection.
10          A.    I think I answered this.
11          Q.    Didn't Sloan do a bridge financing
12   for Drinks?
13                MS. WALSH:  Objection.
14          A.    I answered this question, I think
15   you have asked it about a half dozen times
16   already.
17          Q.    I don't think so.
18          A.    You don't think what, that you
19   asked it a dozen times or that I answered it?
20          Q.    Both, its a simple question
21   really.
22                Did Sloan do a bridge financing
23   for Drinks Americas at any time?
24          A.    Sloan raised $1.35 million for
25   Drinks Americas in the form of a convertible

00135
1                       Kassai
2    instrument.
3           Q.    Okay.
4                 MR. GOPSTEIN:  For the record, I'm
5    going to mark and hand counsel
6    Defendant's Exhibit D.  It is the
7    affidavit of Daniel Myers sworn to today,
8    for identification.
9                 (Defendant's Exhibit D, affidavit,
10   marked for identification, as of this
11   date.)
12                MS. WALSH:  Which has never been
13   produced prior, is that accurate?  It has
14   never been produced to me before?
15                MR. GOPSTEIN:  Did you hear the
16   last few words?  I said it was sworn to
17   today.
18                MS. WALSH:  Yes, my question was it
19   has never been produced?
20                MR. GOPSTEIN:  Prior to today?
21                MS. WALSH:  What time was it sworn
22   to today?
23                MR. GOPSTEIN:  Am I under oath
24   here?
25                MS. WALSH:  You're not.

00136
1                       Kassai
                      Page 58

12-12-07 phillip kassai v drinks america holdings - kassai.txt

```
 2            MR. GOPSTEIN:  I'm just telling you
 3   it was sworn to today and I'm producing
 4   it today on the same day.
 5            MS. WALSH:  Can you tell me what
 6   time it was sworn or are you refusing to
 7   answer me?
 8            MR. GOPSTEIN:  No.
 9            MS. WALSH:  You're not going to
10   tell me?
11            MR. GOPSTEIN:  No, I'm not going to
12   tell you.
13            RQ
14            MS. WALSH:  I would like to have a
15   courtesy copy of this.
16            RQ
17            MR. GOPSTEIN:  Absolutely.
18            I'm done.  Subject to the
19   production of all of the important
20   documents that I asked for today, I will
21   conclude today and will hold the
22   deposition open and after I get the
23   documents, I may or may not need some
24   additional time with this witness.
25            MS. WALSH:  I have made my witness
```

00137
```
 1                    Kassai
 2   available today, counsel has had plenty
 3   of notice of that.  I have moved it, in
 4   fact, several times as a courtesy to
 5   counsel and his witnesses.  It is only
 6   5:30, we started an hour late because you
 7   were running late, which is not a
 8   problem.  We are prepared to stay longer,
 9   there is absolutely no reason to keep
10   this deposition open, I object for the
11   record.
12            RQ
13            And I'm also going to call for the
14   immediate production of all documents
15   that are in your possession or your
16   constructive possession since you have
17   now provided an affidavit by a former
18   member of Sloan who was obviously in your
19   company today because it is sworn to
20   before me, meaning Sheldon Gopstein,
21   December 12th.
22            We don't know what time that was,
23   but I am also going to note for the
24   record that you were 45 minutes late, you
25   requested taking two breaks so you could
```

00138
```
 1                    Kassai
 2   go downstairs and meet with people.  And
 3   if you need more time, my client is here
 4   and available.
 5            MR. GOPSTEIN:  Let me clarify one
 6   thing.  I don't need more time today.
 7            MS. WALSH:  Today is the time when
 8   my client is available.
 9            MR. GOPSTEIN:  I'm telling you I
10   don't need more time today.  In fact, I
```

```
          12-12-07 phillip kassai v drinks america holdings - kassai.txt
  11          can't question him today on documents
  12          that I don't have.  If I had the
  13          documents I would be more than willing to
  14          continue.  I'm not leaving because it is
  15          late, I'm leaving because I have no
  16          further questions concerning the
  17          documents that we have before us.
  18              When you produce the additional
  19          documents if they exist, the witness has
  20          indicated that he's not sure if some of
  21          these documents even exist.  But if they
  22          do, when they are produced I'll let you
  23          know whether I need to ask him more
  24          questions or not, and for that reason I'm
  25          holding the deposition open.
```
⌐
```
00139
   1                        Kassai
   2              MS. WALSH:  You will note that you
   3          were given documents, you have already
   4          noted on the record that you were given
   5          documents today, so that's it.
   6              Thank you very much.
   7              Off the record.
   8              (Whereupon, an off-the-record
   9          discussion was held.)
  10              (Time noted:  5:42 p.m.)
  11
  12                    _____
  13                    PHILLIP KASSAI
  14
  15      Subscribed and affirmed to before me
  16      this ___ day of _____, 2007.
  17
  18      _____
  19
  20
  21
  22
  23
  24
  25
```
⌐
```
00140
   1                        Kassai
   2                   C E R T I F I C A T E
   3      STATE OF NEW YORK    )
   4                          : ss.
   5      COUNTY OF NEW YORK   )
   6
   7          I, Jeremy Frank, a Notary Public
   8      within and for the State of New York, do
   9      hereby certify:
  10          That PHILLIP KASSAI, the witness whose
  11      deposition is hereinbefore set forth, was duly
  12      affirmed by me and that such deposition is a
  13      true record of the testimony given by the
  14      witness.
  15          I further certify that I am not related
  16      to any of the parties to this action by blood
  17      or marriage, and that I am in no way
  18      interested in the outcome of this matter.
  19          IN WITNESS WHEREOF, I have hereby
                          Page 60
```

```
        12-12-07 phillip kassai v drinks america holdings - kassai.txt
20      set my hand on the 15th day of December, 2007.
21
22
23
                                _____
24                              JEREMY FRANK, MPM
25
```

00141
```
 1                              Kassai
 2      ----------------- I N D E X ----------------
 3
 4      WITNESS                 EXAMINATION BY         PAGE
 5      MR. KASSAI              MR. GOPSTEIN              5
 6
 7      ----------- INFORMATION REQUESTS -----------
 8
 9      TO BE FURNISHED:        Page 18
10      REQUESTS:               Pages 30, 71, 72, 73,
11                              116, 117, 121, 136, 137
12
13      ------------------ EXHIBITS ----------------
14
15      Defendant's A           Complaint               69
16      Defendant's B           Letter and investment
17                              Banking agreement with
18                              Schedules               90
19      Defendant's C           Amendment to investment
20                              Banking agreement      118
21      Defendant's D           Affidavit of Daniel
22                              Myers                  135
23
24
25
```

00142
```
 1                        PHILLIP KASSAI
 2              *** ERRATA SHEET  ***
 3
        NAME OF CASE: KASSAI v. DRINKS AMERICA
 4      DATE OF DEPOSITION:  December 12th, 2007
        NAME OF WITNESS:   PHILLIP KASSAI
 5      PAGE   LINE       FROM          TO
 6      ____|____|_____|_____
 7      ____|____|_____|_____
 8      ____|____|_____|_____
 9      ____|____|_____|_____
10      ____|____|_____|_____
11      ____|____|_____|_____
12      ____|____|_____|_____
13      ____|____|_____|_____
14      ____|____|_____|_____
15      ____|____|_____|_____
16      ____|____|_____|_____
17      ____|____|_____|_____
18
                        _____
19                        PHILLIP KASSAI
20      Subscribed and affirmed to before me
        this ____ day of _____, 2007.
21
        _____  _____
22
```

Page 61

12-12-07 phillip kassai v drinks america holdings - kassai.txt
23
24
25

# EXHIBIT F

## Coldwell, Mark

| | |
|---|---|
| **From:** | Daniel M. Myers [danm@sloansecurities.com] |
| **Sent:** | Wednesday, March 09, 2005 5:31 PM |
| **To:** | 'Coldwell, Mark'; 'Steven Uslaner' |
| **Cc:** | 'Littman, Mitchell' |
| **Subject:** | Drinks Americas funding |

Mark – as we discussed, investors are now going to be sending their funds to your IOLA acct instead of Cannella's.  When the first tranche of capital arrives from Cornell tomorrow it will be for $445,000 (see attached disbursement letter b/w Drinks and Cornell)

When the funds hit please send out the following:

**Wire 1**
| | |
|---|---|
| Amount: | $50,000 |
| Firm: | Sloan Securities Corp |
| Bank: | Fleet Bank |
| | Linwood Plaza |
| | Fort Lee NJ 07024 |
| ABA No.: | 021200339 |
| Account No.: | 0101144172 |

**Wire 2**
| | |
|---|---|
| Amount: | $390,000 |
| Firm: | Drinks Americas, Inc |
| Bank: | JP Morgan Chase Bank |
| | 92-98 Grove Street |
| | Ridgefield, CT 06877 |
| ABA No.: | 021000021 |
| Account No.: | 22750036540-65 |

Obviously, you will take your 5k (the balance 5k when we close the next tranche)

Thanks,
**Daniel M. Myers**
**Managing Director, Investment Banking**
**Sloan Securities Corp.**
**444 Madison Ave, 23rd Floor**
**New York, NY 10022**
**Tel: (212) 308-2233**
**Fax: (212) 202-4022**
**Cell (516) 643-9493**
**danm@sloansecurities.com**
**www.sloansecurities.com**

Sloan Securities archives and reviews outgoing and incoming e-mail. Such may be produced at the request of regulators. Sender accepts no liability for any errors or omissions arising as a result of transmission. Use by other than intended recipients is prohibited. This is neither an offer nor a solicitation of an offer to buy or sell securities. Opinions or estimates constitute our best judgment at this time and are subject to change without notice. Information upon which this material is based was obtained from sources believed to be reliable but has not been verified. Additional information is available upon request. Sloan Securities its affiliates and respective directors, officers and employees may

3/14/2005

# EXHIBIT G

## Coldwell, Mark

| | |
|---|---|
| **From:** | Daniel M. Myers [danm@sloansecurities.com] |
| **Sent:** | Monday, March 21, 2005 10:25 AM |
| **To:** | 'Daniel M. Myers'; 'Steven Uslaner'; 'Littman, Mitchell'; jca@sloansecurities.com |
| **Cc:** | 'Coldwell, Mark'; 'Rebecca Rubenstein'; 'Bruce Klein'; 'Phil Kassai' |
| **Subject:** | RE: 2ND Tranch of Drinks Americas Bridge |

Just a revised email -- as 20k of the 430k was in check and will not clear for a few days -- we will close on $410k and as we are expecting more funds shortly anyway we close on the balance when additional funds come in...

Thus the new wires

| | |
|---|---|
| To Sloan | $41k |
| To LK | $ 5k |
| To Drinks | $364k |

**Daniel M. Myers**
**Managing Director, Investment Banking**
**Sloan Securities Corp.**
**444 Madison Ave, 23rd Floor**
**New York, NY 10022**
**Tel: (212) 308-2233**
**Fax: (212) 202-4022**
**Cell (516) 643-9493**
**danm@sloansecurities.com**
**www.sloansecurities.com**

Sloan Securities archives and reviews outgoing and incoming e-mail. Such may be produced at the request of regulators. Sender accepts no liability for any errors or omissions arising as a result of transmission. Use by other than intended recipients is prohibited. This is neither an offer nor a solicitation of an offer to buy or sell securities. Opinions or estimates constitute our best judgment at this time and are subject to change without notice. Information upon which this material is based was obtained from sources believed to be reliable but has not been verified. Additional information is available upon request. Sloan Securities its affiliates and respective directors, officers and employees may buy or sell securities mentioned as agent or principal. This is for use by professional or institutional investors only. No investments or services mentioned or described are available to "private customers" as defined by the FSA or to anyone in Canada not a "Designated Institution".

**From:** Daniel M. Myers [mailto:danm@sloansecurities.com]
**Sent:** Friday, March 18, 2005 3:12 PM
**To:** 'Steven Uslaner'; 'Littman, Mitchell'; 'jca@sloansecurities.com'
**Cc:** 'Coldwell, Mark'; 'Rebecca Rubenstein'; 'Bruce Klein (pklein1129@aol.com)'; 'Phil Kassai'
**Subject:** 2ND Tranch of Drinks Americas Bridge

Gentlemen --

(1) As of today, March 18, 2005, a wire transfer for $400,000 from Periscope Partners has been sent to your IOLA acct.
(2) In addition, a wire transfer of $10k from John Dalfansi of Roth Capital Partners and
(3) a check in the amount of $20k from Christopher Jennings of Roth CP has been sent as well.

On Monday, please confirm that you have received these amounts.  When you have confirmed this -- please send out the following amounts --

4/5/2005

# EXHIBIT H

**Coldwell, Mark**

| | |
|---|---|
| **From:** | Daniel M. Myers [danm@sloansecurities.com] |
| **Sent:** | Tuesday, April 05, 2005 5:37 PM |
| **To:** | 'Coldwell, Mark'; 'Rebecca Rubenstein' |
| **Cc:** | 'Uslaner, Steven'; 'Paul Walfish' |
| **Subject:** | RE: Drinks Americas |

Instructions
Please wire transfer

$153,000 to Drinks Americas
$17,000 to Sloan Securities Corp.

**Daniel M. Myers**
**Managing Director, Investment Banking**
**Sloan Securities Corp.**
**444 Madison Ave, 23rd Floor**
**New York, NY 10022**
**Tel: (212) 308-2233**
**Fax: (212) 202-4022**
**Cell (516) 643-9493**
**danm@sloansecurities.com**
**www.sloansecurities.com**

**From:** Coldwell, Mark [mailto:mcoldwell@lkllp.com]
**Sent:** Tuesday, April 05, 2005 5:38 PM
**To:** Daniel M. Myers; Coldwell, Mark; 'Rebecca Rubenstein'
**Cc:** Uslaner, Steven; 'Paul Walfish'
**Subject:** RE: Drinks Americas

$169,975 but I told Rebecca to do the instructions for $170,000 since that's what we are deeeming the investments to have totalled.

**From:** Daniel M. Myers [mailto:danm@sloansecurities.com]
**Sent:** Tuesday, April 05, 2005 5:04 PM
**To:** 'Coldwell, Mark'; 'Rebecca Rubenstein'
**Cc:** 'Uslaner, Steven'; 'Paul Walfish'
**Subject:** RE: Drinks Americas

How much is in the escrow

**Daniel M. Myers**
**Managing Director, Investment Banking**
**Sloan Securities Corp.**
**444 Madison Ave, 23rd Floor**
**New York, NY 10022**
**Tel: (212) 308-2233**
**Fax: (212) 202-4022**
**Cell (516) 643-9493**
**danm@sloansecurities.com**

4/5/2005

# EXHIBIT I

## Mark Coldwell

| | |
|---|---|
| **From:** | Daniel M. Myers [danm@sloansecurities.com] |
| **Sent:** | Friday, April 15, 2005 12:43 PM |
| **To:** | Mark Coldwell; 'Daniel Myers' |
| **Cc:** | Steve Uslaner; 'Paul Walfish'; 'Rebecca Rubenstein' |
| **Subject:** | RE: Drinks Americas |

Disburse as follows
162,000 to Drinks
18,000 to Sloan Securities

**Daniel M. Myers**
**Managing Director, Investment Banking**
**Sloan Securities Corp.**
**444 Madison Ave, 23rd Floor**
**New York, NY 10022**
**Tel: (212) 308-2233**
**Fax: (212) 202-4022**
**Cell (516) 643-9493**
**danm@sloansecurities.com**
**www.sloansecurities.com**

**From:** Coldwell, Mark [mailto:mcoldwell@lkllp.com]
**Sent:** Friday, April 15, 2005 12:45 PM
**To:** Daniel M. Myers; Daniel Myers
**Cc:** Uslaner, Steven; 'Paul Walfish'; Rebecca Rubenstein
**Subject:** Drinks Americas

Dan, we have $180,000 of available investor funds. Please send us disbursement instructions for this amount and also for $80,000 in case Joe Cannella doesn't get the paperwork completed for the new $100,000 investor.

**Mark F. Coldwell, Esq.**
**LITTMAN KROOKS, LLP**
655 Third Avenue
New York, NY 10017
Tel: (212) 490-2020
Fax: (212) 490-2990

This electronic message transmission contains information from the law firm of Littman Krooks LLP, which may be confidential or privileged. The information is intended to be for the use of the individual or entity named above. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the contents of this information is prohibited. If you have received this electronic transmission in error, please notify us by telephone (212-490-2020 or 914-684-2100) or by electronic mail (mcoldwell@lkllp.com) immediately.

Sloan Securities archives and reviews outgoing and incoming e-mail. Such may be produced at the request of regulators. Sender accepts no liability for any errors or omissions arising as a result of transmission. Use by other than intended recipients is prohibited. This is neither an offer nor a solicitation of an offer to buy or sell securities. Opinions or estimates constitute our best judgment at this time and are subject to change without notice. Information upon which this material is based was obtained from sources believed to be reliable but has not been verified. Additional information is available upon request. Sloan Securities its affiliates and respective directors, officers and employees may buy or sell securities mentioned as agent or principal. This is for use by professional or institutional investors only. No investments or services mentioned or described are available to "private customers" as defined by the FSA or

1/25/2006

# EXHIBIT J

## Mark Coldwell

**From:** Daniel M. Myers [danm@sloansecurities.com]
**Sent:** Thursday, May 05, 2005 4:14 PM
**To:** Mark Coldwell; 'Daniel Myers'
**Cc:** Steve Uslaner; 'Rebecca Rubenstein'; jca@sloansecurities.com
**Subject:** RE: Drinks Americas

confirmed

**Daniel M. Myers**
**Managing Director, Investment Banking**
**Sloan Securities Corp.**
**444 Madison Ave, 23rd Floor**
**New York, NY 10022**
**Tel: (212) 308-2233**
**Fax: (212) 202-4022**
**Cell (516) 643-9493**
**danm@sloansecurities.com**
**www.sloansecurities.com**

**From:** Coldwell, Mark [mailto:mcoldwell@lkllp.com]
**Sent:** Thursday, May 05, 2005 3:56 PM
**To:** Daniel M. Myers; Daniel Myers
**Cc:** Uslaner, Steven; Rebecca Rubenstein
**Subject:** Drinks Americas

Dan, we have been told by our bank that all funds will be available for distribution tomorrow ($90,000).  Unless we are informed otherwise, once we have received the signed documents from the Company we will distribute the funds as follows:

$9,000 to Sloan
$81,000 to the Company

Please confirm.

Mark F. Coldwell, Esq.
LITTMAN KROOKS, LLP
655 Third Avenue
New York, NY  10017
Tel: (212) 490-2020
Fax: (212) 490-2990

This electronic message transmission contains information from the law firm of Littman Krooks LLP, which may be confidential or privileged. The information is intended to be for the use of the individual or entity named above. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the contents of this information is prohibited. If you have received this electronic transmission in error, please notify us by telephone (212-490-2020 or 914-684-2100) or by electronic mail (mcoldwell@lkllp.com) immediately.

Sloan Securities archives and reviews outgoing and incoming e-mail. Such may be produced at the request of regulators. Sender accepts no liability for any errors or omissions arising as

1/25/2006