# EXHIBIT K

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------X
                                                                    :
PHILLIP KASSAI,                                                     : 07 CIV 5590 (RMB)(AJP)
                                                                    :
                                    Plaintiff,                      : **AFFIDAVIT**
                                                                    :
              - against -                                           :
                                                                    :
DRINKS AMERICA HOLDINGS, LTD.,                                      :
                                                                    :
                                    Defendant.                      :
-------------------------------------------------------------------X

DEFENDANT'S
EXHIBIT

STATE OF NEW YORK     )
                      ss.:
COUNTY OF NEW YORK    )

    DANIEL M. MYERS, being duly sworn, deposes and says:

    1. From early 2003 through August 2006, I was a Managing Director of Investment Banking at Sloan Securities Corp. in New York City. I am also a managing member (and 40% owner) of Sloan Equity Partners, LLC. The other members of Sloan Equity Partners are James Ackerman (20% owner) and Phillip Kassai (40% owner).

    2. I am fully familiar with the business relationship between Sloan Securities Corp. ("Sloan") and Drinks Americas Holdings, Ltd. ("Drinks").

    3. On or about December 27, 2004, Sloan and Drinks entered into an Investment Banking Agreement (the "Agreement"). Pursuant to the Agreement, Sloan was to use its best efforts to procure financing in the range of $6 million to $10 million of equity or equity-linked securities of Drinks. Prior to the equity financing, Sloan was to use its best efforts to procure bridge financing in accordance with a proposed term sheet. The fees and other compensation to be earned by Sloan were set forth in Section 4 of the Agreement. Section 4.1(a) governs compensation payable to Sloan for the equity financing. Section 4.1(b) governs compensation payable to Sloan for the bridge financing.

    4. Sloan successfully raised $1,350,000 of bridge financing for Drinks in the form of convertible debt evidenced by promissory notes issued by Drinks. Sloan did not raise any equity for

Drinks in connection with the Agreement. Sloan was paid its fees for the bridge financing pursuant to Section 4.1(b) of the Agreement.

5. On or about May 9, 2005, I asked Sloan's counsel to prepare a Stock Purchase Warrant for 300,000 shares of Drinks' common stock at an exercise price of $0.45, subject to adjustment (the "Warrant"). I invited Bruce Klein, the Chairman of Drinks, to come to my office and asked him to sign the Warrant, which he did. The Warrant was issued in the name of Sloan Equity Partners, LLC.

6. I believed at the time that Sloan was entitled to the Warrant for work it had done in raising money for Drinks. Today, it is not clear to me whether or not Sloan was actually entitled to the Warrant under the terms of the Agreement. It is a legal question that I am not qualified to answer.

7. If Sloan is entitled to any warrants, it would be entitled to 217,500 (not 300,000) based upon the following calculation: A total of $1,350,000 of debt was raised from various lenders who were given an option to convert to stock at $0.45 per share - resulting in the issuance of 300,000 shares of stock. Under the terms of the convertible notes, the noteholders were also given an additional share of stock for each dollar converted to equity - resulting in the issuance of another 1,350,000 shares. So, a total of 4,350,000 shares of stock were issued by Drinks to the noteholders who converted their notes. If Sloan is entitled to warrants for the bridge financing, it would be entitled to 5% of 4,350,000 shares - or 217,500 warrants exerciseable at $0.45 per share.

8. I have no interest in the outcome of this lawsuit since I am no longer employed by Sloan and I previously assigned to Jim Ackerman any rights I may have had to a portion of the Warrant.

Daniel M. Myers

Sworn to before me this _12 TH_

day of _DECEMBER_, 2007

Notary Public

SHELDON H. GOPSTEIN
Notary Public, State of New York
Registration No. 02GO6163392
Qualified in Westchester County
Commission Expires 03/26/2011

# EXHIBIT L

# STOCK PURCHASE WARRANT

THE SECURITIES REPRESENTED BY THIS WARRANT HAVE BEEN ACQUIRED FOR INVESTMENT AND HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "*SECURITIES ACT*"). THESE SECURITIES MAY NOT BE SOLD OR TRANSFERRED IN THE ABSENCE OF SUCH REGISTRATION OR AN EXEMPTION THEREFROM UNDER THE SECURITIES ACT OR UNDER STATE SECURITIES LAWS. THIS WARRANT MAY NOT BE SOLD, ASSIGNED, TRANSFERRED OR OTHERWISE DISPOSED OF EXCEPT PURSUANT TO THE EXPRESS PROVISIONS OF THIS WARRANT, AND NO SALE, ASSIGNMENT, TRANSFER, OR OTHER DISPOSITION OF THIS WARRANT SHALL BE VALID OR EFFECTIVE UNLESS AND UNTIL SUCH PROVISIONS SHALL HAVE BEEN COMPLIED WITH.

Date of Issuance: May 9, 2005

## DRINKS AMERICAS HOLDINGS, LTD.

Stock Purchase Warrant

(Void after May 8, 2010)

Drinks Americas Holdings, Ltd., a Delaware corporation (the "Company"), for value received, hereby certifies and agrees that SLOAN EQUITY PARTNERS, LLC or its registered assigns (the "Registered Holder"), is entitled, subject to the terms set forth below, to purchase from the Company, at any time or from time to time on or after the date hereof (the "Date of Issuance") and on or before May 8, 2010 at not later than 5:00 p.m. New York time (such date and time, the "Expiration Time"), THREE HUNDRED THOUSAND (300,000) duly authorized, validly issued, fully paid and nonassessable shares of the Company's common stock, $0.001 par value per share (the "Common Stock") at an initial exercise price equal to the lower of (i) $.45 per share, or (ii) if the Company consummates a private placement of its Common Stock raising net proceeds of not less than $6,000,000 to the Company (excluding the private placement to investors of Notes of up to $1,350,000 principal amount of which this Warrant is a part) and Sloan Securities Corp. acts as placement agent with respect thereto, the per share price of the common stock in such offering: subject to adjustment in certain cases as described herein. The shares purchasable upon exercise of this Warrant, and the purchase price per share, are hereinafter referred to as the "Warrant Shares" and the "Exercise Price," respectively. The term "Warrant" as used herein shall include this Warrant and any other warrants delivered in substitution or exchange therefor, as provided herein.

1.    <u>Exercise.</u>

    1.1.    <u>Method of Exercise</u>

        (a)    This Warrant may be exercised by the Registered Holder, in whole or in part, by surrendering this Warrant, with a Notice of Exercise in the form of Annex A hereto (the "Notice of Exercise") duly executed by such Registered Holder or by such Registered Holder's duly authorized attorney, at the principal office of the Company set forth on the signature page hereto, or at such other office or agency as the Company may designate in writing (the "Company's Office"), accompanied by payment in full, in lawful money of the United States, of the Exercise Price payable in respect of the number of shares of Warrant Shares purchased upon such exercise.

        (b)    Each exercise of this Warrant shall be deemed to have been effected immediately prior to the close of business on the day on which the Notice of Exercise shall be dated and directed to the Company (as evidenced by the applicable postmark or other evidence of transmittal) as provided in Section 1(a) hereof. At such time, the person or persons in whose name or names any certificates for Warrant Shares shall be issuable upon such exercise as provided in Section 1.1(c) hereof shall be deemed to have become the holder or holders of record of the Warrant Shares represented by such certificates.

        (c)    As soon as practicable after the exercise of this Warrant, in full or in part, and in any event within ten (10) days thereafter, the Company, at its expense, will cause to be issued in the name of, and delivered to, the Registered Holder, or as such Registered Holder (upon payment by such Registered Holder of any applicable transfer taxes) may direct:

        (i)    a certificate or certificates for the number of full Warrant Shares to which such Registered Holder shall be entitled upon such exercise plus, in lieu of any fractional share to which such Registered Holder would otherwise be entitled, cash in an amount determined pursuant to Section 3 hereof; and

        (ii)    in case such exercise is in part only, a new warrant or warrants (dated the date hereof) of like tenor, representing in the aggregate on the face or faces thereof the number of Warrant Shares equal (without giving effect to any adjustment therein) to the number of such shares called for on the face of this Warrant minus the number of such shares purchased by the Registered Holder upon such exercise as provided in Section 3 hereof or received pursuant to Section 1.2 hereof.

    1.2.    <u>Exercise by Surrender of Warrant</u>.  In addition to the method of payment set forth in Section 1.1 and in lieu of any cash payment required thereunder, the Warrant may be exercised by surrendering the Warrant in the manner specified in this Section 1.2, together with irrevocable instructions to the Company to issue in exchange for the Warrant the number of shares of Common Stock equal to the product of (x) the number of shares of Common Stock underlying the Warrants multiplied by (y) a fraction, the numerator of which is the Market Value (as defined below) of the Common Stock less the Exercise Price and the denominator of which is such Market Value. As used herein, the phrase "Market Value" at any date shall be deemed to be

2

the last reported sale price, or, in case no such reported sale takes place on such day, the average of the last reported sale prices for the last three (3) trading days, in either case as officially reported by the principal securities exchange or "over the counter" (including on the pink sheets or bulletin board) exchange on which the Common Stock is listed or admitted to trading, or, if the Common Stock is not listed or admitted to trading on any national securities exchange or sold "over the counter", the average closing bid price as furnished by the NASD through NASDAQ or similar organization if NASDAQ is no longer reporting such information, or if the Common Stock is not quoted on NASDAQ, as determined in good faith by resolution of the Board of Directors of the Company, based on the best information available to it.

2.    Shares to be Fully Paid; Reservation of Shares. The Company covenants and agrees that all shares of Common Stock which may be issued upon the exercise of the rights represented by this Warrant will, upon issuance by the Company, be validly issued, fully paid and nonassessable, and free from preemptive rights and free from all taxes, liens and charges with respect thereto. The Company further covenants and agrees that, from and after the Date of Issuance and during the period within which the rights represented by this Warrant may be exercised, the Company will at all times have authorized, and reserve, free from preemptive rights, out of its authorized but unissued shares of Common Stock, solely for the purpose of effecting the exercise of this Warrant, a sufficient number of shares of Common Stock to provide for the exercise of the rights represented by this Warrant.

3.    Fractional Shares. The Company shall not be required upon the exercise of this Warrant to issue any fractional shares, but shall make an adjustment therefor in cash on the basis of the Market Value for each fractional share of the Company's Common Stock which would be issuable upon exercise of this Warrant.

4.    Requirements for Transfer.

(a)    Warrant Register. The Company will maintain a register (the "Warrant Register") containing the names and addresses of the Registered Holder or Registered Holders. Any Registered Holder of this Warrant or any portion thereof may change its address as shown on the Warrant Register by written notice to the Company requesting such change, and the Company shall promptly make such change. Until this Warrant is transferred on the Warrant Register of the Company, the Company may treat the Registered Holder as shown on the Warrant Register as the absolute owner of this Warrant for all purposes, notwithstanding any notice to the contrary, provided, however, that if and when this Warrant is properly assigned in blank, the Company may, but shall not be obligated to, treat the bearer hereof as the absolute owner hereof for all purposes, notwithstanding any notice to the contrary.

(b)    Warrant Agent. The Company may, by written notice to the Registered Holder, appoint an agent for the purpose of maintaining the Warrant Register referred to in Section 4(a) hereof, issuing the Common Stock issuable upon the exercise of this Warrant, exchanging this Warrant, replacing this Warrant or any or all of the foregoing. Thereafter, any such registration, issuance, exchange, or replacement, as the case may be, may be made at the office of such agent.

3

(c)    <u>Transfer</u>. Subject to the provisions of this Section 4, this Warrant and all rights hereunder are transferable, in whole or in part, upon the surrender of this Warrant with a properly executed Assignment Form in substantially the form attached hereto as <u>Annex B</u> (the "Assignment") at the principal office of the Company.

(d)    <u>Exchange of Warrant Upon a Transfer</u>. On surrender of this Warrant for exchange, properly endorsed on the Assignment and subject to the provisions of this Warrant and with the limitations on assignments and transfers as contained in this Section 4, the Company at its expense shall issue to or on the order of the Registered Holder a new warrant or warrants of like tenor, in the name of the Registered Holder or as the Registered Holder (on payment by the Registered Holder of any applicable transfer taxes) may direct, for the number of shares issuable upon exercise hereof.

5.    <u>Adjustment</u>.

(a)    <u>Computation of Adjusted Exercise Price</u>. Except as hereinafter provided, in case the Company shall at any time after the date hereof issue or sell any shares of its Stock (as defined in Section 5(g)), other than (i) the issuances or sales referred to in Section 5(h) hereof, (ii) those warrants options or shares of Common Stock disclosed as issued or to be issued on the Company's Current Report of Form 8-K, filed with the Securities and Exchange Commission in March of 2005, a draft of which is attached to the Securities Purchase Agreement between the Company and the Holder of this Warrant (among other investors) provided that the terms under which such warrants, options, or shares of Common Stock issued or to be issued are as described in such Form 8-k and (iii) the shares of Common Stock issuable upon conversion of the Notes and Warrants issued to the Holder of this Warrant and the other investors who purchased Notes and Warrants pursuant to such Securities Purchase Agreement(collectively, "Excluded Securities"), for a consideration per share less than the Exercise Price in effect immediately prior to the issuance or sale of such shares, or without consideration, then forthwith upon such issuance or sale, the Exercise Price shall (until another such issuance or sale) be reduced to the price (calculated to the nearest full cent) equal to the quotient derived by dividing (A) an amount equal to the sum of (X) the product of (a) the Exercise Price in effect immediately prior to such issuance or sale, multiplied by (b) the total number of shares of Stock outstanding immediately prior to such issuance or sale, plus (Y) the aggregate of the amount of all consideration, if any, received by the Company upon such issuance or sale, by (B) the total number of shares of Stock outstanding immediately after such issuance or sale; provided, however, that in no event shall the Exercise Price be adjusted pursuant to this computation to an amount in excess of the Exercise Price in effect immediately prior to such computation, except in the case of a combination of outstanding shares of Stock, as provided by Section 5(c) hereof.

For the purposes of this Section 5 the term Exercise Price shall mean the Exercise Price per share set forth on the first page of this Warrant, as adjusted from time to time pursuant to the provisions of this Section 5.

(i)    For purposes of any computation to be made in accordance with this Section 5(a), the following provisions shall be applicable:

4

(ii)     In case of the issuance or sale of shares of Stock for a consideration part or all of which shall be cash, the amount of the cash consideration, shall be deemed to be the amount of cash received by the Company for such shares (or, if shares of Stock are offered by the Company for subscription, the subscription price, or, if either of such securities shall be sold to underwriters or dealers for public offering without a subscription price, the public offering price, before deducting therefrom any compensation paid or discount allowed in the sale, underwriting or purchase thereof by underwriters or dealers or other persons or entities performing similar services), or any expenses incurred in connection therewith and less any amounts payable to security holders or any affiliate thereof, including, without limitation, any employment agreement, royalty, consulting agreement, covenant not to compete, earnout or contingent payment right or similar arrangement, agreement or understanding, whether oral or written; all such amounts shall be valued at the aggregate amount payable thereunder whether such payments are absolute or contingent and irrespective of the period or uncertainty of payment, the rate of interest, if any, or the contingent nature thereof.

(iii)     In case of the issuance or sale (otherwise than as a dividend or other distribution on any stock of the Company) of shares of Stock for a consideration part or all of which shall be other than cash, the amount of the consideration therefor other than cash shall be deemed to be the value of such consideration as determined in good faith by the Board of Directors of the Company.

(iv)     Shares of Stock issuable by way of dividend or other distribution on any capital stock of the Company shall be deemed to have been issued immediately after the opening of business on the day following the record date for the determination of stockholders entitled to receive such dividend or other distribution and shall be deemed to have been issued without consideration.

(v)     The reclassification of securities of the Company other than shares of Stock into securities including shares of Stock shall be deemed to involve the issuance of such shares of Stock for consideration other than cash immediately prior to the close of business on the date fixed for the determination of security holders entitled to receive such shares, and the value of the consideration allocable to such shares of Stock shall be determined as provided in Section 5(a)(iii).

(vi)     The number of shares of Stock at any one time outstanding shall include the aggregate number of shares issued or issuable (subject to readjustment upon the actual issuance thereof) upon the exercise of then outstanding options, rights, warrants, and convertible and exchangeable securities.

(b)     Options, Rights, Warrants and Convertible and Exchangeable Securities.

(i)     In case the Company shall at any time after the date hereof issue options, rights or warrants to subscribe for shares of Stock, or issue any securities convertible into or exchangeable for shares of Stock, for a consideration per share less than the Exercise Price in effect immediately prior to the issuance of such options, rights, warrants or such convertible or exchangeable securities, or without consideration, the Exercise Price in effect

5

immediately prior to the issuance of such options, rights, warrants or such convertible or exchangeable securities, as the case may be, shall be reduced to a price determined by making a computation in accordance with the provisions of Section 5(a) hereof, provided that:

(ii) The aggregate maximum number of shares of Stock, as the case may be, issuable under such options, rights or warrants shall be deemed to be issued and outstanding at the time such options, rights or warrants were issued, for a consideration equal to the minimum purchase price per share provided for in such options, rights or warrants at the time of issuance, plus the consideration (determined in the same manner as consideration received on the issue or sale of shares in accordance with the terms of the Warrant), if any, received by the Company for such options, rights or warrants. The aggregate maximum number of shares of Stock issuable upon conversion or exchange of any convertible or exchangeable securities shall be deemed to be issued and outstanding at the time of issuance of such securities, and for a consideration equal to the consideration (determined in the same manner as consideration received on the issue or sale of shares of Stock in accordance with the terms of the Warrant) received by the Company for such securities, plus the minimum consideration, if any, receivable by the Company upon the conversion or exchange thereof. If any change shall occur in the price per share provided for in any of the options, rights or warrants referred to in subsection, or in the price per share at which the securities referred to in this subsection are exchangeable, such options, rights or warrants or exchange rights, as the case may be, shall be deemed to have expired or terminated on the date when such price change became effective in respect to shares not theretofore issued pursuant to the exercise or exchange thereof, and the Company shall be deemed to have issued upon such date new options, rights or warrants or exchangeable securities at the new price in respect of the number of shares issuable upon the exercise of such options, rights or warrants or the conversion or exchange of such exchangeable securities.

(c)   <u>Subdivision and Combination</u>. If the Company at any time subdivides (by any stock split, stock dividend, recapitalization, reorganization, reclassification or otherwise) the shares of Stock subject to acquisition hereunder into a greater number of shares, then, after the date of record for effecting such subdivision, the Exercise Price in effect immediately prior to such subdivision will be proportionately reduced and the number of shares of Common Stock subject to acquisition upon exercise of this Warrant will be proportionately increased. If the Company at any time combines (by reverse stock split, recapitalization, reorganization, reclassification or otherwise) the shares of Stock subject to acquisition hereunder into a smaller number of shares, then, after the date of record for effecting such combination, the Exercise Price in effect immediately prior to such combination will be proportionately increased and the number of shares of Common Stock subject to acquisition upon exercise of this Warrant will be proportionately decreased.

(d)   <u>Merger or Consolidation</u>. In case of any consolidation of the Company with, or merger of the Company into any other corporation, or in case of any sale or conveyance of all or substantially all of the assets of the Company other than in connection with a plan of complete liquidation of the Company, then as a condition of such consolidation, merger or sale or conveyance, adequate provision will be made whereby the Registered Holder will have the right to acquire and receive upon exercise of this Warrant in lieu of the shares of Common Stock immediately theretofore subject to acquisition upon the exercise of this Warrant, such shares of stock, securities or assets as may be issued or payable with respect to or in exchange for the

number of shares of Common Stock immediately theretofore subject to acquisition and receivable upon exercise of this Warrant had such consolidation, merger or sale or conveyance not taken place. In any such case, the Company will make appropriate provision to insure that the provisions of this Section 5 hereof will thereafter be applicable as nearly as may be in relation to any shares of stock or securities thereafter deliverable upon the exercise of this Warrant.

(e)     Notice of Adjustment. Upon the occurrence of any event which requires any adjustment of the Exercise Price, then and in each such case the Company shall give notice thereof to the Registered Holder, which notice shall state the Exercise Price resulting from such adjustment and the increase or decrease, if any, in the number of Warrant Shares purchasable at such price upon exercise, setting forth in reasonable detail the method of calculation and the facts upon which such calculation is based.

(f)     Adjustment in Number of Securities. Upon each adjustment of the Exercise Price pursuant to the provisions of this Section 5, the number of securities issuable upon the exercise of each Warrant shall be adjusted to the nearest full amount by multiplying a number equal to the Exercise Price in effect immediately prior to such adjustment by the number of Warrant Shares issuable upon exercise of the Warrants immediately prior to such adjustment and dividing the product so obtained by the adjusted Exercise Price.

(g)     Definition of Stock. For the purpose of this Agreement, the term "Stock" shall mean (i) the class of stock designated as Common Stock in the Certificate of Incorporation of the Company as may be amended as of the date hereof, or (ii) any other class of stock resulting from successive changes or reclassifications of such Stock consisting solely of changes in par value, or from par value to no par value, or from no par value to par value.

(h)     No Adjustment of Exercise Price in Certain Cases. No adjustment of the Exercise Price shall be made:

(i)     Upon issuance or sale of Excluded Securities or this Warrant or Warrant Shares, or the other Warrants and Warrant Shares issued in connection with the Securities Purchase Agreement Executed between the Company and the holder of this Warrant including the warrants issued to investors who purchased Notes and Warrants pursuant to the Securities Purchase Agreement, or other options, warrants and convertible securities outstanding as of the date hereof into or for shares of Common Stock including but not limited to shares issuable on conversion..

(ii)     Upon the issuance or sale of any shares of capital stock, or the grant of options exercisable therefor, issued or issuable after the date of this Warrant, to directors, officers, employees, advisers and consultants of the Company or any subsidiary pursuant to any incentive or non-qualified stock option plan or agreement, stock purchase plan or agreement, stock restriction agreement or restricted stock plan, employee stock ownership plan (ESOP), consulting agreement, stock appreciation right (SAR), stock depreciation right (SDR), bonus stock arrangement, or such other similar compensatory options, issuances, arrangements, agreements or plans approved by the Board of Directors.

7

(iii)    If the amount of said adjustment shall be less than one cent ($0.01) per security issuable upon exercise of this Warrant, *provided, however,* that in such case any adjustment that would otherwise be required then to be made shall be carried forward and shall be made at the time of and together with the next subsequent adjustment which, together with any adjustment so carried forward, shall amount to at least two cents ($0.02) per security issuable upon exercise of this Warrant.

6.    No Impairment. The Company will not, by amendment of its charter or through reorganization, consolidation, merger, dissolution, sale of assets or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms of this Warrant but will at all times carry out all such terms and take all such action as may be reasonably necessary or appropriate in order to protect the rights of the holder of this Warrant against impairment.

7.    Liquidating Dividends and Other Distributions. If the Company pays a dividend or makes a distribution on the Common Stock payable otherwise than in cash out of earnings or earned surplus (determined in accordance with generally accepted accounting principles) except for a stock dividend payable in shares of Common Stock (a "Liquidating Dividend") or otherwise distributes to its stockholders any assets, properties, rights, evidence of indebtedness, securities whether issued by the Company or by another, or any other thing of value, then the Company will pay or distribute to the Registered Holder of this Warrant, upon the exercise hereof, in addition to the Warrant Shares purchased upon such exercise, either (i) the Liquidating Dividend that would have been paid to such Registered Holder if he had been the owner of record of such Warrant Shares immediately prior to the date on which a record is taken for such Liquidating Dividend or, if no record is taken, the date as of which the record holders of Common Stock entitled to such dividends or distribution are to be determined or (ii) the same property, assets, rights, evidences of indebtedness, securities or any other thing of value that the Registered Holder would have been entitled to receive at the time of such distribution as if the Warrant had been exercised immediately prior to such distribution.

8.    Notices of Record Date, Etc.  In case the Company shall take a record of the holders of its Common Stock (or other stock or securities at the time deliverable upon the exercise of this Warrant) for the purpose of entitling or enabling them to receive any dividend or other distribution, or to receive any right to subscribe for or purchase any shares of stock of any class or any other securities, or to receive any other right; or of any capital reorganization of the Company, any reclassification of the capital stock of the Company, any consolidation or merger of the Company with or into another corporation (other than a consolidation or merger in which the Company is the surviving entity), or any transfer of all or substantially all of the assets of the Company; or of the voluntary or involuntary dissolution, liquidation or winding-up of the Company; then, and in each such case, the Company will mail or cause to be mailed to the Registered Holder of this Warrant a notice specifying, as the case may be, (i) the date on which a record is to be taken for the purpose of such dividend, distribution or right, and stating the amount and character of such dividend, distribution or right, or (ii) the effective date on which such reorganization, reclassification, consolidation, merger, transfer, dissolution, liquidation or winding-up is to take place, and the time, if any is to be fixed, as of which the holders of record

8

of Common Stock (or such other stock or securities at the time deliverable upon the exercise of this Warrant) shall be entitled to exchange their shares of Common Stock (or such other stock or securities) for securities or other property deliverable upon such reorganization, reclassification, consolidation, merger, transfer, dissolution, liquidation or winding-up. Such notice shall be mailed at least ten (10) days prior to the record date or effective date for the event specified in such notice unless such prior notice is waived by the Registered Holder.

9.  No Rights of Stockholders.  Subject to other Sections of this Warrant, the Registered Holder shall not be entitled to vote, to receive dividends or subscription rights, nor shall anything contained herein be construed to confer upon the Registered Holder, as such, any of the rights of a stockholder of the Company, including without limitation any right to vote for the election of directors or upon any matter submitted to stockholders, to give or withhold consent to any corporate action (whether upon any recapitalization, issuance of stock, reclassification of stock, change of par value or change of stock to no par value, consolidation, merger, conveyance, or otherwise), to receive notices, or otherwise, until the Warrant shall have been exercised as provided herein.

10.  Replacement of Warrant. Upon receipt of evidence reasonably satisfactory to the Company of the loss, theft, destruction or mutilation of this Warrant and (in the case of loss, theft or destruction) upon delivery of an indemnity agreement reasonably satisfactory to the Company, or (in the case of mutilation) upon surrender and cancellation of this Warrant, the Company will issue, in lieu thereof, a new Warrant of like tenor.

11.  Mailing of Notices. Etc. All notices and other communications from the Company to the Registered Holder of this Warrant shall be mailed by first-class certified or registered mail, postage prepaid, to the address furnished to the Company in writing by the last Registered Holder of this Warrant who shall have furnished an address to the Company in writing. All notices and other communications from the Registered Holder of this Warrant or in connection herewith to the Company shall be mailed by first-class certified or registered mail, postage prepaid, to the Company at its principal office set forth below. If the Company should at any time change the location of its principal office to a place other than as set forth below, then it shall give prompt written notice to the Registered Holder of this Warrant and thereafter all references in this Warrant to the location of its principal office at the particular time shall be as so specified in such notice.

12.  Change or Waiver. Any term of this Warrant may be changed or waived only by an instrument in writing signed by the party against which enforcement of the change or waiver is sought.

13.  Headings. The headings in this Warrant are for purposes of reference only and shall not limit or otherwise affect the meaning of any provision of this Warrant.

9

14.  Severability.  If any provision of this Warrant shall be held to be invalid and unenforceable, such invalidity or unenforceability shall not affect any other provision of this Warrant.

15.  Governing Law and Submission to Jurisdiction.  This Warrant will be governed by and construed in accordance with the laws of the State of New York without regard to principles of conflict or choice of laws of any jurisdiction.  The parties hereby agree that any action, proceeding or claim against it arising out of, or relating in any way to this Warrant shall be brought and enforced in the courts of the State of New York, and irrevocably submit to such jurisdiction, which jurisdiction shall be exclusive.

16.  Certificate.  Upon request by the Registered Holder of this Warrant, the Company shall promptly deliver to such holder a certificate executed by its President or Chief Financial Officer setting forth the total number of outstanding shares of capital stock, convertible debt instruments and options, rights, warrants or other agreements relating to the purchase of such capital stock or convertible debt instruments, together with its calculation of the number of shares remaining available for issuance upon exercise of this Warrant, and a certificate of the accuracy of the statements set forth therein.

17.  Supplements and Amendments.  The Company and the Registered Holder may from time to time supplement or amend this Warrant in order to cure any ambiguity, to correct or supplement any provision contained herein which may be defective or inconsistent with any provision herein, or to make any other provisions in regard to matters or questions arising hereunder which the Company and the Holder may deem necessary or desirable.

18.  Successors.  All the covenants and provisions of this Warrant shall be binding upon and inure to the benefit of the Company and the Registered Holder and their respective successors and assigns hereunder.

19.  Benefits of this Warrant.  Nothing in this Warrant shall be construed to give to any person, entity or corporation other than the Company and the Registered Holder of the Warrant Certificate any legal or equitable right, remedy or claim under this Warrant; and this Warrant shall be for the sole and exclusive benefit of the Company and the Registered Holder of the Warrant Certificate.

IN WITNESS WHEREOF, Drinks Americas Holdings, Ltd. has caused this Warrant to be signed by its duly authorized officers under its corporate seal and to be dated on the day and year first written above.

DRINKS AMERICAS HOLDINGS, LTD.

By: _____

Name: Bruce K Klein

Title: Chairman

Principal Office:

11

## ANNEX A

### NOTICE OF EXERCISE FORM

To:                                                          Dated:


       The undersigned, pursuant to the provisions set forth in the attached Warrant, hereby irrevocably elects to purchase shares of Common Stock covered by such Warrant and herewith makes payment of $_____, representing the full purchase price for shares at the exercise price per share provided for in such Warrant.


                                Signature:

                                Address:

## ANNEX B

### ASSIGNMENT FORM

FOR VALUE RECEIVED, _Sloan Equity Partners LLC_ hereby sells, assigns and transfers all of the rights of the undersigned under the attached Warrant with respect to the number of shares of Common Stock covered thereby set forth below, unto:

| Name of Assignee | Address | No. of Shares |
|---|---|---|
| PATRICK MURPHY | 2555 Hempstead Tpke East Meadow, NY | 13,500 |
| FRANK INGRASSIA | " | 13,500 |

Dated: _Jun 7 2006_

Signature: _Jon Clark for Sloan Equity Partners_

Dated:

Witness:

13

# EXHIBIT M

ORIGINAL

1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - x

PHILLIP KASSAI,

               Plaintiff,

                                07 Civ.

          -against-              5590

DRINKS AMERICA HOLDINGS, LTD.,

               Defendant.

- - - - - - - - - - - - - - - - - - - - - x

               November 20, 2007

               10:50 a.m.

Deposition of BRUCE KLEIN, taken by Plaintiff,
pursuant to Notice, held at the offices of Moskowitz
& Book, LLP, 1372 Broadway, New York, New York,
before Joseph R. Danyo, a Shorthand Reporter and
Notary Public within and for the State of New York.

HUDSON REPORTING & VIDEO, INC.

124 West 30th Street, 2nd Fl.

New York, New York 10001

Tel: 212-273-9911   Fax: 212-273-9915

New York
Connecticut
          Hudson Reporting & Video
          1-800-310-1769
          New Jersey
Pennsylvania

A p p e a r a n c e s:


MOSKOWITZ & BOOK, LLP

Attorneys for Plaintiff

1372 Broadway

14th Floor

New York, New York 10018


By:    SUSAN J. WALSH, ESQ.




LAW OFFICES OF SHELDON H. GOPSTEIN, ESQ.

Attorneys for Defendant and the

Witness

130 West 42nd Street

Suite 410

New York, New York 10036


By:    SHELDON H. GOPSTEIN, ESQ.


oOo

New York
Connecticut

Hudson Reporting & Video
1-800-310-1769

New Jersey
Pennsylvania

1

2    B R U C E    K L E I N,    having been first

3            duly sworn by the Notary Public (Joseph

4            R. Danyo), was examined and testified as

5            follows:

6    EXAMINATION BY

7    MS. WALSH:

8            Q.    Good morning.  Could you please

9    state your name.

10           A.    Bruce K. Klein.

11           Q.    Mr. Klein, I know I have

12   introduced myself off the record, but I am going

13   to introduce myself again.  I am Susan Walsh,

14   and I represent Phillip Kassai, and I have a

15   number of questions that I am going to ask you.

16           First of all, I am going to tell

17   you that, if you need a break, if you need to

18   get some air or something, by all means.  If you

19   are uncomfortable, please tell me and we will

20   take a recess.  I also would like to ask you if

21   you are under any medications.

22           A.    No.

23           Q.    I would ask you if you would be

24   kind enough that you let me finish the question

25   before you answer and it will make it easier on

1                        Klein

2          A.    This is a document I believe that

3     Dan Meyers brought to me to sign in his office.

4          Q.    When you say Dan Meyers brought it

5     to you to sign, where were you?

6          A.    In his office.

7          Q.    Where was that?

8          A.    444 Madison.

9          Q.    Where in the office were you?

10         A.    At his part of the office.

11         Q.    Would that be different from the

12    balcony or patio that you described earlier?

13         A.    Probably.  I don't remember if it

14    was outside or inside that day.  It is May, who

15    knows?

16         Q.    Was anybody else present besides

17    yourself and Mr. Meyers?

18         A.    I don't believe so.

19         Q.    Did Mr. Meyers present this to

20    you -- had you had any discussion prior to your

21    coming to Mr. Meyers' office on May 9, 2005?

22         A.    No.  On this, no.

23         Q.    What was the purpose of your going

24    to his office that day?

25         A.    I was there to talk to him about

1                         Klein

2    the funding business to see how he was getting

3    along, and he came up to me, and he said, look,

4    I need you to sign this.  This is part of our

5    original agreement.  We deserve these warrants,

6    and here it is.

7                   So he raised the money for us, and

8    I figured that he was correct in his giving me

9    this document, and I signed it inadvertently,

10   and, within two weeks of that, after I spoke to

11   Joe Cannela, our attorney, we found out that

12   they didn't deserve any warrants, so it was my

13   mistake in even signing it for him, and once

14   again I was asked to do it even though he

15   couldn't reach Pat, and I didn't think it was a

16   big deal, because I knew Patrick would sign

17   another form, but Dan was adamant he had to have

18   it for his file.  I acquiesced, and it was my

19   fault because they don't deserve anything.

20        Q.    Are you finished?

21        A.    Yes.

22        Q.    You indicated then that you spoke

23   with him, him being Mr. Meyers, again two weeks

24   later.  Is that correct?

25        A.    Within two weeks I stated.  I had

<pre>
 1                      Klein
 2   spoken with Joe Cannela, and then I spoke with
 3   Meyers, and I told him that these warrants were
 4   no good, and he should go back to Mark Caldwell
 5   who knows the warrants were no good.  That was
 6   his attorney.
 7        Q.   Who contacted Mr. Cannela?
 8        A.   I did.
 9        Q.   Why?
10        A.   Because I called him and said, you
11   know, I signed a document in Danny's office that
12   he claims he deserves some warrants and Pat
13   wasn't around.  I just want to know about it,
14   because they will be coming back to him through
15   Caldwell with Patrick's signature, and Joe had
16   told me that they deserved no warrants, so the
17   document was no good, which I called Dan and
18   told him the same thing.
19        Q.   When in relation to your
20   conversation that you just described with Mr.
21   Cannela did you speak with Dan?
22        A.   Shortly thereafter Mr. Cannela's
23   conversation.
24        Q.   Was that in the month of May 2005?
25        A.   I don't know.  It would have been
</pre>

```
  1                        Klein
  2    within a couple of weeks.  Yes, maybe.
  3              Q.    Did you have any conversation with
  4    anyone besides Mr. Cannela at Drinks America
  5    regarding this May 9, 2005 stock purchase
  6    warrant?
  7                    MR. GOPSTEIN:  Let me just ask the
  8              witness.  I didn't get a chance to
  9              object quickly enough.
 10                    Try to stay away from discussing
 11              conversations with Joe Cannela.
 12              Obviously, if you are acting in an
 13              official capacity and he is company
 14              counsel, those conversations are
 15              privileged.
 16                    THE WITNESS:  I'm sorry.
 17                    MR. GOPSTEIN:  So you can testify
 18              as to documents you may have
 19              communicated, but just don't -- stay
 20              away from the substance of any
 21              communications with the company counsel.
 22                    THE WITNESS:  Okay.  I got it.
 23              Q.    Is Mr. Cannela the company
 24    counsel?
 25              A.    He was at that time.
```

# EXHIBIT N

**Sloan Securities Corp.**
**444 Madison Avenue, 23rd Floor**
**New York, NY 10022**

September 29, 2005

Drinks Americas Holdings, Ltd.
372 Danbury Road
Wilton, CT 06897
Attn:  Bruce Klein, Chairman
        Patrick Kenny, CEO

Re: <u>Investment Banking Agreement</u>

Dear Bruce and Patrick:

This letter confirms the agreement ("<u>Agreement</u>") of Drinks Americas, Inc. and its affiliated companies, (referred to herein as the "<u>Company</u>") to retain Sloan Securities Corp. ("<u>SSC</u>") on an exclusive basis, to provide during the Term (as hereinafter defined), the services described below.

1.      <u>Services</u>      SSC agrees to perform such of the following financial advisory and investment banking services ("<u>Services</u>") as the Company reasonably and specifically requests:

        1.1      **Advisory Services.**  SSC will (i) familiarize itself to the extent it deems appropriate and feasible with the business, operations, properties, financial condition and prospects of the Company; (ii) advise the Company's management in corporate finance, structuring the nature, extent and other parameters of any transaction; and (iii) evaluate financial matters and assist in financial arrangements and investment banking transactions, including assistance and advice with regard to maximization of shareholder value.  In consideration of such financial advisory services and as a material inducement for SSC to enter into this Agreement, the Company shall issue to SSC upon execution of this agreement a five-year warrant to purchase 100,000 shares of the Company's common stock at an exercise price of $0.45 per share (the "Agreement Warrant").  In addition, in the event that SSC is successful at completing the minimum amount of the Financing ($6 million) as described below within 90 days from the date of this Agreement, the Company shall issue to SSC a warrant to purchase an additional 100,000 shares of the Company's common stock at an exercise price of $.45 (the "Bonus Warrant").  The Agreement Warrant and the Bonus Warrant (if any) shall contain customary terms, including without limitation, provisions for change of control, corporate and weighted average price protection anti dilution (except for compensatory stock options) and registration rights consistent with the registration rights granted to the parties in the Bridge Financing (as defined below).  The foregoing compensation shall be in addition to any other compensation and reimbursement of expenses described herein.

-PK 065-

Bruce Klein, Chairman
Patrick Kenny, CEO
9/30/2005
Page 2

    1.2    **Financing.** The Company is also engaging SSC, on a exclusive basis, to use its reasonable efforts to introduce the Company to corporations, partnerships, mutual funds, hedge funds, accredited investors, investment partnerships, securities firms, lending and other institutions and entities (collectively, if introduced by SSC "Entity or Entities") which may engage in or provide financing in the range of Six Million ($6,000,000.00) Dollars to Ten Million ($10,000,000.00) Dollars to the Company in the form of equity or equity-linked securities of the Company (the "Offering"). The specific terms and conditions of the Financing shall ultimately be agreed to by the Company and the Entities after good faith negotiations, subject to market conditions. However, it is contemplated that SSC shall approach the Entities with a term sheet, attached hereto as Exhibit "T". As used herein, the term "Entities" also means and includes any party, which is directly or indirectly connected with or related to one of the Entities described above including, without limitation, all affiliates as well as any referral from any of the Entities. The Financing will be made in accordance with the exemption from the registration requirements of the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder (collectively, the "Act") provided by Regulation D under the Act ("Regulation D") and the qualification and registration requirements of applicable state and foreign securities or blue sky laws and regulations. If requested by SSC, the Company will, at the closing of the Financing, furnish SSC with the same favorable opinion of its outside counsel as is furnished to the investors, addressed to SSC or together with a letter from such counsel that SSC may rely on its opinion as if directed to SSC. Such opinion will include customary items contained in legal opinions rendered in connection with Financing transactions, including, among other things, opinions on matters relating to organization and good standing, capitalization, corporate power and authority, and exemption of Financing. In addition, at the closing of the Financing, the Company will provide SSC with the same certificates of the officers of the Company as are furnished to the investors and such other certification, opinions and documents as SSC or its counsel may deem appropriate, in form and substance satisfactory to SSC and its counsel, including any updates of the Company's representations and warranties set forth herein. Prior to the consummation of the Financing, it is also contemplated that SSC shall use reasonable efforts to introduce the Company to Entities for the purposes of providing bridge financing (the "Bridge Financing") to the Company in the amount of $1,000,000 on terms substantially set forth in the Bridge Term Sheet, attached hereto as Schedule B.

    1.3    **Reasonable Efforts.** SSC agrees to devote such time and effort to the affairs of the Company as is reasonable and adequate to render the Services contemplated by this agreement. The Company understands and agrees that SSC shall not be responsible for the performance of any services which may be rendered hereunder without the Company providing the necessary information in writing prior thereto, nor shall SSC include any services that constitute the rendering of any legal opinions or performance of work that is in the ordinary purview of the Certified Public Accountant. SSC does not guarantee results on behalf of the Company, but shall pursue all reasonable avenues available through its network of contacts. At such time as an interest is expressed by a third party in the Company's needs, SSC shall notify the Company and advise it as to the source of such interest and any terms and conditions of such interest. The Company acknowledges that SSC's responsibilities shall be limited to the

-PK 066-

Bruce Klein, Chairman
Patrick Kenny, CEO
9/30/2005
Page 3

foregoing, and that SSC shall have no responsibility for fulfilling any reporting or filing requirements of the Company pursuant to applicable federal and state securities laws. In addition, the Company expressly acknowledges and agrees that SSC's obligations hereunder are on a reasonable best effort basis only and that the execution of this Agreement does not (i) constitute a commitment by SSC to purchase the securities or any other securities of the Company and (ii) ensure the successful placement of the securities per the Financing or any portion thereof.

2.    Term

     This Agreement shall take effect immediately upon execution and shall continue for an initial term of one hundred fifty (150) days ("Term"). Thereafter, the Agreement will terminate unless renewed by the parties in writing. Notwithstanding the expiration or termination of this Agreement, the indemnification, contribution, reimbursement and "tail" obligations of the Company shall survive and all previously paid fees (including, without limitation, any securities previously issued to SSC) shall be retained by SSC on a non-accountable basis.

3.    Information

     In connection with SSC's engagement hereunder, the Company will furnish SSC and any prospective Entity with any information concerning the Company that SSC reasonably deems appropriate and will provide SSC and prospective Entities with reasonable access to the Company's officers, directors, accountants, counsel and other advisors, subject to the Company's non-disclosure agreement. In addition, SSC shall be kept fully informed of any events that are reasonably likely to have a material effect on the financial condition of the Company. The Company represents and warrants to SSC that all such information concerning the Company and all private placement materials, whether in the form of a letter, circular, memorandum, notice or otherwise to be used in selling the securities ("Materials") will be true and accurate in all material respects and will not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements therein not misleading in light of the circumstances under which such statements are made. The Company acknowledges and agrees that SSC will not undertake any "due diligence" investigation and will be using and relying upon the information supplied by the Company and its officers, agents and others, the Materials, and any other publicly available information concerning the Company.

4.    Fees.

     In consideration of SSC's services, SSC shall be entitled to receive, and the Company hereby agrees to pay to SSC, the following:

     4.1    **Financing Fees.** Unless otherwise provided herein, either (i) upon closing of any Financing or (ii) upon rejection by the Company of a Financing with any third party that is ready, willing and able to consummate the Financing on terms the Company had previously agreed (a

-PK 067-

Bruce Klein, Chairman
Patrick Kenny, CEO
9/30/2005
Page 4

"Late Rejection"), SSC shall receive a Financing Fee payable by wire transfer or by other immediate available funds equal to 9% of the Financing Amount (as defined below), and shall be paid as proceeds are received by the Company from each Financing, or promptly following a Late Rejection. Any portion of SSC's Financing Fee that is attributable to proceeds to be received by the Company upon the occurrence of a future event, or the satisfaction of a contingency shall be paid when the event occurs or the contingency is satisfied and the funds are received by the Company. In addition to the foregoing, upon consummation of a Financing or promptly following a Late Rejection, the Company will issue to SSC and/or its designee(s) warrants (the "Warrants") to purchase such number of securities as shall be equal to 9% of the number of securities (including stock and warrants) issued to (or which would have been issued in the case of a Late Rejection) investors in the Financing at the same per share price or exercise price applicable to securities sold in the Financing. The Warrants shall be exercisable for a period of five years from the date of closing with an exercise price equal to the effective per price share paid by the Entities participating in the Financing. The terms of the Warrants shall be set forth in one or more agreements (the "Warrant Agreements") in form and substance reasonably satisfactory to SSC and the Company. The Warrant Agreements shall contain customary terms, including without limitation, provisions for change of control, corporate and weighted average price protection anti dilution (except for compensatory stock options) and registration rights consistent with the registration rights granted to the parties in the Financing. In addition, the Company shall also be responsible for SSC's reasonable legal fees and expenses incurred in connection with any Financing or a Late Rejection not to exceed $30,000 in the aggregate to be paid at the initial closing of the Financing or promptly following the Late Rejection.

It is understood and agreed that to the extent the Company consummates any financing transaction within one year following the expiration or termination of this Agreement (or the Company enters into a definitive agreement with respect to a financing transaction within such one-year period which is consummated at any time thereafter) with any Entity or Entities introduced by SSC to the Company prior to the expiration or termination of this agreement (hereinafter, "SSC Introduced Parties"), the Company shall pay SSC upon the consummation of such financing a "tail" fee equal to the financing fees which would have otherwise been payable to SSC had such financing been consummated during the Term as described above   It is intended that "introduced" shall have its commonly understood meaning in Financings such as those contemplated in this Agreement. Moreover, an Entity shall be deemed to be an SSC Introduced Party if (i) SSC has taken any steps to develop or communicate a specific financing with the Company to that Entity, even if that Entity has previously been known to the Company or (ii) SSC merely brings such Entity to the attention of the Company, provided that the Company had no prior contacts with that Company. In addition, no fee payable by the Company to any agent, lender or investor shall reduce or otherwise affect any fee payable by the Company to SSC hereunder. Lastly, SSC shall deliver to the Company a list of Entities contacted by SSC on behalf of the Company in connection with the Financing within 15 business days of termination or expiration of this Agreement, which shall represent a comprehensive list of SSC Introduced Parties for purposes of the "tail" provisions above (the "SSC Introduced Parties

-PK 068-

Case 1:07-cv-05590-RMB    Document 25-5    Filed 03/31/2008    Page 31 of 51

Bruce Klein, Chairman
Patrick Kenny, CEO
9/30/2005
Page 5

List"). The Company acknowledges and agrees that for purposes of this Agreement the SSC Introduced Parties List is proprietary to SSC and shall be maintained in strict confidence by the Company except as may be required by law.

4.2     Subject to the provisions of Section 7.9 hereto, SSC's Financing Fee shall have been earned and shall be payable to SSC upon consummation of any Financing which occurs during the Term (or if the Company enters into a definitive agreement during the Term with respect to a Financing which is consummated at any time thereafter) irrespective of whether the parties to such Financing were introduced to the Company by SSC.

4.3     As used herein, the term "Financing Amount" shall mean the gross amount of all consideration, including without limitation to, all cash, cash equivalents, stock, warrants, and/or assets that is exchanged or provided to the Company or its shareholders, affiliates, or subsidiaries in a Financing, or which would have been provided to such individuals or entities but for a Late Rejection.

5.     Non-Circumvent.

In order to prevent the Company from circumventing SSC's position with an Entity, the Company agrees that whether or not any Financing concerning the Company is completed, for a twelve month period commencing from the date of this Agreement, without the prior express written consent of SSC, that the Company will not (a) contact an Entity introduced to the Company by SSC during the term of this Agreement in order to (i) deprive SSC of the fees it is entitled pursuant to this Agreement or (ii) arrange any other type of transaction with such an Entity introduced to the Company with SSC; or (b) otherwise circumvent SSC's right to earn a fee pursuant to this Agreement or otherwise with respect to Entities introduced to the Company with SSC in any manner whatsoever.

6.     Indemnification

The Company shall indemnify SSC under the indemnification provisions attached hereto as Schedule A and made a part hereof.

7.     General Provisions.

7.1     Any and all claims, disputes, or controversies arising out of this Agreement will be resolved by arbitration before the American Arbitration Association ("AAA") and that with respect to this Agreement, a party may seek injunctive relief and ancillary damages before the AAA. Each party irrevocably consents to subject matter jurisdiction before the AAA. The parties shall restrict themselves to claims for compensatory damages and no claims shall be made by any party for punitive or similar damages. The parties agree that any award or decision by the AAA shall be final and binding upon the parties and a judgment may be entered in a court of competent jurisdiction upon such award or decision. The parties agree that the exclusive situs of

Case 1:07-cv-05590-RMB    Document 25-5    Filed 03/31/2008    Page 32 of 51

Bruce Klein, Chairman
Patrick Kenny, CEO
9/30/2005
Page 6

any arbitration or legal proceedings hereunder shall be the City of New York.

7.2     This Agreement may not be amended or modified except in writing signed by both parties to the Agreement.

7.3     All notices and other communications hereunder shall be deemed given upon (a) the sender's confirmation of receipt of a facsimile transmission to the recipient's facsimile number set forth below, (b) confirmed delivery by a standard overnight carrier to the recipient's address set forth below, or (c) delivery by hand to the recipient's address set forth below (or, in each case, to or at such other facsimile number or address for a party as such party may specify by notice given in accordance with this Section 7.3):

    (a)     If to the Company, to:

            Drinks Americas Holdings, Ltd.
            372 Danbury Road
            Wilton, CT  06897
            Attn: Bruce Klein
            Fax:   (203) 762-8992

    (b)     If to SSC, to:

            James C. Ackerman
            Sloan Securities Corp.
            444 Madison Avenue, 23rd Floor
            New York, NY 10022
            Fax: (212) 308-6433

7.5     SSC shall perform its services hereunder as an independent contractor and not as an employee of the Company or an affiliate thereof. It is expressly understood and agreed to by the parties hereto that SSC shall have no authority to act for, represent or bind the Company or any affiliate thereof in any manner, except as may be agreed to expressly by the Company in writing from time to time.

7.6     The Company hereby represents that it is a sophisticated business enterprise that has retained SSC for the limited purposes set forth in this letter, and the parties acknowledge and agree that their respective rights and obligations are contractual in nature. Each party disclaims an intention to impose fiduciary obligations on the other by virtue of the engagement contemplated by this letter.

7.7     Neither the execution and delivery of this Agreement by the Company nor the consummation of the transactions contemplated hereby will, directly or indirectly, with or without the giving of notice or lapse of time, or both, (i) violate any provisions of the Certificate

PK 070

Case 1:07-cv-05590-BMB   Document 25-5   Filed 08/31/2008   Page 33 of 51

Bruce Klein, Chairman
Patrick Kenny, CEO
9/30/2005
Page 7

of Incorporation or By-laws of the Company; or (ii) violate, or be in conflict with, or constitute default under, any agreement, lease, mortgage, debt or obligation of the Company or require the payment, any pre-payment or other penalty with respect thereto. The Company has all requisite power and authority to enter into and perform its obligations under this Agreement. This Agreement has been duly executed and delivered and constitutes valid and binding obligations of the Company , enforceable against the Company in accordance with their respective terms.

7.8     In the event that other services are required and/or transactions which are the result of SSC's efforts that are not as contemplated herein, the parties hereto shall negotiate in good faith to determine a mutually acceptable level of compensation in such an eventuality.

7.9     Notwithstanding the exclusive nature of this Agreement, SSC is aware that prior to the time that SSC notifies the Company in writing of its intent to commence marketing activities for the Financing ("Financing Commencement Notice"), the Company has the right to attempt to secure additional financing ("Non-Sloan Financings") through debt or equity offerings, or otherwise. Such financings, if raised, will be used to repay the Bridge Financing and for working capital. The Company agrees that it will cease all efforts with respect to any Non-Sloan Financing within 14 days of its receipt of the Financing Commencement Notice (the "Non-Sloan Financing Wind Down Period"). During the Non-Sloan Financing Wind Down Period, SSC shall be entitled to a 1.25% cash fee and 1.25% warrant coverage on any funds that are invested in the Non-Sloan Financing by any non-SSC introduced parties and the financing fee set forth in section 4.1 with respect to funds invested by SSC Introduced Parties. Following the Non-Sloan Financing Wind Down Period, SSC shall be entitled to a 5% cash fee and 5% warrant coverage on any funds that are invested in the Non-Sloan Financing by any non-SSC introduced parties and the financing fee set forth in section 4.1 with respect to funds invested by Sloan Introduced Parties.

-PK 071-

Bruce Klein, Chairman
Patrick Kenny, CEO
9/30/2005
Page 8

If the foregoing is acceptable to you, please sign and return the enclosed copy of this letter to my attention.

Very truly yours,

SLOAN SECURITIES CORP.

By: _____
    James C. Ackerman
    Chief Executive Officer and President

AGREED AND ACCEPTED THIS
_6_ DAY OF SEPTEMBER, 2005:

DRINKS AMERICAS HOLDINGS, LTD.

By: _____  10-6-05
    Bruce Klein, Chairman

By: _____  10/06/05
    Patrick Kenny, CEO

-PK 072-

Bruce Klein, Chairman
Patrick Kenny, CEO
9/30/2005
Page 9

Schedule A

James C. Ackerman
Sloan Securities Corp.
444 Madison Avenue
New York, New York 10022
Fax: (212)308-6433

Ladies and Gentlemen:

In connection with our engagement of Sloan Securities Corp. ("SSC") as Investment Bankers, we hereby agree to indemnify and hold harmless SSC and its affiliates, and the respective directors, officers, shareholders, agents and employees of SSC (collectively the "Indemnified Persons"), from and against any and all claims, actions, suits, proceedings (including those of shareholders), damages, liabilities and expenses as incurred by any of them (including the reasonable fees and expenses of counsel) which (A) relate to or arise out of (i) any actions taken or omitted to be taken (including any untrue statements made to any Indemnified Person) in connection with our engagement of SSC, or (B) otherwise relate to or arise out of SSC's activities on our behalf under SSC's engagement, and we shall reimburse any Indemnified Person for all expenses (including the reasonable fees and expenses of counsel) as incurred by such Indemnified Person in connection with investigating, preparing or defending any such claim, action , suit or proceeding (collectively a "Claim"), in connection with pending or threatened litigation in which any Indemnified Person is a party. We will not, however, be responsible for any Claim which is finally judicially determined to have resulted from the gross negligence or willful misconduct of any person seeking indemnification hereunder. We further agree that no Indemnified Person shall have any liability to us for or in connection with our engagement of SSC except for any Claim incurred by us solely as a direct result of any Indemnified Person's gross negligence or willful misconduct.

We further agree that we will not, without the prior written consent of SSC, settle, compromise or consent to the entry of any judgment in any pending or threatened Claim in respect of which indemnification may be reasonably sought hereunder (whether or not any Indemnified Person is an actual or potential party to such Claim), unless such settlement, compromise or consent includes an unconditional, irrevocable release of each Indemnified Person against whom such claim may be brought hereunder from any and all liability arising out of such claim.

Promptly upon receipt by an Indemnified Person of notice of any complaint or the assertion or institution of any Claim with respect to which indemnification is being sought hereunder, such Indemnified Person shall notify us in writing of such complaint or of such assertion or institution but failure to do so notify us shall not relieve us from any obligations we may have hereunder, unless and only to the extent such failure results in the forfeiture by us of substantial rights and defenses, and will not in any event relieve us from any other obligation or liability we may have to any Indemnified Person, we will assume the defense of such Claim, including the employment of counsel reasonably satisfactory to such Indemnified Person and the payment of reasonable fees and expenses of such counsel. In the event,

-PK 073-

Bruce Klein, Chairman
Patrick Kenny, CEO
9/30/2005
Page 10

however, that such Indemnified Person reasonably determines that having common counsel with the Company and/or another Indemnified Person would present such counsel with a conflict of interest or if the defendant in, or target of, any such Claim, includes an Indemnified Person and us, and such Indemnified reasonably concludes that there may be legal defenses available to it or other Indemnified Persons different from or in addition to those available to us, then such Indemnified Person may employ its own separate counsel to represent or defend it in any such Claim and we shall pay the reasonable fees and expenses of such counsel. Notwithstanding anything herein to the contrary, if we fail timely or diligently to defend, contest, or otherwise protect against any Claim, the relevant Indemnified Person shall have the right, but not the obligation, to defend, contest, compromise, settle, assert cross Claims, or counterclaims or otherwise protect against the same, and shall be fully indemnified by us therefore, including without limitation, for the reasonable fees and expenses of its counsel and all amounts paid as a result of such Claim or the compromise or settlement thereof. In any Claim in which we assume the defense, the Indemnified Person shall have the right to participate in such Claim and to retain its own counsel therefore at its own expense.

We agree that if any indemnity sought by an Indemnified Person hereunder is held by a court to be unavailable for any reason, then (whether or not SSC is the Indemnified Person), we and SSC shall contribute to the Claim for which such indemnify is held unavailable in such proportion as is appropriate to reflect the relative benefits to us, on the one hand, and SSC on the other, in connection with SSC's engagement referred to above, and the relative fault, as between us and the Indemnified Person in respect of the Claim, subject to the limitation that in no event shall the amount of SSC's contribution to such Claim exceed the amount of fees actually received by SSC from us pursuant to SSC's engagement. We hereby agree that the relative benefits to us, on the one hand, and SSC on the other, with respect to SSC's engagement shall be deemed to be in the same proportion as (a) the total value paid or proposed to be paid or received by us or our stockholders as the case may be, pursuant to the Financing (whether or not consummated) for which SSC is engaged, to (b) the fee actually paid to SSC in connection with such engagement; provided, however, that under no circumstances whatsoever shall SSC be required to contribute to any such claim any amount in excess of the fee actually paid in connection with such engagement.

Our indemnity, reimbursement and contribution obligations under this Agreement shall be in addition to, and shall in no way limit or otherwise adversely affect, any rights that any Indemnified Party may have at law or at equity.

Should SSC or its personnel be required or requested by us to provide documentary evidence or testimony in connection with any proceeding arising form or relating to SSC's engagement, we agree to pay all actual reasonable expenses (including fees incurred for legal counsel) in complying therewith.

Any and all claims, disputes, or controversies arising out of this Agreement will be resolved by arbitration before the American Arbitration Association ("AAA") and that with respect to this Agreement, a party may seek injunctive relief and ancillary damages before the AAA. Each party irrevocably consents to subject matter jurisdiction before the AAA. The parties shall restrict themselves to claims for compensatory damages and no claims shall be made by any party for punitive or similar damages. The parties agree that any award or decision by the AAA shall be final and binding upon the parties and a judgment may be entered in a court of competent jurisdiction upon such award or decision. The parties agree that the situs of any arbitration or legal proceedings hereunder shall be the City of New York.

Bruce Klein, Chairman
Patrick Kenny, CEO
9/30/2005
Page 11


It is understood that, in connection with SSC's engagement, SSC may be engaged to act in one or more additional capacities and that the terms of the original engagement or any such additional engagement may be embodied in one or more separate written agreements. The provisions of this Agreement shall apply to the original engagement, any such additional engagement and any modifications of the original engagement or such additional engagement and shall remain in full force and effect following the completion or termination of SSC's engagement(s).


Very truly yours,


Confirmed and agreed to:

SLOAN SECURITIES CORP.

By: _____ 10/6/05
Name:   James C. Ackerman
Title:    Chief Executive Officer and President


DRINKS AMERICAS HOLDINGS, LTD.

By: _____ 10-6-05
       Bruce Klein, Chairman

By: _____ 10/6/05
       Patrick Kenny, CEO

Bruce Klein, Chairman
Patrick Kenny, CEO
9/30/2005
Page 12

## Schedule B

## BRIDGE FINANCING TERM SHEET

| | |
|---|---|
| Company: | Drinks Americas Holdings, Ltd. |
| Placement Agent: | Sloan Securities Corp. ("SSC" or "Agent") |
| Amount: | $1,000,000 |
| Investment: | Senior Convertible Promissory Notes ("Notes") and warrants (the "Warrants"). |
| Terms of the Notes: | |
| Maturity Date: | The Notes shall mature upon the earlier of (i) one year after the date of issuance or (ii) consummation of any financing transaction by the Company with minimum gross proceeds of $6 million. |
| Payment Terms: | Principal and accrued interest on the Notes shall become due and payable in one installment upon maturity. |
| Interest Rate: | 10% per annum, calculated on actual calendar days elapsed and a 360-day year basis. Interest shall be paid in cash. |
| Security: | The Notes shall be unsecured obligations of Drinks, but Drinks will not issue secured obligations to any third party without the consent of at least 51% of the principal amount of Notes then outstanding. while the Notes are outstanding. |
| Ranking: | The Notes will be senior to all existing indebtedness of the Company, except that the Notes shall be *pari passu* with $1,350,000 of principal amount of senior convertible notes issued by the Company on or about April 2005. The Company may not incur any additional indebtedness senior to or pari passu with the Notes without the prior approval by Noteholders representing at least 51% of the principal amount of Notes then outstanding. |
| Conversion: | The Notes shall, at any time at the Note holder's option, convert into the shares of the Company's common stock at $.45 per share. The conversion price of the Notes shall be subject to customary corporate antidilution adjustments in the event of stock splits, stock dividends, and recapitalizations and "weighted average" price protection (except for compensatory stock options). |
| Guarantee: | Each of the operating subsidiaries of the Company shall provide a joint and several guarantee with respect to the obligations under the Notes. |
| Terms of the Warrant: | The purchasers of Notes shall receive 100% warrant coverage so that assuming all $1,000,000 of principal amount of Notes are sold, such purchasers would receive five-year warrants to purchase 1,000,000 shares of common stock at an exercise |

Bruce Klein, Chairman
Patrick Kenny, CEO
9/30/2005
Page 13

| | price of .45 per share. The Warrants shall contain customary corporate antidilution adjustments in the event of stock splits, stock dividends, and recapitalizations and "weighted average" price protection (except for compensatory stock options). The Warrant shall contain a "cashless exercise" feature. |
|---|---|
| Registration Rights: | The Company shall be obligated to file a registration statement (the "Registration Statement") with the SEC covering the Common Stock underlying the Notes and the Warrants (collectively, "Registrable Securities") within 60 days of the closing. The Company shall be obligated to respond in writing to comments received from the SEC in connection with the registration statement within 15 business days of the receipt of such comments. In the event that (i) the Company fails to file the registration statement within 60 days of the closing; or (ii) the Company fails to respond to comments within 15 business days of receipt; or (iii) the Registration Statement is not declared effective by the SEC within 180 days of the last closing; or (iv) subject to customary blackout periods, the Registration Statement does not remain effective and available for use, the Company will make payments to the investors in cash at the rate of two (2%) percent of the initial investment amount per month so long as such circumstances continue, provided, however, that such penalty obligation shall cease at such time as the Registrable Securities may be sold without volume restrictions pursuant to Rule 144(k). |
| Securities Purchase Agreement: | The parties will use commercially reasonable efforts to execute a definitive securities purchase agreement (the "Securities Purchase Agreement") and other appropriate documents on or prior to October 15, 2005. The Securities Purchase Agreement will contain representations, warranties, conditions and covenants customary for transactions of this type. The Securities Purchase Agreement shall be governed by and construed in accordance with the law of the State of New York. |
| Conditions to Closing: | Closing subject to negotiation of definitive legal documents. |
| Use of Proceeds: | Proceeds from the investment shall be used for working capital purposes only. |
| Fees and Expenses: | Upon consummation of the Bridge Financing, the Company shall pay to SSC a cash fee equal to 9% of the principal amount of Notes issued in the Bridge Financing and the Company shall issue to SSC a warrant to purchase 100,000 shares of the Company's common stock identical to the warrants issued to the bridge investors. Each party will bear its own expenses relating to the transactions contemplated hereby, except that the Company shall pay the reasonable fees and expenses of Littman Krooks LLP, counsel to the Agent, not to exceed $10,000. |
| Other Terms: | The parties recognize that matters material to the transactions contemplated hereby that are not addressed in this Term Sheet may be raised by one another for inclusion in the Securities Purchase Agreement. |
| Non-Binding Term Sheet; Exceptions: | The parties acknowledge that this is a non-binding term sheet and no party shall be under any obligation to the other unless and until a Securities Purchase Agreement is executed. |

-PK 077-

Bruce Klein, Chairman
Patrick Kenny, CEO
9/30/2005
Page 14

Bruce Klein, Chairman
Patrick Kenny, CEO
9/30/2005
Page 15

## Schedule T

### Material Terms and Conditions of Series A Convertible Preferred Stock
### of
### Drinks Americas Holdings, Ltd.

**Issue Price:**                              $____ per share

**Liquidation Preference**          In the event of any liquidation or winding up of the Company, the holders of Series A Preferred Stock shall be entitled to receive, in preference to the holders of Common Stock, an amount equal to $ _____(1X) per share in the case of Series A Preferred, plus any unpaid dividends thereon ("Initial Payment"). If the assets of the Company are insufficient to permit the full payment of the initial payment, then the assets shall be distributed pro rata among the holders of the Series A Preferred in order to satisfy their preference in full. After the Initial Payment has been made in full, the holders of Series A Preferred and the holders of Common Stock shall participate ratably until holders of Series A Preferred have received an aggregate of $_____ (1X) per share. Thereafter, the remaining assets of the Company will be distributed ratably to the holders of Common Stock. A merger, acquisition or sale of all or substantially all of the assets of the Company in which the shareholders of the Company immediately prior to such event do not own a majority of the outstanding shares of the surviving corporation will be deemed to be a liquidation for purposes of the liquidation preference. Notwithstanding the foregoing, if the holders of Series A Preferred Stock approve of said transaction pursuant to their separate series vote on such matter, such transaction will not to be deemed to be a liquidation for these purposes.

**Conversion Rights.** Each holder of Series A Preferred will have the right, at the option of the holder at any time, to convert shares of Series A Preferred into shares of Common Stock at an initial conversion ratio of one-to-one. The initial Conversion Price for each share of Series A Preferred Stock will be the same as the original issue price for the Series A Preferred Stock

**Anti-Dilution.**. In the event that at any time following the closing, the Company issues any equity securities (other than the issuance of capital stock to employees, consultants, officers or directors of the Company pursuant to stock purchase or stock option plans or agreements approved by the Board not to exceed 20% of the Company's total capitalization) with a common stock equivalent purchase price of less than the then-applicable per-share conversion price (a "Dilutive Issuance"), the conversion price of the Series A Preferred Stock will be decreased on a weighted average basis. Proportional antidilution protection for stock splits, stock dividends and the like

**Dividends.** The holders of Series A Preferred will be entitled to receive dividends prior and in preference to any declaration or payment of any dividend on the Common Stock at the rate of 10% of the Series A Purchase Price per annum which shall be paid monthly in the form of cash. The dividend shall be cumulative.

**Voting Rights.** Each share of Series A Preferred Stock shall be entitled to a number of votes equal to the number of shares of Common Stock that such share is convertible into based on the then existing

Bruce Klein, Chairman
Patrick Kenny, CEO
9/30/2005
Page 16

Conversion Price. Except as provided by law, the holders of the Series A Preferred Stock shall vote together with the holders of the Common Stock (and any other class or series which may be similarly entitled to vote with the shares of Common Stock) as one class on all matters submitted to a vote of stockholders of the Company.

Protective Provisions:  Without the approval of the holders of at least a majority of the Series A Preferred Stock, voting together as a single class on an as-if-converted to Common Stock basis, the Company will not take any action to (i) effect a sale of all or substantially all of the Company's assets or enter into any transaction which results in the holders of the Company's capital stock prior to the transaction owning less than 50% of the voting power of the Company's capital stock after the transaction, (ii) redeem shares of Preferred Stock or Common Stock (excluding shares of Common Stock repurchased from employees, officers, directors, consultants or other persons performing services for the Company), (iii) pay or declare any dividends or make any other distributions on any of the Company's junior securities, (iv) effect a liquidation, dissolution, recapitalization or reorganization of the Company or enter into any exclusive license that has the same economic effect as a liquidation of the Company, (v) authorize or issue capital stock with rights or privileges that are equivalent or superior to any series of Preferred Stock.

Redemption. The Company has no right to redeem the shares of Series A Preferred Stock.

[Registration Rights:  To be negotiated by investors]

# EXHIBIT O

Agreement Dated June 15, 2006 by and between Sloan Securities Corp., 444 Madison Ave, New York, NY 10022 ("Sloan") and Philip Kassai, 444 Madison Ave, New York, NY 10022 ("Phil").

Whereas Phil has been affiliated with Sloan Securities Corp. for the past several years and the parties have recently decided to sever their arrangement;

Therefore, in order to reflect their current agreement, Phil and Sloan are entering into the following agreement.

1) Phil shall resign from any future work with Sloan and shall not hold himself out as representing Sloan in any capacity after the date hereof (but shall continue work on behalf of Sloan Asset Management). With respect to two pending transactions involving Sloan, namely Versadial and US Modular, Phil shall no longer be involved in any work on these transactions but in the event these transactions are ultimately successful and generate fee income payable to Sloan, Phil shall be entitled to the same proportionate compensation as in effect prior to the date hereof (i.e. 40% of the net income payable to Sloan ie, net of fees payable to third parties). However, Sloan shall be entitled to offset $45,000.00 as reparation of its deficit funding prior to the date hereof.

2) Phil shall vacate his office on the 23rd floor of 444 Madison Ave by 5:00 p.m. on Monday June 19, 2006 and shall relocate to offices on the 18th floor of 444 Madison Ave. Phil shall be entitled to remove the contents of his office, including his computer. Except for the offset referred to in Paragraph 1, Phil shall no longer be required to pay, or reimburse Sloan for, any bills relating to Phil's affiliation with Sloan after the date hereof.

3) All mail addressed to Phil which is received by Sloan after the date hereof shall be forwarded unopened to Phil at his new location.

4) If Phil receives any calls on the Sloan telephone system after Phil vacates his office on the 23rd floor, the caller shall be politely notified that Phil has relocated and shall be given Phil's new phone number, which shall be supplied to Sloan as soon as it becomes available.

5) This shall acknowledge the understanding of both parties that neither party has a claim, financial or otherwise, against the other, except for matters expressly set forth in this agreement; that neither party has to date acted wrongfully within the context of their business relationship; and that this revision of the parties' working relationship is derived by mutual consent of both parties and not as a result of the wrongful acts of any one or both of them. In this respect, Sloan shall file a requisite U-4/5 form which shall state that Phil has voluntarily resigned from Sloan.

In witness whereof, the parties are signing below to evidence their full agreement to the foregoing.

Sloan Securities Corp
By; Jim Ackerman

Philip Kassai

PK 54

# EXHIBIT P



**SLOAN
SECURITIES
CORP.**

www.SloanSecurities.com
**Investing made simple.**

TWO EXECUTIVE DRIVE • FORT LEE, NEW JERSEY 07024 • (201) 592-9900 • Member NASD and SIPC
E-MAIL: info@SloanSecurities.com

Overnight mail

Jason Lazo
Drinks America Holdings, LTD
Drinks America Inc.
372 Danbury Road
Wilton, CT 06897

December 15, 2006

Dear Jason:

Enclosed please find a Stock Purchase Warrant issued May 9, 2005 for 300,000 shares. This warrant should have been issued to Sloan Securities Corp., the registered broker dealer.

Please reissue the Warrant, as of May 9, 2005 to Sloan Securities Corp. Also, Sloan Securities Corp. never received its 67,500 warrants due to it under our investment banking agreement we had with you.

Thank you for your help in this matter.

Very truly yours,

**SLOAN SECURITIES CORP.**

By: _____
James C. Ackerman, CEO

Enclosures

JCA/am

PK 53

# EXHIBIT Q

SLOAN
ATLANTIC
Ø 001/001
Ø 002/002

Sloan Equity Partners, LLC
444 Madison Avenue
New York, NY 10022

January 25, 2007

Bruce Klein, Chairman
Drinks Americas, Ltd
372 Danbury Road
Wilton, CT 06897

Re:    Sloan Equity Partners, LLC warrant for 300,000 shares of DKAM

Dear Bruce

As we discussed, please allow this letter to serve as notice that the members of Sloan Equity Partners, LLC ("SEP") have resolved their issues related to the above mentioned warrant. As such, please allow this letter to serve to serve as SEP's desire to assign and exercise the warrant as follows:

1.    13,500 shares to Frank Ingrassia
2.    13,500 shares to Patrick Murphy
3.    109,200 shares to Philip Kassel
4.    163,800 shares to James C. Ackerman

Please kindly expedite this request and forward the certificates to the addresses attached to this letter. If there are any questions, please do not hesitate to contact me at 516 849 9119.

Best regards,
Sloan Equity Partners, LLC

Daniel Myers

Philip Kassel

James Ackerman

PK001

# EXHIBIT R



**SLOAN**
**SECURITIES**
**CORP.**

www.SloanSecurities.com
Investing made simple.

TWO EXECUTIVE DRIVE • FORT LEE, NEW JERSEY 07024 • (201) 592-9900 • Member NASD and SIPC
E-MAIL: info@SloanSecurities.com

**Overnight via DHL**

Bruce Klein
Chairman
Drinks America Holdings Ltd.
372 Danbury Road
Wilton, CT 06897

April 2, 2007

Dear Bruce:

RE: Sloan Securities Corp. Warrant for 217,500 shares for DKAM

As per the Investment Banking Agreement dated December 27, 2004, (the "Agreement") between Drinks America Holdings, LTD and Drinks America, Inc. ("Drinks") and Sloan Securities Corp. ("Sloan") where under Sloan raised $1,350,000 for Drinks entitling Sloan to a warrant for 217,500 common shares pursuit to paragraph 4.1 of the Agreement, please allow this letter to serve as Sloan's desire to assign and exercise the warrant as follows:

1.     113,100 shares to James C. Ackerman
           SS# 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

2.      78,300  shares to Philip Kassai
           SS# 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

3.      13,050 shares to Frank Ingrassia
           SS# 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

4.       13,050 shares to Patrick Murphy
           SS# 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

Kindly expedite this request and forward the certificates to the above address for Sloan Securities. If there are any questions, please do not hesitate to contact me at 201-592-9900.

Very truly yours,
SLOAN SECURITIES CORP.

By: _____
   James C. Ackerman, CEO

PK002